UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x

JOSEPH MAZZEI, on behalf of himself          :          Case No.  01 Civ. 5694 (JES)
and all others similarly situated,

                     Plaintiff,          :

            -- against --          :

THE MONEY STORE and TMS MORTGAGE, INC.,          :

               Defendants.          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x


**PLAINTIFFS' MEMO OF LAW IN OPPOSITION TO THE MONEY STORE
<u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS                                              Page

TABLE OF AUTHORITIES ………………………………………....………   i

PRELIMINARY STATMENT ………………………………………..………   1

COUNTER-STATEMENT OF FACTS ………………………………………...   3

ARGUMENT ……………………………………………………………..……..   7

POINT I
AS MAZZEI PAID AMOUNTS IN EXCESS OF THE TOTAL BALANCE
DUE ON HIS ACCOUNT, THE MONEY STORE HAS VIOLATED §1666D OF
TILA ……………………………………………………………………………   7

    I.     THE BURDEN ON MONEY STORE'S MOTION ………..…..………….   8

    II.    MONEY STORE'S "EVIDENCE" IS INADMISSIBLE …………………   10

    III.   THERE IS NO EVIDENCE IN THE RECORD THAT
          MONEY STORE PAID THE LEGAL FEES AND EXPENSES
          CHARGED TO MAZZEI ……………………………………..………...   12

    IV.   EVEN IF MONEY STORE HAD SUPPLIED EVIDENCE OF
          PAYMENT OF THE AMOUNTS CHARGED TO MAZZEI, THERE
          ARE NUMEROUS OTHER FEES AND EXPENSES WHICH WERE
          PALPABLY IMPROPER ……………………………………..…………   15

          A. Money Store Improperly Charged Mazzei for $190.00 To Post a Notice
             of Sale, When Money Store Could Only Be Charged $50.00 By
             Contract …………………………………………………………   15

          B. Money Store Improperly Charged Mazzei for $133.00 in Late Charges
             After Acceleration ………………………………………………..   16

          C. The Attorneys' Fees Charged To Mazzei Were Completely Improper
             ………………………………………………………………...……   19

             1. Money Store Charged Mazzei $125.00 For A Bankruptcy
                Objection Filed 11 Days After The Case Was Dismissed …………   19

             2. The Evidence Demonstrates That The "Legal Fees" Charged
                To  Mazzei Were Illegally Shared With Non-Attorney Outsourcers
                ………………………………………………………..…..   20

          D. Money Store Improperly Charged Mazzei $75.00 For The Cost of
             Obtaining A Document In Bankruptcy Which Was Available For Free
             ………………………………………………………………...   21

E.  Money Store Improperly Charged Mazzei For Late Fees,
Inspection Fees, Substitution of Trustee Fees And A Broker Price
Opinion After The Notice of Default Was Recorded ………………….   23

F.  Money Store Charged Mazzei More Than It Was Allowed For
Trustee's Fees ……………………………………………………   24

CONCLUSION ………………………………………………………………...   24

# <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>                                                                                    **Page**

<u>Addison Express, LLC v. Medway Air Ambulance</u>, 2006 U.S. Dist. Lexis
31677, *37 (N.D. Tex. 2006) ……………………………………………..   17

<u>Allied Supplier & Erection, Inc. v. A. Baldwin & Co., Inc.</u>, 688 S.W.2d 156
(Tex. Ct. App. 1985) ……………………………………………………   17

<u>Bank National Assoc. v. Shephard Mall Partners LLC</u>, 140 P.3d 559, 562
(Okla. Ct. of Civil Appeals 2005) ………………………………………...   17

<u>Bertelsman v. Harris</u>, 537 F.3d 1047, 1061 (9th Cir. 2008) ……………………   20

<u>Birbrower, Montalbano, Condon & Frank, P.C. v. Superior Court</u>, 17 Cal. 4th
119, 949 P.2d 1 (Cal. 1998) ……………………………………………   21

<u>Carreras v. Weinreb</u>, 826 N.Y.S.2d 72, 74, 2006 WL 3086932, at (2d Dep't
2006) ……………………………………………………………………   17

<u>Crete v. Koskotas</u>, 733 F.Supp. 648, _ (S.D.N.Y. 1990) ………………………   14

<u>FDIC v. Great Am. Ins. Co.</u>, 607 F.3d 288, 292 (2d Cir. 2010) ………………   9

<u>Fowler v. First Federal Savings & Loan Ass</u>., 643 So.2d 30, 33 (Fla. 1st DCA
1994) ……………………………………………………………………   17

<u>Gallo v. Prudential Residential Services, Ltd.</u>, 22 F.3d 1219, 1223 (2d Cir.
1994 ……………………………………………………………………   9

<u>Green Point Savings Bank v. Varana</u>, 236 A.D.2d 443, 653 N.Y.S.2d 656 (2d
Dep't 1997) ………………………………………………………………   17

<u>Hensley v. Eckerhart</u>, 461 U.S. 424, 434 (1982) ……………………………   9

<u>In re Mary Ann Grayboyes</u>, 371 B.R. 113, 124 (Bank. E.D. Pa. 2007 ………...   17

<u>In re River Valley Fitness One, L.P.</u>; 2004 WL 1171732, *4 (Bank.
S.D.N.Y.) ………………………………………………………………   17

<u>In re Tavern Motor Inn, Inc.</u>, 69 B.R. 138, 141 (Bank. D. Vt. 1987) …………..   17

<u>In re United States Trustee</u>, 32 F.3d 1370, 1376 (9th Cir. 1994) ………………   19

<u>In re White</u>, 88 B.R. 498, 505 (D.Mass. 1988) …………………………………   17

**Cases**                                                                                          **Page**

Krear v. Nineteen Named Trustees, 810 F.2d 1250, _ (2d Cir. 1987) ………… 10,13

Malletier v. Dooney & Bourke, Inc., 2006 U.S. Dist. Lexis 87096, * (S.D.N.Y.
2006) ……………………………………………………………………… 22

McIntosh v. Mills, 17 Cal. Rptr.3d 66 (2d Dist. Cal. Ct. App. 2004) …………. 21

Newman v. Silver, 1984 U.S. Dist. Lexis 22314, *6 (S.D.N.Y. 1984) ………... 21

Pereira v. Cogan, 294 B.R. 449, 515 (Bank. S.D.N.Y. 2004) ………………….. 17

Philatelic Leasing, 601 F. Supp at 1565-66, aff'd, ____ ……………………… 14,23

Potamkin Cadillac v. B.R.I. Coverage Corp., 38 F.3d 627 (2d Cir. 1994) ……. 12,13

River Valley Fitness One, L.P., 2004 WL 1171732, *4 (Bank. D.N.H. 2004) ... 17

RTC Mort. v. J.I. Sopher & Sopher & Co., Inc., 1998 WL 132815, at *5
(S.D.N.Y. 1998) ……………………………………………………………….. 17

Savarese v. Cirrus Design Corp., 2010 U.S. Dist. Lexis 166698, *21 (S.D.N.Y.   9
2010)
Security Mut. Life Ins. Co. v. Contemporary Real Estate Ass., 979 F.2d 329,
330-331 (3rd Cir.1993)(same) ………………………………………………… 17

Schnall v. Marine Midland Bank, 225 F.3d 263, 267 (2d Cir. 2000) ………….. 8

Tatum v. City of New York, 2010 U.S. Dist. Lexis, *41 (S.D.N.Y. 2010) …… 9

TMG Life Ins. Co. v. Ashner, 898 P.2d 1145, 1162 (Kan.App.1995) ………… 17

U.S. v. Pent-R-Books, 538 F.2d 519, 529 (2d cir. 1976) ……………………… 9

U.S. v. Philatelic Leasing, Ltd., 601 F.Suipp. 1554, _ (S.D.N.Y. 1985), aff'd,
_____ (2d Cir. _____) ………………………………………………………….. 14,23

Walker v. Countrywide Home Loans, Inc., 98 Cal.App.4th 1158, 1174 121 Cal   23,24
.Rptr.2d 79 (2002) (Grob. Decl. Ex. _) …………………………………………...

Wells Fargo Bank v. Guarnieri, 297 B.R. 365, 369 (Bankr. Conn.. 2003), aff'd
308 B.R. 122 (D. Ct. 2004) …………………………………………………… 17

| **Cases** | **Page** |
|---|---|

Wilmington Savings Fund Society v.37 The Circle, LLC, 2008 Del. Super. Lexis 273, at *3 (Superior Court of Del. 2008) ……………………………... 17

Winterrowd v. American General Ann. Ins. Co., 556 F.3d 815, _ (9th Cir. 2009) ……………………………………………………………………… 21


**STATUTES & OTHER AUTHORITIES**

CFR §226.21 of Regulation Z ……………………………………………… 8

15 U.S.C. §1666d …………………………………………………………… 1,7,8

Fannie Mae Guideline ……………………………………………………… 16,21

F.R.C.P. Rule 30(b)(6) …………………………………………………… Passim

Friedman, Contract & Conveyances of Real Property, §6.3, at 813-814 (5th Ed.) …………………………………………………………………………….. 18

Section 2924c or 2924d of the California Civil Code ………………………… 23,24

## PRELIMINARY STATMENT

Plaintiff Joseph Mazzei ("Mazzei" or "Plaintiff") respectfully submits this memorandum of law in opposition to the motion for summary judgment by The Money Store, TMS Mortgage and HomEq Servicing Corp. (collectively "Money Store").   Money Store does not dispute that its loan to Mazzei is governed by the federal Truth in Lending Act, 15 U.S.C. §1601 et seq. ("TILA").   Nor does Money Store deny that it is a TILA "creditor" for purposes of the Mazzei loan.   The sole basis proffered by Money Store for summary judgment is its contention that no credit balance exceeding $1 is owed to Plaintiff that must be refunded under §1666d of TILA. No admissible evidence is proffered in support of this contention.   Moreover, Money Store's motion for summary judgment flatly contradicts its own admissions that Mazzei was owed a refund of $188.51 and that his loan had been fully satisfied.   (See 10/24/2000 letter annexed to the Declaration of Paul Grobman dated Dec. 13, 2010 (hereinafter "Grob. Decl.") as Exh. A)

Notwithstanding the admissions made prior to the commencement of this action, Money Store's motion now asserts that there was no credit balance owed to Mr. Mazzei because – months after Mazzei had paid off the loan and subsequent to the filing of this lawsuit– additional legal fees and costs chargeable to Mazzei materialized which purportedly offset the credit balance owed to him.

To substantiate this contention, Money Store proffers two principal pieces of evidence: (1) a "Customer Account Activity Statement" from TMS showing foreclosure and bankruptcy legal fees and expenses allegedly incurred by TMS in Mr. Mazzei's bankruptcy and foreclosure which were posted to Mazzei's account (which this Court described as "undecipherable" when previously submitted by Money Store in support of summary judgment); and (2) a set of invoices for alleged legal fees and expenses from Fidelity National Foreclosure Solutions ("Fidelity"), an

Outsource firm which served as an intermediary between TMS and the attorneys and other entities providing foreclosure and bankruptcy services. (Declaration of John Dunnery dated Nov. 10, 2010 (hereinafter "Dunnery Decl."), Exh. R)

    None of the foregoing materials constitutes admissible evidence on a motion for summary judgment.  The transactions indicated on the "Customer Account Activity Statement" constitute double hearsay.  Even if the document itself may be admitted under the business records exception, the transactions shown therein constitute hearsay within hearsay to which no exception applies.  The invoices from the Outsource firm are likewise inadmissible double hearsay.

    In any event, even if this 'evidence' were admissible, it fails to establish that Money Store actually paid any of these invoices for purported legal fees and expenses, precluding it from charging Plaintiff.  Tellingly absent from the summary judgment record are invoices from any of the attorneys who actually performed the legal services on Money Store's behalf for which Mr. Mazzei was charged.  In addition, TMS has proffered no evidence whatsoever that the legal fees and expenses set forth in the Fidelity invoices passed on to Mr. Mazzei were ever actually paid by TMS.  In fact, the deposition testimony of TMS' Rule 30(b)(6) witness John Dunnery strongly supports the opposite: i.e., that the legal fees and expenses posted to Mazzei's account were never paid by Money Store.

    Finally, even if HomEq had produced invoices from the attorneys purportedly representing Money Store in Mazzei's foreclosure and bankruptcy actions, and even if it had provided evidence demonstrating that that those invoices were actually paid, there would still be a fundamental problem with Money Store's motion.  As Mr. Mazzei previously demonstrated in opposition to Money Store's two prior dispositive motions, and as he again demonstrates below,

Mazzei's account was riddled with improper fees and costs, amounts which even Money Store's Rule 30(b)(6) witness could not begin to explain.

For nearly 10 years, Mazzei has asked Money Store to provide evidence of the legal fees and expenses it purportedly incurred and charged to Mazzei at the time he paid off his loan, which form the basis for Money Store's claim that, despite admitted overcharges, there was a continuing debit balance in Mazzei's account.   Money Store has completely failed to do so, and the available evidence indicates that most, if not all, of the fees and expenses charged to Mazzei were either never incurred, or were patently improper

## COUNTER-STATEMENT OF FACTS

Plaintiff obtained a loan from Money Store for his home located in Sacramento, California in November 1994. (Grob. Decl. Exh. B; Grob. Decl. Exh. C)  On March 23, 2000, Money Store accelerated Mazzei's loan, recording a Notice of Default in the Clerk's Office in Sacramento County, California.  (Grob. Decl Exh. D).

Numerous fees, costs and expenses were assessed to Mazzei's account in foreclosure, as set forth in Money Store's internal records under the heading "Corporate Advances."  (See Transaction History, Grob. Decl. Exh. E)

On October 17, 2000, Mazzei paid off his loan based on amounts in an October 2, 2000 Payoff Statement provided by Money Store.  (Grob. Decl. Exh. F)   In the October 2nd Payoff Statement,  Money Store demanded payment for a "Corporate Advance" balance of $798.80, as well as "Attorney Outsourcing Fees" of $1,455.01.  (Grob. Decl. Exh. F)   With the threat of foreclosure looming, Plaintiff paid all amounts demanded by Money Store.

By letter dated October 24, 2000, TMS advised Mazzei that his loan was "paid in full", and, in fact, that he had made an "overpayment in the amount of $188.51" which TMS would refund. (Grob. Decl., Exh. A)

By letter dated January 16, 2001, Mazzei wrote Money Store asking for "an explanation of your right to collect … and an itemized breakdown of the 'Attorney Outsourcing Fees" and 'Unpaid Other Fees' referred to in the October 2, 2000 Payoff Letter." (Grob. Decl. Exh. G) In February 2001, Plaintiff commenced this action against TMS alleging that the legal fees and expenses assessed against him by Money Store were improper.   Several weeks later, by letter dated February 27, 2001, Money Store acknowledged the first of the overcharges in Mr. Mazzei's account, admitting that it had charged Mazzei $5.00 more than Mr. Mazzei's loan document permitted for a Non-Sufficient Funds fee, and represented that the "overpayment of $5.00 will be refunded to you.  Please allow 7-10 business days to receive it." (Grob. Decl. Exh. H).   However, despite this representation, Money Store never sent any refund to Plaintiff.

Instead, by letter dated June 8, 2001, Money Store advised Mazzei that the $5.00 overpayment had been credited to his account but not refunded as previously promised because "there were fees assessed in connection with the delinquent status of your account that were due, but not yet charged to your account at the time your loan was paid in full." (Grob. Decl. Exh. I) As for Plaintiff's request for an explanation of the attorneys' fees and expenses passed on to him in October 2000,  Money Store advised Mazzei that "it is taking us longer than expected to complete our research" and that "an explanation for these items will be provided to you shortly under separate cover." (Grob. Decl. Exh. I).

In fact, no breakdown of the attorneys' fees and expenses which were assessed to Mr. Mazzei in October 2000 was provided by Money Store until two years later when, in an

Interrogatory Response served in April 2003, Money Store attached billing records from Fidelity, the Outsourcer hired by Money Store to direct bankruptcy and foreclosure actions involving delinquent borrowers.  (Grob. Decl. Exh. J). [1]

The Fidelity invoices and the accompanying Interrogatories indicated that Mazzei's account had been charged $255.00 in "Bankruptcy Attorney's Fees" [2], (Grob. Decl. Exh. J, Response # 16); $461 in "Foreclosure Attorneys' Fees" (Grob. Decl. Exh. J, Response # 16, #19), and around $1,500.00 in various foreclosure and bankruptcy-related costs and expenses. (Grob. Decl. Exh. J, Response #16, #19, pp. 3, 5, and attached invoices).

For several fundamental reasons, the Fidelity invoices offered no guidance as to whether the legal fees and expenses charged to Mr. Mazzei's account by Money Store were bona fide. First, since the bills were from the Fidelity outsourcer, rather than the attorneys and other entities which actually performed the bankruptcy and foreclosure services charged to Mazzei's account, it was impossible to determine whether the purported fees and expenses were accurate, or even genuine.

Each of the Fidelity invoices for Mazzei had a section called "Invoice Processing Summary" with various fields, including "Date Submitted", "Accepted", "Approved", "Check Requested" and "Check Confirmed."  (Invoices, Grob. Decl. Exh. J)

---

[1] Several of these bills were apparently not submitted by Fidelity until July and August of 2001, six months after this lawsuit was initiated, and almost a year after the services were purportedly rendered. (Invoices, Grob. Decl. Exh. J)  At his deposition, Mr. Dunnery acknowledged that the delivery of such bills months after the loan was paid off was directly contrary to Money Store's policy requiring that bills be submitted one day after payoff.  (Grob. Decl. as Exh. K, at 76-77)

[2] In a subsequent Interrogatory Response, Money Store admitted that the Fidelity invoices had mistakenly characterized a $125.00 bankruptcy attorneys' fee for objection to Mr. Mazzei's reorganization plan as a bankruptcy cost, increasing the total amount of bankruptcy legal fees charged to Mr. Mazzei's account to $380.00. (See Defendant's Supplemental Response, Grob. Decl. Exh. L, #7, pp. 2-3)

Money Store's own Rule 30(b)(6) deponent, John Dunnery, testified that, under Fidelity's computerized invoice system, checks are not issued, let alone transmitted, until a date is given under the "Check Confirmed" column on Fidelity's computerized invoice.  Thus, testifying about an invoice charged to Ruth Ann Gutierrez, a plaintiff in the <u>Vincent</u> case, Mr. Dunnery testified as follows:

> DUNNERY:   I can't tell you when it was mailed. I can tell you what date the check was confirmed, which would have been November 29, 2005.
> Q.   What does that mean, check confirmed?
> DUNNERY:   The check actually went out to the vendor.
> Q.   So that was the date that the check went out to the vendor?
> DUNNERY:   Cut.  I should use that more specific term.  That was the date that the check was cut for the vendor.  Whether or not it was mailed that day or mailed shortly around that day, I can't say.
> Q.   So the date the check is confirmed, what does check confirmed mean?
> DUNNERY:   That check was actually cut and issued by the check writer system.

(See Dunnery Dep., Grob. Decl. Exh. M, pp. 516-17)[3]

With respect to the Fidelity electronic invoices produced here by TMS to support its motion for summary judgment, each invoice charged to Plaintiff's account, under the "Check Confirmed" heading, bears the notation *"**Unavailable**."*  (Invoices, Grob. Decl. Exh. J).

The bills produced by the Money Store defendants in the <u>Vincent</u> matter, representing legal fees and expenses purportedly incurred by Money Store which were passed on to plaintiff Gutierrez, Vincent and the Garridos, raise identical concerns regarding payment.  (Those bills are annexed to the Grob. Decl. as Exh. O)  Of the 24 invoices produced by Money Store relating to legal fees and expenses charged to the <u>Vincent</u> plaintiffs' accounts, *nine* of the invoices -- totaling *$5,075.95* in fees and expenses -- had no date under "Check Confirmed."  (See Grob. Decl. Exh. O, at TMS 1273, 1280-82, 1290, 1298, 1301, 1303, 1305)  Moreover, another *six* of

---

[3] See also Grob. Decl. Exh. N, pp. 151-52 (in which Dunnery again testifies that the "Check Confirmed" date is the actual payment date).

the invoices charged to Gutierrez, Vincent and the Garridos (totaling *$1376.21* in fees and expenses) had "Check Confirmed" dates which were anywhere from 1-3 years after the <u>Vincent</u> plaintiffs were charged for – and paid – such amounts.   (Grob. Decl. Exh. O, at TMS 1265, 1267, 1269, 1271, 1275, 1306)

In both this and the <u>Vincent</u> litigation, plaintiffs have repeatedly demanded copies of all invoices and other documents which would allow them to determine (1) the amount of fees and expenses which were actually charged by the attorneys and other foreclosure and bankruptcy service providers in the matters involving plaintiffs; and (2) documents showing "proof of payment by defendants."  (See Mazzei's Second Request for Documents, Grob. Decl. as Exh. P, #18-19)   Despite this – and just as in the <u>Vincent</u> action – the Money Store defendants have failed to provide any invoices from the attorneys or other service providers who purportedly performed the work for which Mr. Mazzei was charged, or copies of checks or other documents demonstrating that the Fidelity invoices posted to Mazzei's account were ever actually paid.

## ARGUMENT

### POINT I

### AS MAZZEI PAID AMOUNTS<br>IN EXCESS OF THE TOTAL BALANCE DUE ON HIS ACCOUNT,<br><u>THE MONEY STORE HAS VIOLATED §1666D OF TILA</u>

Section 1666d of TILA states in relevant part as follows:

Whenever a ***credit balance*** in excess of $1 is created in connection with a consumer credit transaction through
**(1)** transmittal of funds to a creditor ***in excess of the total balance due*** on an account,….
**(3)** ***amounts otherwise owed*** to or held for the benefit of an obligor, the creditor shall—
**(A)** ***credit*** the amount of the credit balance to the consumer's account;
**(B)** ***refund*** any part of the amount of the remaining credit balance, upon request of the consumer… (15 U.S.C. 1666d (emphasis added))

By its terms, §1666d of TILA applies where there is a "credit balance" resulting from a lender demanding and a borrower transmitting funds "in excess of the total balance due on an account." As the Official Staff Commentary to §226.21 of Regulation Z states, a refundable "credit balance" subject to both TILA §1666d and CFR §226.21 results "from the debtor's *paying off a loan* by transmitting funds in excess of the total balance owed on the account." (Grob. Decl. Exh. Q)   As the Second Circuit has said, as a remedial statute, "TILA is meant to be construed liberally in favor of the consumer." Schnall v. Marine Midland Bank, 225 F.3d 263, 267 (2d Cir. 2000).

By letter dated October 24, 2000, TMS advised Mazzei that his loan was "paid in full", and in fact that he had made an "overpayment in the amount of $188.51" which TMS would refund. (Grob. Decl., Exh. A).  Now, Money Store argues that it's prior admissions were in error, because additional legal fees and expenses incurred by Money Store resulted in Mazzei purportedly owing $229.26 more to Money Store than the amount collected from him in October 2000, an amount the Money Store ultimately wrote off.  (See Dunnery Declaration, ¶¶ 6-8)  As shown below, Money Store's claim that there is a $229.26 deficit in Mr. Mazzei's account resulting from legal fees and expenses purportedly paid by Money Store is not only unsupported by any admissible evidence, but demonstrably false.

## I. **The Burden On Money Store's Motion**

On a motion for summary judgment, "the burden is upon the moving party to demonstrate that no genuine issue respecting any material fact exists", Gallo v. Prudential Residential Services, Ltd., 22 F.3d 1219, 1223 (2d Cir. 1994), producing "admissible evidence adduced from persons with personal knowledge of the facts." U.S. v. Pent-R-Books, 538 F.2d 519, 529 (2d Cir. 1976).  (Internal citations omitted)  Summary judgment can be granted "only

8

where it is clear that no rational finder of fact could find in favor of the nonmoving party because the evidence to support its case is so slight." FDIC v. Great Am. Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010)

As a general matter, a party seeking to recover legal fees and expenses bears the burden of "submit[ting] evidence supporting the hours worked and rates claimed." Hensley v. Eckherhart, 461 U.S. 424, 434 (1982); Tatum v. City of New York, 2010 U.S. Dist. Lexis 7748, *41 (S.D.N.Y. 2010) ("expenses not supported by documentation will not be considered"); Savarese v. Cirrus Design Corp., 2010 U.S. Dist. Lexis 16698, *21 (S.D.N.Y. 2010) ("where an attorney fails to provide suitable documentation to substantiate the costs incurred, a court may decline to award any costs"); In re United States Trustee, 32 F.3d 1370, 1376 (9th Cir. 1994) ("Concrete documentation, in the form or receipts and invoices, is therefore necessary to support any application for reimbursement")

Mazzei's form loan documents with defendants also squarely place the initial burden of proof on Money Store.  Here, Money Store asserts that it had the right to charge Mr. Mazzei for its purported attorneys' fees and expenses pursuant to Paragraph 7 of Mazzei's Deed of Trust. (Money Store Rule 56.1 Statement, ¶32.)  Paragraph 7 states that, if the borrower fails to satisfy its obligations under the loan or "there is a legal proceeding that may significantly affect Lender's rights in the Property, then the Money Store

> may do and ***pay for*** whatever is necessary to protect the value of the Property.  Lenders actions may include…. appearing in court, appearing in court, *paying reasonable attorney's fees* and entering on the property to make repairs.
> Any amounts ***disbursed by Lender*** under this paragraph 7 shall become additional debt of Borrower secured by this Security Instrument.  Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest ***from the date of disbursement*** at the Note rate…."

9

(Grob. Decl. Exh. C, at p.TMS 88, ¶7 (emphasis added))

Thus, under the controlling provisions in Mazzei's loan documents, Money Store must demonstrate that it actually "disbursed" or "paid" legal fees or expenses to an attorney or other service provider before it could properly demand reimbursement from a borrower like Mazzei, and must also show that such fees were "reasonable." Indeed, as a general matter, courts presented with a fee-shifting clause in a contract hold what is obvious -- that "a party is not entitled to an award exceeding *the amount he has actually paid his attorney.*" Krear v. Nineteen Named Trustees, 810 F.2d 1250, 1269 (2d Cir. 1987) (emphasis added)

## II.  **Money Store's "Evidence" Is Inadmissible**

Money Store seeks summary judgment based on a printout of computerized records for Plaintiff -- i.e. the Customer Account Activity Statement dated September 16, 2002 ("the Account Statement") – purportedly showing that "a remaining debit balance of *$229.26* debit balance" existed in Mr. Mazzei's account after he paid off his loan. (Dunnery Decl., ¶¶ 6-8). In rejecting one of Money Store's prior motions for summary judgment, this Court described this same Account Statement as "undecipherable." Mazzei v. Money Store, 349 F.Supp.2d 651, 662 n.7 (S.D.N.Y. 2004)

The Account History constitutes hearsay. Fed. R. Evid. 801(c) ("'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."). Even if the Customer Account Activity Statement is found admissible under the business records exception, its contents reflect data entries based on legal fees and expenses purportedly invoiced or submitted by non-parties, i.e. the attorneys or law firms that performed the underlying work. The contents of the Customer Account Activity Statement are, therefore, "double hearsay" or hearsay within hearsay pursuant to Fed. R. Evid.

805.  See, <u>Rodriguez v. Modern Handling Equip. of NJ, Inc.</u>, 604 F. Supp. 2d 612, 622-23

(S.D.N.Y. 2009).  Inadmissible hearsay does not become admissible solely by virtue of its

inclusion in an admissible report.  <u>Parsons v. Honeywell, Inc.</u>, 929 F.2d 901, 907 (2d Cir. 1991).

"Double hearsay is not admissible unless each level of hearsay is covered by an exception to the

hearsay rule." <u>Agriculture Ins. Co., Inc. v. Ace Hardware Corp.</u>, 214 F. Supp. 2d 413, 416

(S.D.N.Y. 2002). [4]

      In fact, even Money Store itself has previously admitted that the Account Statement does

not present an accurate picture of the amount Mazzei allegedly owed.   In Money Store's prior

motion for summary judgment filed in October 2006, Money Store submitted a virtually identical

Declaration from Mr. Dunnery relying on the identical Account Statement to also claim that a

$229.26 debit balance was owed in Mazzei's account after payoff.  (See Dunnery Declaration

dated Oct. 12, 2006, Grob. Decl. Exh. R, pp. 4-6, ¶¶ 20-22)   However, as Mr. Mazzei stated in

his Rule 56.1 Statement in support of his Cross-Motion for Summary Judgment, "the alleged

$229.26 'debit balance' which Money Store 'wrote off' does not reflect a $50.00 credit for the

Outsource Management Fee which Money Store admits was improperly charged." (Plaintiff's

11/20/2006 Rule 56.1 Statement, Grob. Decl. Exh. S, p. 12, ¶25)  In its Response to Plaintiff's

Rule 56.1 Statement on the prior motion, Money Store *admitted* that the Account Statement was

incorrect.  (Money Store's 12/21/06 Rule 56.1 Response, Grob. Decl. Exh. T, p. 6, ¶25)  Despite

its prior sworn admission to this Court that the purported "debit balance" was not $229.26 as

Money Store's Account Statement purportedly reflects, in its instant motion, Money Store makes

---

[4] Moreover, the Fidelity invoices, which purportedly show services rendered by lawyers and other third
parties in the Mazzei's bankruptcy and foreclosure which were then billed to Money Store by Fidelity,
also constitute hearsay within hearsay as well.  In fact, even if the invoiced services were provided
directly by Fidelity, without foundational testimony from Fidelity regarding the invoices' preparation, the
invoices would not be admissible to prove that such legal services were performed.  <u>Harris v. Jamaica
Auto Repair</u>, 2009 U.S. Dist. Lexis 64220, *13 (E.D.N.Y. 2009)

the same sworn false assertions about a "$229.26 debit balance", relying on the same document which even it previously admitted contains erroneous information.

In <u>Potamkin Cadillac v. B.R.I. Coverage Corp.</u>, 38 F.3d 627 (2d Cir. 1994), the Second Circuit faced a similar effort by a purported creditor (BRI) to use a computerized accounting history to establish that it had advanced premiums to insurance companies on behalf of Potamkin for which it was entitled to reimbursement.  As here, apart from the account history, BRI "presented no evidence such as copies of checks or remittance advices… to show that it had made the alleged unreimbursed payments." <u>Potamkin</u>, 38 F.3d at 633.  Similarly, the Second Circuit also noted that the account history contained "numerous uncorrected errors."  Based on these errors, and the failure to present checks or other evidence of payment, the Court found that the Account History "was not sufficiently reliable to permit BRI to use it in support of its claims that it made unreimbursed advances on behalf of Potamkin."  38 F.3d 633.

On this basis alone, Money Store's motion for summary judgment should be denied.

## III. THERE IS NO EVIDENCE IN THE RECORD THAT MONEY STORE PAID THE LEGAL FEES AND EXPENSES CHARGED TO MAZZEI

Even if the "evidence" presented by Money Store could be considered, there is no evidence in the summary judgment record showing that Money Store actually paid the legal fees and expenses which it charged to Mazzei's account and which forms the basis for its claim of a debit balance.  To establish its right to the legal fees posted in Mazzei's account, Money Store submits six invoices from Fidelity purportedly showing $1749.27 in legal services and expenses billed to Money Store which were purportedly rendered in the Mazzei foreclosure and bankruptcy matters.  However, the record contains no evidence that these purported invoices charged to Mazzei were ever paid by Money Store.

Under a fee-shifting clause in a contract, "a party is not entitled to an award exceeding the amount he has actually paid his attorney." Krear v. Nineteen Named Trustees, 810 F.2d 1250, 1269. Thus, a fee-shifting provision requires payment "only after [the party seeking such fees] has presented proof that it has paid its attorneys the sums for which reimbursement is sought." Krear, 810 F.2d at 1269.

No such proof of payment to Fidelity such as checks or other evidence has been produced by Money Store. Even when viewed alone, Money Store's failure to present any evidence that it actually paid the Fidelity bills dooms its motion. Potamkin, 38 F.3d at 633 (affirming dismissal of claim seeking repayment of insurance premiums purportedly advanced by broker on insured's behalf where there were no checks or other evidence "to show that it had made the alleged unreimbursed payments").

Here, Mr. Mazzei specifically demanded "proof of payment" of the legal bills charged to his account in his discovery requests to Money Store. (Grob. Decl. Exh. P, #18-19) At his deposition, Dunnery repeatedly testified that there were numerous methods in which Money Store could determine the date that an invoice was actually paid, including looking at the "physical check" provided to the vendor "to see if those amounts appear on the check", (Grob. Decl. Exh. N, p. 347), and other methods of obtaining payment information through Money Store's servicing system. (Grob. Decl. Exh. N, pp. 10-11) Despite the ready availability of such information, Money Store has failed to produce any evidence showing that the invoices charged to Mazzei (or to the Vincent plaintiffs) were actually paid, much less the date of payment. Even if there were no other evidence supporting plaintiff's claim that Money Store routinely charged borrowers for legal fees before it ever actually paid them, the failure to present any evidence of payment "supports an inference that the evidence would be harmful to the party's cause." Crete

13

v. Koskotas, 733 F.Supp. 648, 654 (S.D.N.Y. 1990); U.S. v. Philatelic Leasing, 601 F.Supp. at
1565-66, aff'd, 794 F.2d 781 (2d Cir. 1986)  ("where a party withholds… relevant evidence
within its control, the court may conclude that such evidence would be harmful to the party's
cause").

In fact, all of the available evidence in this litigation indicates that an invoice is not
actually paid by Money Store until the date indicated on the invoice under "Check Confirmed."
Mr. Dunnery repeatedly testified that the "Check Confirmed" date on an invoice was the date
that the check paying the invoice was actually issued by Money Store.  (Grob. Decl. Exh. M, pp.
516-17; Grob. Decl. Exh. N, pp. 9, 151-52)   Moreover, manuals relating to the Fidelity
electronic invoicing system used by Money Store further demonstrate that an invoice is not paid
on the date under "Check Requested", but rather the date under "Check Confirmed."  (See
excerpts from FIS Desktop Manual, Grob. Decl. Exh. U, at pp. 12, 284)

None of the Fidelity invoices charged to Mazzei has a date under "Check Confirmed."
Rather, the field says "Unavailable."  (Grob. Decl. Exh. J)  Under "Invoice Status", each of the
hard copies of the invoices produced to Mazzei by Money Store says "Check Requested."
(Grob. Decl. Exh. J).

In sum, there is not a shred of evidence that Money Store ever paid the Fidelity invoices
totaling *$1749.27* which were charged to Mr. Mazzei, and abundant evidence to the contrary.
As a result, Money Store's collection of such fees and expenses from Mazzei and the Vincent
plaintiffs was patently improper.

### IV.   EVEN IF MONEY STORE HAD SUPPLIED EVIDENCE OF PAYMENT OF THE AMOUNTS CHARGED TO MAZZEI, THERE ARE NUMEROUS OTHER FEES AND EXPENSES WHICH WERE <u>PALPABLY IMPROPER</u>

Even if Money Store had supplied evidence that it had paid the Fidelity invoices which were posted to Mr. Mazzei's account, an analysis of the individual fees and expenses charged therein shows that they are riddled with errors and improper charges.

### A. Money Store Improperly Charged Mazzei for $190.00 To Post a Notice of Sale, <u>When Money Store Could Only Be Charged $50.00 By Contract</u>

Money Store admitted that it charged Mazzei **$190.00** for posting a Notice of Sale on Mazzei's home, based on its purported payment of that amount to Fidelity.  (Mazzei Rule 56.1, Grob. Decl. Exh. S, p. 12, ¶29; Money Store 56.1 Response, Grob. Decl. Exh. T, p. 6, ¶29; Grob. Decl. Exh. J)  Money Store also acknowledged that its Outsource Agreement with Fidelity ("the Fidelity Agreement") limited the amount Fidelity could charge for posting Notices of Sale to $50.00:

> PUBLICATION AND POSTING CHARGES
> A flat fee of $350 will be charged to TMS for publication   in California and ***posting shall be $50 in California***.

(Grob. Decl. Exh. S, p. 12, ¶29; Grob. Decl. Exh. T, p. 6, ¶29; Fidelity Agreement, Grob. Decl. Exh. V, at TMS 1340 (emphasis added)).

When Mr. Dunnery was asked about the $190.00 charge at his Rule 30(b)(6) deposition, he testified that the charge did not appear consistent with the Fidelity Agreement:

> **Q.** Based on this document, was TMS and The Money Store allowed to charge Mr. Mazzei $190 regarding the Notice of Sale?
> **Mr. Kaminsky**: Objection to the form of the question.
> **Dunnery:** I don't know that.
> **Q.** Was Fidelity National allowed to charge more than $50 for posting the notice of sale?
> **Dunnery:**  In accordance with – and I don't know the time frame of [the Agreement], but in accordance with [the Agreement], those

15

should have been the charges allowed for both publication and
posting at the time frame [the provision] is referencing....

(Grob. Decl Exh. K, at 237-38).

Money Store attempts to justify the $190.00 charge to Mazzei's account by contending

that the $50 "flat fee" in the Fidelity Agreement applies only to "fees" -- not the "costs" -- of

posting.  Even if this were a permissible interpretation of the Fidelity Agreement, Money Store

has failed to produce any invoice or other document showing that there were any purported

"costs" of posting a notice on Mazzei's house (much less costs of $140.00).  In fact, as Money

Store admits, it does "not generally ask for copies of the actual invoices paid by its outsourcer for

fees and expenses expended by the outsourcer in performing its services."  (Grob. Decl. Exh. T,

p. 10, ¶¶ 50, 53).

In any event, under the Fannie Mae Guidelines which served as the industry standard

followed by Money Store, [5] the maximum amount which could be charged for posting a notice of

sale in California was $60.00. (Fannie Mae Guideline, Grob. Decl. Exh. W, p. 4)

### B. Money Store Improperly Charged Mazzei for $133.00 in Late Charges After Acceleration

As Mr. Dunnery testified, Money Store assessed at least five late charges against

Mazzei's account after his loan was accelerated in March 2000, totaling *$133.80*.  (Grob. Decl.

Exh. K at 189.)  There was no provision in the Plaintiff's form loan documents that even referred

to -- much less expressly permitted -- late fees to be charged after the loan was accelerated and

Money Store demanded payment of the *entire* amount owed on the loan.  As Dunnery testified:

**Q.**  Are you aware of any provision in the [Money Store California

_____

[5] Dunnery Dep., 6/5/06, Grob. Decl. Exh. N, pp. 241-42, 243 (Testifying "HomeQ [uses] the Fannie Mae
allowables as its standard.  HomEq basically adopts the amount that Fannie Mae says can be charged.");
p. 243 (HomEq uses the Fannie Mae allowable as its standard because "it is a significant way of knowing
what the normal and customary rate[s] for those services are.").

> loan documents] which deals with the right to charge late fees after
> acceleration?
> **Dunnery:** I don't think there is any provision in the form note or deed of
> trust documents that refer to late charges after acceleration.

(Grob. Decl. Exh. N, at p. 337-38; Exh. M, pp. 355-58)

Courts have uniformly found that a lender may not charge late fees after acceleration in the absence of an express provision in a contract allowing it to do so.  As a 1998 decision in this district succinctly stated

> because acceleration terminated [the borrower's] obligation, as
> mortgager, to make monthly payments after the date of
> acceleration, it cannot be liable, as mortgager, for late charges on
> monthly payments that it was not obligated to make.

RTC Mort. v. J.I. Sopher & Co., Inc., 1998 WL 132815, at *5 (S.D.N.Y. 1998).[6]

In addition to uniform judicial authority, in United States v. Fairbanks Capital, Civ. # 03-12219 (D. Mass. 2003), a Stipulated Final Judgment in an action brought by the FTC permanently enjoined Fairbanks (then the largest servicer of subprime loans in the nation) from "assessing or collecting any late fee or delinquency charge once a loan account has been accelerated into foreclosure status." (Grob. Decl. Exh. X, at 17-18).

---

[6] See also Carreras v. Weinreb, 826 N.Y.S.2d 72, 74, 2006 WL 3086932, at *2 (2d Dep't 2006); Security Mut. Life Ins. Co. v. Contemporary Real Estate Ass., 979 F.2d 329, 330-331 (3rd Cir. 1993) (same); In re Mary Ann Grayboyes, 371 B.R. 113, 124 (Bank. E.D. Pa. 2007); Pereira v. Cogan, 294 B.R. 449, 515 (Bank. S.D.N.Y. 2004);  In re River Valley Fitness One, L.P., 2004 WL 1171732, *4 (Bank. D.N.H. 2004); Wells Fargo Bank v. Guarnieri, 297 B.R. 365, 369 (Bankr. Conn. 2003), aff'd 308 B.R. 122 (D. Ct. 2004);   In re White, 88 B.R. 498, 505 (D.Mass. 1988);  In re Tavern Motor Inn, Inc., 69 B.R. 138, 141 (Bank. D. Vt. 1987); Addison Express, LLC v. Medway Air Ambulance, 2006 U.S. Dist. Lexis 31677, *37 (N.D. Tex. 2006);  Bank National Assoc. v. Shephard Mall Partners LLC, 140 P.3d 559, 562 (Okla. Ct. of Civil Appeals 2005); TMG Life Ins. Co. v. Ashner, 898 P.2d 1145, 1162 (Kan.App.1995); Fowler v. First Federal Savings & Loan Ass., 643 So.2d 30, 33 (Fla. 1st DCA 1994);   Green Point Savings Bank v. Varana, 236 A.D.2d 443, 653 N.Y.S.2d 656 (2d Dep't 1997);  Allied Supplier & Erection, Inc. v. A. Baldwin & Co., Inc., 688 S.W.2d 156 (Tex. Ct. App. 1985); Wilmington Savings Fund Society v.37 The Circle, LLC, 2008 Del. Super. Lexis 273, at *3 (Superior Court of Del. 2008); See also Friedman, Contract & Conveyances of Real Property, §6.3, at 813-814 (5th Ed.) ("Provisions for payment of late charges are enforceable prior to acceleration but not thereafter")

To circumvent the contractual and legal prohibition of such fees, Money Store argues that Mazzei falls within a limited exception to the assessment of post-acceleration late fees recognized in Rizzo v. Pierce & Assoc., 351 F.3d 791 (7th Cir. 2004), contending that "his debt was reinstated, i.e., The Money Store later permitted Mazzei to recommence paying off his loan in installment payments." (Money Store Brief, p. 10)   However, at his March 13, 2009 deposition, Mr. Dunnery testified repeatedly and unequivocally that Mr. Mazzei "never reinstated" after his loan was accelerated by Money Store in March 2000.  (Grob. Decl. Exh. M, pp. 428-29).  That testimony, and the admission contained therein, are binding on TMS under Rule 30(b)(6).

Moreover, the reinstatement argument now posited by movants is also directly contradicted by a letter from Money Store to Mazzei dated October 24, 2000, in which Money Store discussed its refusal to accept two monthly installments Mazzei attempted to pay in May and June 2000:

> These checks were appropriately returned to you because your loan was delinquent for the December 1999 through May 2000 payments at that time and was in active foreclosure.  Moreover, these payments were ***insufficient to reinstate your loan*** and were not submitted in accordance with any repayment plan approved by The Money Store.

(Grob. Decl. Exh. A (emphasis added))

In fact, Money Store contradicts its own assertion that Mazzei "reinstated" elsewhere in its brief, admitting that Mazzei sold his home and paid the entire loan balance as accelerated:

> But, ***rather than pursue the reinstatement***, Mazzei thereafter sold his house in October 2000 and used the proceeds of that sale to pay off his debts….

18

Money Store Br., p. 6 (emphasis added).   As Money Store well knows, late fees are not allowed to be charged to a borrower who – like Mazzei -- pays off his entire loan after acceleration, as the Rizzo case relied upon by Money Store plainly makes clear:

> It should be noted that the Rizzos are not obligated to pay the late fees in all cases.  If, for whatever reason, the Rizzos did not want to pay the late fees, *they were free to pay the loan as accelerated. Such a payment would nullify any obligation to pay post-acceleration late fees.*

Rizzo, 351 F.3d at 794 (emphasis added). Accordingly, Money Store cannot meaningfully dispute that Mazzei paid off the loan as accelerated, and thus was improperly assessed *$133.80* in late fees after acceleration.

## C.   The Attorneys' Fees Charged To Mazzei Were Improper

As shown by Money Store's responses to interrogatories, Mazzei's account was charged $461.47 in foreclosure attorneys' fees and $320.00 in bankruptcy attorney's fees based on the Fidelity invoices.  (see pp. 4-5 supra)  Even if Money Store had presented evidence that these invoices had actually been paid, the attorney's fees are patently improper.

### 1. Money Store Charged Mazzei $125.00 For A Bankruptcy Objection Filed 11 Days After The Case Was Dismissed

Money Store charged Mr. Mazzei **$125.00** for a "fee charged to defendants by their bankruptcy counsel for drafting and filing an objection for the proposed bankruptcy plan's treatment of the secured debt."  (Grob. Decl. Exh. L, pp. 2-3). As shown by the court docket in Mazzei's bankruptcy (annexed to Grob. Decl. as Exh. Y) and Money Store's Objection itself, (Grob. Decl. Exh. Z) Money Store's objection to Mr. Mazzei's Chapter 13 Plan was not filed until October 16, 2000. However, pursuant to a motion made by Mr. Mazzei (annexed as Grob. Decl. Exh. AA), Mr. Mazzei's bankruptcy case was dismissed on October 5, 2000, *eleven days*

*before* Money Store's attorney filed its objection to the Chapter 13 Plan.  (See Order of Dismissal dated Oct. 5, 2000, Grob. Decl. Exh. BB; Grob. Decl. Exh. Y, p. 2, entry # 21)

Obviously, it was completely improper for Money Store to charge Mazzei for an objection to a bankruptcy plan filed almost two weeks after the bankruptcy had been dismissed.

### 2. The Evidence Demonstrates That The "Legal Fees" Charged To Mazzei Were Illegally Shared With Non-Attorney Outsourcers

As previously stated, not only did Money Store fail to provide any evidence that the legal fees assessed to Mazzei were paid by Money Store, it also failed to provide any bills from the lawyers who allegedly performed the services for which Mazzei was charged.  The only bills relating to these legal services came from Fidelity, who Money Store describes in its motion as its' "outsourcer" (Money Store Br., p. 14) and "an outside company that assisted Money Store on defaulted loans."  (Money Store Rule 56.1 Statement, pp. 6-7, fn. 2)

As does every other state, California (where Mazzei's house was located) statutorily prohibits the payment of legal fees to non-lawyers.  California Rule 1-320 (annexed to Grob. Decl. as Exh. CC)  Here, there is no evidence that any of the legal fees purportedly paid by Money Store to Fidelity and charged to Mr. Mazzei were ever ultimately paid to attorneys (or indeed ever paid at all).

Thus, the purported payment of legal fees to non-attorney Fidelity -- if payment in fact occurred – was not only improper, but illegal.  Bertelsman v. Harris, 537 F.3d 1047, 1061 (9th Cir. 2008) (fee-sharing agreement with nonlawyer unenforceable); McIntosh v. Mills, 17 Cal. Rptr.3d 66 (2d Dist. Cal. Ct. App. 2004) (same).  Since Mazzei's Note allowed Money Store to recover attorneys' fees from him only if they were "reasonable" and "not prohibited by applicable law", (Grob. Decl. Exh. B, ¶4(D), p. 1), the legal fees charged by Fidelity and passed on to Mazzei were patently improper.

20

In fact, even if there were no such provision in the contract, courts have routinely found that legal fees paid to non-lawyers (or even out-of-state lawyers who could not be admitted *pro hac vice*) must be disgorged.  See, e.g., Birbrower, Montalbano, Condon & Frank, P.C. v. Superior Court, 17 Cal. 4th 119, 949 P.2d 1 (Cal. 1998) (in which the California Supreme Court ordered a New York attorney to disgorge fees for services performed in New York on a California matter, stating that "no one may recover compensation for services as an attorney at law in [California] unless the person was at the time the services were performed a member of the State Bar"); Newman v. Silver, 1984 U.S. Dist. Lexis 22314, *6 (S.D.N.Y. 1984) (in which the court required that the non-attorney party to a fee-splitting agreement return the amounts paid to it by the client.  See also Winterrowd v. American General Ann. Ins. Co., 556 F.3d 815, 825-26 (9th Cir. 2009) (in which the court held that an out-of-state lawyer may not recover legal fees for work done in a matter in California federal court if "he did not meet the qualifications to be admitted *pro hac vice* to the bar of the relevant court had he applied")

Finally, not only is the payment of legal fees to Fidelity statutorily-prohibited, but Fannie Mae Guidelines also expressly prohibit the payment of any "outsourcing referral fee or a similar fee" in connection with non-judicial foreclosures in California.  (Guideline, Grob. Decl. Exh. W, at p. 2)

### D. Money Store Improperly Charged Mazzei $75.00 For The Cost of Obtaining A Document In Bankruptcy Which Was Available For Free

Mazzei's account was also assessed a *$75.00* fee for the purported cost of obtaining a copy of the Chapter 13 Plan filed by Mazzei in the United States Bankruptcy Court for the Eastern District of California in September 2000.  (Money Store 2006 Rule 56.1 Response, Grob. Decl. Exh. T, ¶45)

As of March 15, 2000, all documents filed in the bankruptcy court for the Eastern District of California were available through the Internet.  (Grob. Decl. Exh. DD)   Notes prepared by Money Store and Fidelity employees in Mazzei's Communication History indicate that they obtained Mazzei's Chapter 13 Plan from the Internet on September 12, 2000.  (Grob. Decl. Exh. EE at TMS 413 ("obtained Plan from the Web")).

Pursuant to General Order 00-4 of the United States Bankruptcy Court for the Eastern District of California dated May 30, 2000, there was **no** cost or fee to download bankruptcy documents from the Eastern District of California through the Internet.  (Grob. Decl. Exh. FF) Thus, there was no legal basis upon which Money Store could charge Mazzei **$75.00** for a document which could be – and apparently was – retrieved for free.

Despite all this – and the fact that Money Store has no proof that it even paid the $75.00 "cost" passed on to Mazzei -- Money Store claims that it was Mazzei's burden to obtain evidence *from Fidelity* to "show that Fidelity … did not actually expend the $75.00 that it charge for obtaining the Mazzei Chapter 13 Plan."  (Money Store Br., pp. 14-15).

Money Store presents no legal support for this completely novel proposition.  Clearly, Money Store had access to documents substantiating the purported $75.00 duplication cost charged by Fidelity, which it was obligated to produce if such evidence existed. Malletier v. Dooney & Bourke, Inc., 2006 U.S. Dist. Lexis 87096, *13 (S.D.N.Y. 2006) (a party to litigation is required to produce "documents held by its outside counsel that pertain to work performed for it by those attorneys").   Its' failure to produce such evidence compels the inference that obtaining Mazzei's Chapter 13 Plan online did not cost $75.00, and that Mazzei was charged for a document which cost nothing to retrieve.  Philatelic, 601 F.Supp. at 1565-66.

**E.  Money Store Improperly Charged Mazzei For Late Fees,**
    **Inspection Fees, Substitution of Trustee Fees And A Broker Price Opinion**

### E. Money Store Improperly Charged Mazzei For Late Fees, Inspection Fees, Substitution of Trustee Fees And A Broker Price Opinion After The Notice of Default Was Recorded

The Notice of Default on Mazzei's California home was recorded on March 23, 2000.

(Grob. Decl. Exh. T, ¶40)  Sections 2924c and 2924d of the California Civil Code "regulate costs

that may be charged to a California borrower [] after notices of default and sale have been

recorded." Walker v. Countrywide Home Loans, Inc., 98 Cal.App.4th 1158, 1174 121 Cal.

Rptr.2d 79 (2002) (a copy of Walker is annexed to the Grob. Decl. Exh. HH).

Under Section 2924c of the California Code, the costs and expenses which may be

charged to a borrower after a Notice of Default has been recorded

> **shall be limited to the costs** incurred for recording, mailing…
> publishing, and posting notices required by Section 2924 to 2924i,
> inclusive, postponement pursuant to 2924g . . . and a fee for a
> trustee's sales guarantee.

Cal. Civ. Code 2924c(c) (a copy is annexed to the Grob. Decl. as Exh. GG).

Money Store has admitted that, after the Notice of Default on Mazzei's property was

recorded, Money Store charged Mazzei for **$133.80** in late fees, **$15.00** for two Property

Inspections, **$100.00** for a Broker Price Opinion, and **$13.00** for the cost of recording a

Substitution of Trustee. (Grob. Decl. Exh. T, p. 9, ¶41)

None of these costs are among those allowed to be passed on to a borrower under §2924c

or any of the statutes which are referenced therein.  Indeed, Walker (a case relied upon by

Money Store) directly rejects Money Store's position that post-default fees such as property

inspections which are not specified in §2924c are recoverable under the statute:

> Here, Countrywide [the lender] agrees that it is not permitted to,
> and does not, charge to delinquent borrowers property inspection
> fees incurred **after** a loan is referred for foreclosure.

Walker,  98 Cal. App. 4th at 1174 (emphasis in original) (Grob. Decl. as Exh. HH)

**F.  Money Store Charged Mazzei More Than It Was Allowed For
      Trustee's Fees**

Money Store has admitted that the purported debit balance in Mr. Mazzei's account includes a Trustee's Fee of **$461.47** assessed in December 2000. (Grob. Decl. Exh. T, p. 6, ¶26) There is no evidence Money Store ever paid this fee.   In any event, under §2924d of the California Civil Code (a copy of which is annexed to the Grob. Decl. as Exh. II), if the unpaid principal sum secured is less than $150,000, a trustee or attorney may charge "a base amount which does not exceed $425.00" in Trustee's fees.  (Calif. Civ. Code, §2924d)  Here, as Money Store admitted in its 2006 Rule 56.1 Response, the unpaid principal sum on the loan to Mazzei never exceeded $64,000.00 (Grob. Decl. Exh. S, ¶27; Exh. T, ¶27).  Thus – even if Money Store could present evidence that it paid the Fidelity invoices --  Money Store charged Mazzei more than it was allowed to for a Trustee Fee.

**CONCLUSION**

For each of the above reasons, Plaintiff respectfully submits that TMS' Motion for Summary Judgment should be denied in its entirety.

Dated: New York, New York
       December 13, 2010

THE LAW OFFICES OF PAUL GROBMAN

_____
Paul Grobman  (PG 1876)
535 Fifth Avenue, 33rd Floor
New York, NY 10017
Tel: (212) 983-5880

SHARMA & DEYOUNG LLP
Neal A. DeYoung (ND 3098)
H. Rajan Sharma (HS 3598)
286 Madison Avenue, Suite 2002,

24

Tel. (212) 561-1907

Attorneys for Plaintiffs