UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -    x

JOSEPH MAZZEI, on behalf of himself          :          Case No.  01 Civ. 5694 (JGK)
and all others similarly situated,

                                            :

                   Plaintiff,

                                            :

        -- against --

                                            :

THE MONEY STORE and TMS MORTGAGE, INC.,
HOMEQ SERVICING CORP.                         :

                   Defendants.          x
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## PLAINTIFF'S MEMO OF LAW IN SUPPORT OF
## <u>CLASS CERTIFICATION</u>

## TABLE OF CONTENTS                                              Page

TABLE OF AUTHORITIES ................................................................ i

INTRODUCTION ......................................................................... 1

STATEMENT OF FACTS ............................................................... 3

    1.  Phantom Legal Fees and Expenses ....................................... 3

    2.  Attorney Fees Split with Fidelity ........................................ 5

    3.  Fees from the Moss Codilis Breach Letter Program ................... 6

    4.  Post-Acceleration Late Fee Charges ..................................... 6

ARGUMENT ............................................................................. 7

    Standard of Review ...................................................... 7

POINT I - The Fees at Issue are Proper Subjects for Class Certification ............... 8

    A.  Numerosity ............................................................ 8

    B.  Questions of Law or Fact Common to the Class ........................... 10

        i.      Phantom Legal Fees and Expenses ......................... 11

        ii.     Attorneys' Fees Split With Non-Lawyer Fidelity ............ 14

        iii.    Fees from The Moss Codilis Breach Letter Program ......... 16

        iv.     Late Fees after Acceleration ............................... 17

    C.Typicality ............................................................. 19

    D.Adequacy of Representation ........................................... 20

POINT II - Rule 23(B)(3): Predominance has Been Satisfied in
    View of the Defendants' Systematic Practices and Form Loan Agreements   21

POINT III - Class Treatment is Clearly the Superior Method of Resolving the Issues in
    this Case ................................................................ 23

    The Class Claims are Easily Manageable ................................. 24

POINT IV - The Court Should also Certify a Subclass of California Borrowers ........ 25

CONCLUSION .......................................................................... 27

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page**


Addison Express, LLC v. Medway Air Ambulance, 2006 U.S. Dist. Lexis 31677 (N.D.
Tex. May 19, 2006) ……………………………………………………..…………   18

Allied Supplier & Erection, Inc. v. A. Baldwin & Co., Inc., 688 S.W.2d 156 (Tex. Ct.
App. 1985) …………………………………………………………………………   18

Am. Airlines v. Wolens, 513 U.S. 219, 115 S. Ct. 817, 130 L. Ed. 2d 715 (1995) ……..   10

Bank National Assoc. v. Shephard Mall Partners LLC, 140 P.3d 559 (Okla. 2005) …….   18

Bertelsman v. Harris, 537 F.3d 1047 (9th Cir. 2008) ……………………….………….   15

Boucher v. Syracuse Univ., 164 F.3d 113 (2d Cir. 1999) ………………………………..    8

Caleb v. DuPont De Nemours, 110 F.R.D. 316 (S.D.N.Y. 1986) …………….…..……..   20

Carreras v. Weinreb, 33 A.D.3d 953, 826 N.Y.S.2d 72 (2d Dep't 2006) ………………   18

C.I.O.S. Foundation v. Berkston Ins. AVV, 2000 U.S. Dist. Lexis 2337 (N.D. Miss. Feb
1, 2000) ……………………………………………………………………………..…   18

Cortigiano v. Oceanview Manor Home for Adults, 227 F.R.D. 194 (E.D.N.Y. 2005) ….   23

Crest S&L Ass'n v. Mason, 243 N.J. Super. 646 (N.J. Sup. Ct. 1990) …………………   18

Deposit Guar. Nat. Bank v. Roper, 445 U.S. 326 (1980) …………………………..……   23

Dupler v. Costco Wholesale Corp., 249 F.R.D. 29  (E.D.N.Y. 2008) ………...............   10

Dynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 178 F.Supp.2d 9 (D.
Mass. 2001) ……………………………………………………..………………………   16

Farmers Ins. Exchange v. Superior Ct., 2 Cal.4th 377 (Cal. 1992) ………….....……..   25

4 B's Realty 1530 CR39, LLC v. Toscano, 2011 U.S. Dist. LEXIS 118265 (E.D.N.Y.
Oct. 12, 2011) ……………………………………………………………..……………   18

Fowler v. First Federal Savings & Loan Ass., 643 So.2d 30 (Fla. 1st DCA 1994) ………

Gates v. Dalton, 67 F.R.D. 621 (E.D.N.Y. 1975) ……………….........………………..   20

i

**Cases**            **Page**

Gen. Ins. Co. v. Mezzacappa Brothers, Inc., 2003 U.S. Dist. Lexis 17167 (E.D.N.Y. Oct. 1, 2003), aff'd, 110 Fed. Appx. 183 (2d Cir. 2004) …………………………..……   9

Green Point Savings Bank v. Varana, 236 A.D.2d 443 (2d Dep't 1997) ………………..   18

Gulf Oil v. Bernard, 452 U.S. 89 (1981) …………………………………………….......   8

Haroco, Inc. v. Am. Nat'l Bank & Trust Co., 121 F.R.D. 664 (N.D. Ill. 1988) ………...   11

Hunt v. Check Recovery Systems, Inc., 241 F.R.D. 505 (N.D. Cal. 2007) …………………………………………………………..……………..   22

In re Drexel Burnham Lambert Group, Inc., 960 F.2d 285 (2d Cir. 1992) …………………………………………………………..……………..   19, 20

In re First Alliance, 280 B.R. 246 (C.D. Cal. 2002) ……………………………………   25

In re Futuronics, 655 F.2d 463 (2d Cir. 1981) …………………………..……………   16

In re Initial Pub. Offering Sec. Litig., 2007 U.S. Dist. LEXIS 19632 (S.D.N.Y. Feb. 28, 2007) ……………………………………………………………….………..   7

In re: Jonathan R. Thorne, 2011 Bankr. Lexis 2398 (N.D. Miss. June 15, 2011) ………   16

In re Mary Ann Grayboyes, 371 B.R. 113 (Bank. E.D. Pa. 2007) ………………..………   18

In re NASDAQ Market-Makers Antitrust Litig., 172 F.R.D. 119 (S.D.N.Y.1997) …..…   22

In re Orion Sec. Litigation, 2008 U.S. Dist. Lexis 55368 (S.D.N.Y. July 8, 2008) …….   19

In re Prudential Sec., Inc., 163 F.R.D. 200 (S.D.N.Y. 1995) …………….…..……………   19

In re River Valley Fitness One, L.P., 2004 WL 1171732 (Bank. D.N.H.  Mar. 17, 2004) ………………………………………………………………………………   18

In re Tavern Motor Inn, Inc., 69 B.R. 138 (Bank. D. Vt. 1987) …………………..…..   18

In re Tri-State Crematory Litig., 215 F.R.D. 660 (N.D. Ga. 2003) ………………...……   11

In re Universal Serv. Fund Tel. Billing Practices Litig., 219 F.R.D. 661 (D. Kan. 2004) ..……………………………………………………………………………….   11

In re Visa Check/Master Money Antitrust Litig., 280 F.3d 124 (2d Cir. 2001) …………   21-25

**Cases**                                                                                          **Page**

In re White, 88 B.R. 498 (D.Mass. 1988) ……………………………………….....   18

Irving Trust Co. v. Nationwide Leisure Corp., 95 F.R.D. 51 (S.D.N.Y. 1982) ………...   11

Jankowski v. Castaldi, 2006 U.S. Dist. LEXIS 4237 (E.D.N.Y. Jan. 13, 2006) …………   23

Jennings Oil Co., Inc. v. Mobil Oil Corp., 80 F.R.D. 124 (S.D.N.Y. 1978) …………....   11

Kleiner v. First Nat'l Bank, 97 F.R.D. 683 (N.D. Ga. 1983) ……………………..………   10

Krear v. Nineteen Named Trustees, 810 F.2d 1250 (2d Cir. 1987) ……………...………   14

Marisol A. v. Giuliani, 126 F.3d 372 (2d Cir. 1997) ……………………………………   8, 19

Martens v. Smith Barney Inc., 181 F.R.D. 243 (S.D.N.Y. 1998) …………..…………...   20

McCaskill v. SCI Management Corp., 298 F.3d 677 (7th Cir. 2001) ……………..…...    9

People United for Children v. City of New York, 214 F.R.D. 252 (S.D.N.Y. 2003) ……   10

Pereira v. Cogan, 294 B.R. 449 (Bank. S.D.N.Y. 2004) ………………………..………   18

Pirelli v. LaBranche & Co., 229 F.R.D. 395  (S.D.N.Y. 2004) …………………………   20

Rizzo v. Pierce & Assocs., 351 F.3d 791 (7th Cir. 2003) ………………………………..   18

Robidoux v. Celani, 987 F.2d 931 (2d Cir. 1993) ……………………………….......    9

Robinson v. Metro-North Commuter R.R., 267 F.3d 147 (2d Cir. 2001) ……………....   24

RTC Mort. V. JI Sopher & Co., Inc., 1998 WL 132815 (S.D.N.Y. 1998) ……………...   18

Security Mut. Life Ins. Co. v. Contemporary Real Estate Assoc., 979 F.2d 329 (3d Cir.
1992) …………………………………………………………………………………..…   18

Steinberg v. Nationwide Mut. Ins. Co., 224 F.R.D. 67 (E.D.N.Y. 2004) ……………....   21

TMG Life Ins. Co. v. Ashner, 898 P.2d 1145 (Kan. 1995) ………………………..……   18

Trautz v. Weisman, 846 F. Supp. 1160 (S.D.N.Y. 1994) ……………….…………..…..   19

United States ex rel. Walker v. Mancusi, 338 F. Supp. 311 (W.D.N.Y. 1971) …………    9

United States v. Fairbanks Capital Corp., Civ. # 03-12219 (D. Mass. 2003) ………..…   18

| **Cases** | **Page** |
|---|---|
| Walker v. Countrywide Home Loans, Inc., 98 Cal.App.4th 1158 (Cal. 2002) ……..…… | 25-27 |
| Wells Fargo Bank v. Guarnieri, 297 B.R. 365 (Bankr. Conn. 2003), aff'd 308 B.R. 122 (D. Ct. 2004) ……………………………………………………………………..… | 18 |
| Wilmington Savings Fund Society v.37 The Circle, LLC, 2008 Del. Super. Lexis 273 (Del. 2008) ……………………………………………………………………… | 18 |
| Wu v. Pearson Educ., Inc., 2011 U.S. Dist. LEXIS 112308 (S.D.N.Y. Sept. 30, 2011) ... | 10, 18 |

## STATUTES & OTHER AUTHORITIES

| | |
|---|---|
| § 1666d of Truth in Lending Act, 15 U.S.C. 1666d …………………….…………… | 2 |
| §12-5-115 of the Colorado Revised Statutes ………………………..……………….. | 17 |
| Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1768 (1972) …………………………………………….…………………….…........ | 20 |
| Federal Rule of Civil Procedure Rule 23(a) ……………………………………… | 8 |
| Contract & Conveyances of Real Property, §6.3 (5th Ed.) …………………….…… | 18 |
| Moore's Federal Practice, § 23.24 …………………………….…………………….. | 19 |
| Rule 23(b) ………………………………………………….……………………… | Passim |
| Rule 30(b) …………………………………………………….…………………… | 4, 5, 7, 12 |

## MEMORANDUM OF LAW IN SUPPORT
## OF MOTION FOR CLASS CERTIFICATION

### INTRODUCTION

Plaintiff seeks to certify a breach of contract class consisting of all similarly

situated borrowers who signed form loan mortgage agreements ("the Form Loan

Agreements") on loans which were owned or serviced by Defendants The Money

Store, TMS Mortgage, Inc. and HomEq Servicing Corp. (hereinafter "HomEq" or

"Defendants") and who, from March 1, 2000 to the present ("Class Period"), were

charged the following fees that were not permitted under the Form Loan

Agreements:

(i)     attorneys' fees and expenses which Defendants never paid to
        Fidelity National Foreclosure Solution ("Fidelity") or their
        attorneys, including penalties paid back by Fidelity from
        attorneys' fees which were not credited to borrowers; and

(ii)    amounts paid to Fidelity , a non-lawyer entity, from attorneys'
        fees charged to borrowers;

(iii)   attorneys' fees improperly collected from borrowers for
        issuance of breach letters by Moss Codilis Stawiarksi, Morris,
        Schneider & Prior LLP;   and

(iv)    late fees after the borrower's loan was accelerated, and where
        the accelerated loan was paid off (or foreclosed on). (the
        "Class")

Plaintiff and the similarly situated members of the Class face a single

common issue that renders this case appropriate for class-wide treatment: whether or

not Defendants breached the Form Loan Agreements by charging borrowers for fees

or expenses which were prohibited by law, or otherwise not permitted under the

Form Loan Agreements.  The only question before the Court that needs to be

resolved is a legal one: whether or not the fees described in the Class definition were permitted by law or contract under the Form Loan Agreement.   In the event that the Court certifies some or all of the proposed Class definition, Plaintiff seeks a subclass consisting of all members who, but for the overcharges described in the Class as certified, would have had a "credit balance" under § 1666d of Truth in Lending Act, 15 U.S.C. 1666d, et seq. ("TILA")[1]

The record establishes that Plaintiff was charged attorneys' fees and expenses for invoices that were, in fact, never paid out to any attorneys or law firms.   The record also establishes that Defendants entered into an agreement with a non-lawyer outsourcer, Fidelity, which provided for its splitting of "attorneys' fees" which were purportedly incurred by Defendants in foreclosures and bankruptcies, and which were ultimately demanded from borrowers.   Legal fees were also charged for the Breach Letter program that was run by an attorney unlicensed to practice law.   Finally, Defendants do not dispute that they routinely charged post-acceleration late fees to borrowers, including Plaintiff.

With respect to each of these types of challenged fees, the Court need only address one overarching legal issue common to the putative Class: whether or not the fee was prohibited by law or by contract under uniform language in the Form Loan Agreements.   Defendants' liability to Plaintiff and the putative Class turns on this common question.   As a result, Plaintiff has met his burden of showing that

---

[1]   Plaintiff also seeks certification of a subclass of California borrowers whose loans were serviced by Defendants and who, after March 2000, were charged (i) any of the fees or expenses set forth in the general Class Definition; or (ii) fees which are not included among those allowed to be charged under Cal. Civil Code 2924c after a Notice of Default was recorded.  (See Point IV, *infra*, at p. 24)

common legal and factual issues predominate on the class-wide claim for breach of contract, and that the proposed Class meets the requirements of Rule 23(a) and (b).

## STATEMENT OF FACTS

In 1994, the Plaintiff took out a mortgage loan from The Money Store on his home in Sacramento, California. ((Declaration of Paul Grobman dated February 10, 2012 (hereinafter "Grob. Decl."). Exh. B) The loan was issued on a Fannie Mae Form Loan Agreement, as were virtually all of the agreements Defendants used and serviced during the relevant time period. (Grob. Decl. Exh. Exh. A, pp. 128-30, 150-52; Exh. B, Exh. C)   Under the relevant provisions in the Form Loan Agreements, Defendants were entitled to recover legal fees and expenses following a default provided that such charges had actually been paid or disbursed, and were "not prohibited by applicable law." (Grob. Decl. Exh. B, p. 1, at ¶4(D); Exh. C, ¶7)

In March 2000, Defendants "accelerated" the Plaintiff's loan obligations, declaring the full amount of the debt immediately payable. (Grob. Decl. Exh. D)  In October 2000, plaintiff paid off the loan as accelerated, along with several thousand dollars in attorneys fees and expenses purportedly incurred by Defendants which they claimed were owed under the Form Loan Agreement. (Grob. Decl. Exh. I, J)

### 1. Phantom Legal Fees And Expenses

The record establishes that Defendants routinely charged Plaintiff and other members of the class for attorney's fees and expenses that Defendants never in fact incurred. Defendants produced six invoices from Fidelity showing $1749.27 in attorney fees and expenses purportedly incurred by them in Plaintiff's bankruptcy and foreclosure. (Grob. Decl. Exh. G, pp. 7-12)  Apart from those invoices,

defendants failed to produce any documentation in response to plaintiff's discovery requests showing that the invoices charged to Mazzei were actually paid out to a third-party, much less the date of payment. (Grob. Decl. Exh. O, #18-19)

Moreover, the invoices themselves indicated that they had never been paid. Defendants' Rule 30(b)(6) witness, John Dunnery,  testified that an invoice for Fidelity was not actually paid by Defendants until the date indicated on the invoice under "Check Confirmed." (Grob. Decl. Ex. A, pp. 516-17).

None of the Fidelity invoices had a date under "Check Confirmed" in the invoices charged to Mazzei.   Rather, the field stated "Unavailable."  (Grob. Decl. Exh. G, pp. 7-12)   Under "Invoice Status", each of the invoices produced to Mazzei by Money Store indicates "Check Requested."  (Grob Decl. Exh  G, pp. 7-12)  Thus, the evidence in the record establishes that Defendants charged Plaintiff attorney fees and expenses of $1749.27 which they never paid.

The record also shows that Defendants routinely charged borrowers for attorney fees which were actually credited or refunded back to Defendants under a penalty program in Defendants' agreement with Fidelity (hereinafter "the Fidelity Agreement")  Under the Fidelity Agreement, if Fidelity did not complete a particular foreclosure or obtain a relief from stay in bankruptcy by a certain deadline, Fidelity would pay a "penalty" to Defendants based on the number of days over the deadline. (Grob. Decl. Exh. N, at 19-21).

Defendants' Rule 30(b)(6) witness testified that between 50 to 70% of the matters handled by Fidelity resulted in "penalty" payments being refunded back to Defendants during part of his tenure with Defendants.  (Grob Decl., Exh  A, pp. 469-

71).   Defendants admitted that they did not reduce the attorneys fees charged to borrowers by the amount of the refunded 'penalty' amounts.  (Grob Decl., Exh A, pp. 469-71, 475-77).    Therefore, in the substantial percentage of bankruptcies and foreclosures in which such "penalties" were assessed, Defendants ultimately paid less attorneys' fees than the amount charged and collected from borrowers.

### 2.  <u>Attorney Fees Split With Fidelity</u>

Defendants admit that Fidelity was not a law firm, but rather "an outside company that assisted Money Store on defaulted loans." (Grob Decl., Exh. JJ, pp. 6-7, fn. 2)  Before 2000, Defendants would directly contract with law firms around the country to provide legal services in foreclosure and bankruptcy actions on behalf of the owners of the loans they serviced.  After 2000, Defendants stopped engaging legal counsel directly and moved to an "Outsourcing" model in which companies such as Fidelity "managed and controlled legal services for" Money Store. (Grob. Decl. Exh. K, pp. 20-21).

Under the Fidelity Agreement, when Defendants needed legal representation in foreclosure or bankruptcy, Fidelity would hire counsel for defendants from among a network of law firms with whom it had contractual relationships.  (Grob. Exh. N, at 12-14)  Fidelity would oversee the work of the law firms, and respond to any questions for information or documents on Defendants' behalf. (Exh. N, at p. 12-16)

In exchange for its services, Fidelity was paid a fee for each foreclosure and bankruptcy matter referred to it, which has variously been described by Defendants and Fidelity as an "outsource management", "administrative" or "technology and referral" fee. (Grob. Exh. K, at p. 417, 434-35; Exh. T) According to Dunnery, the

Fidelity fee would be charged to Defendants "out of the Fannie Mae allowable that we pay." (Grob. Decl. Exh. K, at 417) The Defendants, in turn, would collect the Fidelity fee from borrowers, which would be included within "attorneys fees" in invoices to borrowers, as it was in Plaintiff's case. (Grob. Decl. Exh. K, at 417; Exh. G, at pp. 7-12)

### 3. Fees From The Moss Codilis Breach Letter Program

Over several years, the law firm of Moss Codilis sent out 88,937 breach letters on Defendants' behalf. (Grob. Decl. Exh. Z, p. 4) As admitted in a Rule 56.1 Statement filed by Defendants, Moss Codilis' "in-house counsel" Christina Nash was the 'attorney' responsible at Moss Codilis for the Defendants' "breach letter" program":

> Christina Nash of Moss Codilis performed these tasks; she made the legal determinations involved and oversaw the administrative handling of the debtor accounts with the help of paralegals working under her supervision.

Grob Decl. Exh. AA, ¶ 18).

As Ms. Nash testified at her January 2003 deposition – where she was produced as Moss Codilis's corporate representative -- she was never admitted to practice law in the State of Colorado, the state where Moss Codilis maintained its' office. (Grob. Decl. Exh. BB, p. 15).

As this Court itself recognized in denying summary judgment to Moss Codilis in the related Vincent action, if Ms. Nash's January 2003 deposition testimony is ultimately credited, then Moss Codilis engaged in the unauthorized practice of law in creating and sending out formal default letters on Defendants' behalf. (See Memorandum Opinion dated 9/29/2011, Doc. #156, pp. 17-18) In that

6

event, Moss Codilis would have had no right to charge – and Defendants no

contractual right to pass on – the fees associated with the letters sent to Plaintiff and

other borrowers.

### 4. Post-Acceleration Late Fee Charges

Defendants Rule 30(b)(6) witness confirmed that none of the Form Loan

Agreements serviced by Defendants even refer to -- much less expressly permit --

late fees to be charged after a loan has been accelerated and the lender seeks the

payment of the entire amount --rather than a monthly installment -- owed on the

loan. (Grob. Decl. Exh. K, at 337-38; Exh. A, p. 355-58;  Exh. C, p. 1, ¶4(A)

(provision allowing Money Store to charge a late fee to Mazzei only if Money Store

did not receive "the full amount of any of my monthly payments by the end of 10

calendar days after the date it is due")

Despite the absence of a provision in the Form Loan Agreement authorizing

such post-acceleration charges, Defendants regularly imposed monthly late fees on

borrowers' accounts after their mortgage loans had been accelerated.  (Grob, Decl.

Exh. A, p. 363; Exh. MM, pp. 168-69)  Money Store assessed at least five late

charges totaling $133.80 against Mazzei's account after his loan was accelerated in

full March 2000.  (Grob. Decl. Exh. MM, at 189).

## ARGUMENT

### Standard of Review

"To be certified, a putative class must meet all four requirements of Rule

23(a) as well as the requirements of one of the three subsections of Rule 23(b)." In

re Initial Pub. Offering Sec. Litig., 2007 U.S. Dist. LEXIS 19632, at *11 (S.D.N.Y.

Feb. 28, 2007).   Because "class actions serve an important function in our system of civil justice", Gulf Oil v. Bernard, 452 U.S. 89, 99 (1981),  Rule 23 has traditionally been given a liberal construction.  Marisol A. v. Giuliani, 126 F.3d 372, 377 (2d Cir. 1997).   The Court need not accept the Class definition in its entirety and may modify, subclass, redefine or certify a subset of the proposed Class to meet Rule 23 requirements.  Boucher v. Syracuse Univ., 164 F.3d 113, 118 (2d Cir. 1999)

<div align="center">

**POINT I**

**THE FEES AT ISSUE ARE
PROPER SUBJECTS FOR CLASS CERTIFICATION**

</div>

The claims herein ultimately involve a single common question:  Have Defendants routinely and systematically charged borrowers for fees that were impermissible under the Form Loan Agreement?   As shown below, the putative Class meets the four requirements set forth in Federal Rule of Civil Procedure Rule 23(a): Numerosity, commonality, typicality and adequacy.

**A. Numerosity**

Rule 23 requires a finding that numerosity makes joinder of all class members impracticable; however, "[i]mpracticable does not mean impossible". Robidoux v. Celani, 987 F.2d 931, 935 (2d Cir. 1993).  "Courts have not required evidence of exact class size or identity of class members to satisfy the numerosity requirement." Id.   This Circuit has consistently held that 35 to 40 similarly situated members are sufficient to satisfy the numerosity requirement.  See, e.g., United States ex rel. Walker v. Mancusi, 338 F. Supp. 311, 315-16 (W.D.N.Y. 1971), aff'd, 467 F.2d 51 (2d Cir. 1972) (proposed class of 38 prison inmates considered sufficient to satisfy numerosity requirement)

<div align="center">

8

</div>

As an initial matter, defendants repeatedly represented to the Court that they

would not contest numerosity on class certification, and requested that discovery be

limited accordingly:

> We don't contest numerosity, because there were many
> customers of The Money Store, and therefore in terms of a
> class we couldn't possibly tell them how many were charged
> each different kind of a fee.  It's going to be quite a few.  We
> wouldn't want to waste your time trying to fight over that,
> your Honor.

Transcript of May 28, 2008 Conference before Judge Sprizzo, p. 4, Grob. Decl. Exh.

KK;  See also Grob. Exh. LL (Feb. 5, 2009 letter in which counsel for HomEq seeks

to limit class discovery because there is "no dispute over numerosity")   It is well-

settled that "statements made by an attorney during oral argument constitute binding

judicial admissions." Gen. Ins. Co. v. Mezzacappa Brothers, Inc., 2003 U.S. Dist.

Lexis 17167, *14 (E.D.N.Y. 2003), aff'd, 2004 U.S. App. Lexis 17167 (2d Cir.

2004); McCaskill v. SCI Management Corp., 298 F.3d 677, 680 (7th Cir. 2001) ("The

verbal admission by [defendant's] counsel at oral argument is a binding judicial

admission, the same as any other formal concession made during the course of

proceedings")

In any event, even if numerosity were not conceded, the putative Class easily

meets this requirement.  Defendants referred approximately 46,929 individual

foreclosure and bankruptcy matters to Fidelity as of July 2005, collecting attendant

attorneys fees, expenses and administrative fees.   (Grob. Exh. Q , #18)  Moreover,

Moss Codilis issued at least 88,937 breach letters to prospective class members, (Grob. Exh. Z, at p. 4).[2]

### B.   Questions Of Law Or Fact Common To The Class

"So long as the class shares at least one common question of fact or law, the commonality requirement is met." People United for Children v. City of New York, 214 F.R.D. 252, 257 (S.D.N.Y. 2003)  The element of commonality has routinely been found satisfied in breach of contract cases involving substantively identical provisions.  See Steinberg v. Nationwide Mut. Ins. Co., 224 F.R.D. 67, 74 (E.D.N.Y. 2004) (Substantial use of form contracts and standardized policy established "a 'common factual nexus' exists among the putative class"); Wu v. Pearson Educ., Inc., 2011 U.S. Dist. LEXIS 112308, *17 (S.D.N.Y. Sept. 30, 2011), citing to Am. Airlines v. Wolens, 513 U.S. 219, 233 n.8, 115 S. Ct. 817, 130 L. Ed. 2d 715 (1995) ("[C]ontract law is not at its core diverse, nonuniform, and confusing.").  "When viewed in light of Rule 23, claims arising from interpretations of a form contract appear to present the classic case for treatment as a class action, and breach of contract cases are routinely certified as such." Kleiner v. First Nat'l Bank, 97 F.R.D. 683, 692 (N.D. Ga. 1983); see also Dupler v. Costco Wholesale Corp., 249 F.R.D. 29, 37-38 (E.D.N.Y. 2008) ("An overwhelming number of courts have held that claims arising out of form contracts are particularly appropriate for class action

---

[2] Because of Defendants' computerized accounting system, the class is also readily ascertainable as well.  See, Jankowski v. Castaldi, 2006 U.S. Dist. LEXIS 4237, *15 (E.D.N.Y. 2006)(class is ascertainable because it "can be verified by reference to objective documentation, including employee payroll records and tax returns" in defendants' custody); Cortigiano v. Oceanview Manor Home for Adults, 227 F.R.D. 194 (E.D.N.Y. 2005)(determination of class membership "will be straightforward and can be determined with documents that are under the custody and control of defendants.").

treatment."); <u>Irving Trust Co. v. Nationwide Leisure Corp.</u>, 95 F.R.D. 51 (S.D.N.Y.

1982) (breach of contract for failure to provide charter tour services); <u>Jennings Oil</u>

<u>Co., Inc. v. Mobil Oil Corp.</u>, 80 F.R.D. 124 (S.D.N.Y. 1978) (validity of general

release provision of contract); <u>In re Universal Serv. Fund Tel. Billing Practices Litig.</u>,

219 F.R.D. 661, 667 (D. Kan. 2004) (finding commonality satisfied where plaintiffs'

claims arose from allegations that defendants' breached the terms and conditions of

its consumer contracts); <u>In re Tri-State Crematory Litig.</u>, 215 F.R.D. 660, 692 (N.D.

Ga. 2003) (finding commonality requirement satisfied in breach of contract claim

involving form contracts); <u>Haroco, Inc. v. Am. Nat'l Bank & Trust Co.</u>, 121 F.R.D.

664, 669 (N.D. Ill. 1988) (finding commonality where plaintiffs' claims arose from

allegations of common practice and rights derived from Form Loan contracts).

 Here, Plaintiff signed an agreement that contains material provisions which

are substantively identical to those in the Form Loan Agreements signed by other

putative members of the Class, with the breaches claimed by Plaintiff and the class

members based on the same legal theory.  In fact, because the material provisions in

the form documents serviced by Defendants were uniform, HomEq admitted that it

*stopped looking* at individual loan documents to determine whether a particular fee

or expense could be passed on to a borrower.  (Grob. Decl. Exh. A, pp. 150-52.

### i. **Phantom Legal Fees And Expenses**

 The evidence establishes that Defendants collected $1749.27 in legal fees and

expenses from Plaintiff based on six invoices from Fidelity which they never paid.

(Grob. Decl. Exh. E, G).   Each of the Fidelity invoices submitted to Defendants had

a section called "Invoice Processing Summary" with various fields, including "Date

Submitted", "Accepted", "Approved", "Check Requested" and "Check Confirmed."

(Invoices, Grob. Decl. Exh. G, pp. 7-12)   As Defendants' Rule 30(b)(6) witness

repeatedly testified, under Fidelity's computerized invoice system, checks were not

even issued -- much less sent out -- until the date indicated as "Check Confirmed":

> Q.   If you look at TMS 1265, can you tell me, based on this
> invoice, when Brice was paid for the services reflected on this
> invoice?
> MR. KOBELT:  Object to the form of the question.
> DUNNERY.    When they were paid?
> Q.   Yes, when a check was mailed out to Brice.
> DUNNERY.   I can't tell you when it was mailed. I can tell you
> what date the check was confirmed, which would have been
> November 29, 2005.
> Q.   What does that mean, check confirmed?
> A.   The check actually went out to the vendor.
> Q.   So that was the date that the check went out to the vendor?
> A.   Cut.  I should use that more specific term.  **That was the date
> that the check was cut for the vendor.  Whether or not it was
> mailed that day or mailed shortly around that day, I can't say.**
> Q.   So the date the check is confirmed, what does check confirmed
> mean?
> A.   **That check was actually cut and issued by the check writer
> system.**

Grob. Decl., Exh A, pp. 516-17  (emphasis added)[3]

Under "Check Confirmed", each of the Fidelity invoices passed on to

Plaintiff had the notation "Unavailable."   (Grob. Decl. Exh. G, at 7-12).  Similarly,

of the 24 invoices purportedly substantiating the legal fees charged to plaintiffs in

the related Vincent action, nine invoices for fees and expenses collected from each of

the plaintiffs -- totaling $5,075.95 --had no date under "Check Confirmed."  (See

---

[3] See also Grob. Decl. Exh. K, pp. 151-52.   Manuals relating to the Fidelity electronic
invoicing system used by Money Store further demonstrate that an invoice is not paid on the
date under "Check Requested", but rather not until the date under "Check Confirmed."  (See
excerpts from FIS Desktop Manual, Grob. Decl. Exh. L, at pp. 12, 284)

Grob. Decl. Exh. M, at TMS 1273, 1280-82, 1290, 1298, 1301, 1303, 1305)[4] Thus, in each of these cases, the evidence demonstrates that Defendants were demanding that the class reimburse them for fees and expenses which Defendants did not pay.

Moreover, Defendants routinely charged borrowers for "phantom" fees in another way.   Defendants admit that they charged borrowers for the full amount of the attorney fees passed on by Fidelity in bankruptcy or foreclosure matters, even if the amount paid was then reduced because Fidelity had paid Defendants a "penalty" for failing to meet the contractually-imposed deadlines in the Fidelity Agreement. (Grob Decl., Exh  A, pp. 469-71, 475-77, Exh. N, at pp. 19-21).

Thus, the common factual question is whether Defendants collected legal fees and expenses from borrowers as reimbursement for its' purported payment to Fidelity in bankruptcies and foreclosures which were in excess of the amount Defendants ultimately paid.   As shown here, the evidence in the record demonstrates that the answer is yes.

The common legal issue is whether Defendants were permitted to collect more attorneys' fees from a borrower than actually incurred in a particular case. The Fannie Mae and Freddie Mac Form Loan documents only permit the lender to recover fees that it actually "paid" or "disbursed", (Grob. Exh. C, ¶7).  Thus, as a matter of contract law, the answer is no.

There is no variation in the applicable law governing this issue of contract interpretation, because the Form Loan Agreements plainly prohibit Defendants from

---

[4] Moreover, another *six* of the invoices charged to Gutierrez, Vincent and the Garridos (totaling *$1376.21* in fees and expenses) had "Check Confirmed" dates which were anywhere from 1-3 years after the <u>Vincent</u> plaintiffs were charged for – and paid  – such amounts.   (Grob. Exh. M, at TMS 1265, 1267, 1269, 1271, 1275, 1306).

charging legal fees or expenses that are not paid or disbursed.   Indeed, even if the

Form Agreement did not contain such language, courts presented with a fee-shifting

clause in a contract routinely hold what is obvious -- that "a party is not entitled to

an award exceeding *the amount he has actually paid his attorney.*"   Krear v.

Nineteen Named Trustees, 810 F.2d 1250, 1269 (2d Cir. 1987)  (emphasis added)

### ii. Attorneys Fees Split With Non-Lawyer Fidelity

Under the Fidelity Agreement, Defendants specifically agreed to pay

"Outsource Management Fees" to Fidelity in certain circumstances.  (Grob. Exh. N,

at p. 19)  Defendants admit that they improperly charged plaintiff Mazzei – as well

as the Garrido plaintiffs in the Vincent action -- for a so-called "Outsource

Management Fee" paid by Defendants directly to Fidelity, and improperly

characterized those payments as "attorneys' fees."   (Grob. Decl. Exh Exh. H, ¶51,

p.15; Exh. P, ¶8, at p. 3; Exh. Q, at  #9, pp. 5-6; Exh. G, at  p. 11; Exh. M, at TMS

1300)   Defendants further admit that Fidelity was also paid an additional so-called

"administrative" or "technology and referral" fee out of the "attorney's fees" which

Defendants passed on to borrowers in each bankruptcy and foreclosure matter

referred to Fidelity.  (Grob. Decl. Exh. K, at p. 417, 434-35; Exh. T)   Defendants

testified that they understood that Fidelity ultimately paid a portion of those

"attorneys' fees" to the law firms representing Defendants in these matters, and kept

a portion for themselves.  (Grob. Decl. Exh. K, p. 417, Exh. A, pp. 273-275; Exh. T)

The common legal question is whether the collection of a so-called

"administrative", "technology and referral" or "outsource management" fee from

borrowers out of the "attorney fees" purportedly incurred by the Defendants violated

the Form Loan Agreement as being fees "prohibited by applicable law."   In answer

to this question, Defendants have admitted that the collection of outsource

management fees from Plaintiff Mazzei and Linda and John Garrido was unlawful.

That Defendants have conceded this point lends substantial support to the conclusion

that the issue can be resolved by class-wide proof.  In re Nassau County Strip Search

Cases, 461 F.3d 219, 229 (2d Cir. 2006) ("That the class-wide proof comes in the

form of a simple concession rather than contested evidence certainly shortens the

time that the court must spend adjudicating the issue, but it does nothing to alter the

fundamental cohesion of the proposed class…")

Moreover, as discussed in the accompanying Declaration of Professor Bruce

Green, splitting attorneys' fees with non-lawyers is prohibited under the law of every

state.  (See Declaration of Bruce Green dated February 9, 2012 (hereinafter "Green

Decl"), ¶¶21-22; See Exh. B to Green Declaration (identifying the fee-splitting

prohibitions in each state)

As the Second Circuit stated in In re Futuronics, 655 F.2d 463, 470 (2d Cir.

1981):

> Fee-splitting arrangements have long been
> acknowledged as anathematic enterprises because of
> their natural tendency to cause an attorney to inflate
> his fees in order to offset the diminution in
> compensation caused by the agreement.  Moreover,
> they "also subject[] the officer or attorney sharing fees
> to outside influences and may result in a transfer of
> control to persons who, at best, have a distinctly lesser
> degree of public responsibilities.

655 F.2d at 470 (requiring parties to illegal fee-splitting agreement to disgorge all

legal fees because of the "clandestine fee-splitting arrangement");  Bertelsman v.

Harris, 537 F.3d 1047, 1061 (9th Cir. 2008) (fee-sharing agreement with nonlawyer unenforceable); Dynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 178 F.Supp.2d 9, 26 (D. Mass. 2001) ("if the plaintiff is a nonlawyer, then no state would allow him to share fees with a lawyer")[5]

If the court ultimately concludes that the payment of "outsource", "referral" or "administrative" fees to Fidelity out of the "attorneys' fee" collected from borrowers constitutes illegal fee-splitting, then the Defendants will have violated the Form Loan Agreements. The issue presents common questions of both fact and law applicable to the putative members of the Class.

### iii.   Fees From The Moss Codilis Breach Letter Program

Defendants have admitted that they contracted with the law firm of Moss Codilis to perform "nationwide legal services" for Defendants in sending out breach letters to plaintiff and 88,937 others, (Grob. Decl, Exh. Y, p. 1). Defendants have also represented that Christina Nash "made the legal determinations involved" in implementing the breach letter program from Moss Codilis's Colorado office. (Grob. Decl. Exh. AA, ¶¶18, 45-46). It is not disputed that Nash was never admitted to practice law in Colorado.

Under §12-5-115 of the Colorado Revised Statutes, which was in effect throughout the relevant time period:

> If any unlicensed person receives any money . . . as a fee or
> compensation for services rendered . . . by him as an attorney'

---

[5]  In In re: Jonathan R. Thorne, 2011 Bankr. Lexis 2398 (N.D. Miss. 2010), Fidelity itself submitted a Declaration which acknowledged that any administrative fees paid to Fidelity for bankruptcy or foreclosure services could not be recovered from delinquent borrowers. (See Grob. Decl. Exh. X); Moreover, under the Fannie Mae Guidelines, which Defendants have admitted provide the industry standard used in the mortgage industry, the payment of any type of "outsource" or referral fees is prohibited. See Grob. Decl. Exh. U-W)

> or counselor-at-law within this state, all money so received by
> him … may be recovered, with costs of suit, by an action for
> money had and received. (§12-5-115)

If -- as Nash testified in January 2003 and as Defendants have repeatedly represented to this Court – Nash's direction of the breach letter program for Moss Codilis and Defendants involved the practice of law in Colorado, then §12-5-115 prohibited any compensation to Moss Codilis.  Under the Form Loan Agreement between Defendants, plaintiffs and the other class members, such amount would be a fee "prohibited by applicable law" which could not be assessed against members of the class. (Grob. Exh. C at ¶7)  The legality of borrowers being charged attorney fees for Moss Codilis' breach letter program is common to the proposed Class.

### iv. Late Fees After Acceleration

Defendants admit that they regularly charged borrowers for late fees for monthly payment installments after their loans were "accelerated" (i.e. Defendants demanded payment of the entire amount of principal and interest owed on the loan). Defendants also admit that the Form Loan Agreements only provide for the assessment of late fees for a late *monthly* payment", rather than for late payments when the loan has been accelerated  (Grob. Decl., Exh. C, p. 1 ¶4(a; Exh. K, at 337-38; Exh. A, p. 355-58)

The common question before the Court regarding post-acceleration late fees is, therefore, one of contract interpretation: whether Defendants were permitted to charge late fees after acceleration in the absence of any such contractual provision. Every single court that has addressed this question has found what is obvious: that a

lender may not charge late fees after acceleration in the absence of an express provision in a contract allowing it to do so.  See, e.g., 4 B's Realty 1530 CR39, LLC v. Toscano, 2011 U.S. Dist. LEXIS 118265 (E.D.N.Y. Oct. 12, 2011)("[i]n the absence of a provision in the mortgage to the contrary, the collection of late fees after a mortgage note has been accelerated is impermissible"); Rizzo v. Pierce & Assocs., 351 F.3d 791, 793 n.1 (7th Cir. 2003) (citing sixteen cases for the proposition that "a lender cannot demand payment of late fees for failure to make monthly payments after the loan has been accelerated"); Security Mut. Life Ins. Co. v. Contemporary Real Estate Assoc., 979 F.2d 329, 330-332 (3d Cir. 1992). [6]

Moreover, in United States v. Fairbanks Capital Corp., Civ. # 03-12219 (D. Mass. 2003), a Stipulated Final Judgment in an action brought by the Federal Trade Commission in 2003 permanently enjoined Fairbanks from "assessing or collecting any late fee or delinquency charge once a loan account has been accelerated into

---

[6]   See also Carreras v. Weinreb, 826 N.Y.S.2d 72, 74, 2006 WL 3086932, at *2 (2d Dep't 2006) ("in the absence of a provision in the mortgage to the contrary, the collection of late fees after a mortgage note has been accelerated is impermissible"); RTC Mort. V. Jl Sopher & Co., Inc., 1998 WL 132815, at *5 (S.D.N.Y. 1998); In re Mary Ann Grayboyes, 371 B.R. 113, 124 (Bank. E.D. Pa. 2007); Pereira v. Cogan, 294 B.R. 449, 515 (Bank. S.D.N.Y. 2004); In re River Valley Fitness One, L.P., 2004 WL 1171732, *4 (Bank. D.N.H. 2004); Wells Fargo Bank v. Guarnieri, 297 B.R. 365, 369 (Bankr. Conn.. 2003), aff'd 308 B.R. 122 (D. Ct. 2004); CIOS v. Berkston Ins. AVV, 2000 U.S. Dist. Lexis 2337 (N.D. Miss. 2000);  In re White, 88 B.R. 498, 505 (D.Mass. 1988);  In re Tavern Motor Inn, Inc., 69 B.R. 138, 141 (Bank. D. Vt. 1987); Addison Express, LLC v. Medway Air Ambulance, 2006 U.S. Dist. Lexis 31677, *37 (N.D. Tex. 2006);  Bank National Assoc. v. Shephard Mall Partners LLC, 140 P.3d 559, 562 (Okla. Ct. of Civil Appeals 2005); TMG Life Ins. Co. v. Ashner, 898 P.2d 1145, 1162 (Kan.App.1995); Fowler v. First Federal Savings & Loan Ass., 643 So.2d 30, 33 (Fla. 1st DCA 1994); Crest S&L Ass'n v. Mason, 243 N.J. Super. 646, 649-50, 581 A.2d 120, 122-23 (N.J. Sup. Ct. 1990);  Green Point Savings Bank v. Varana, 236 A.D.2d 443, 653 N.Y.S.2d 656 (2d Dep't 1997);  Allied Supplier & Erection, Inc. v. A. Baldwin & Co., Inc., 688 S.W.2d 156 (Tex. Ct. App. 1985); Wilmington Savings Fund Society v.37 The Circle, LLC, 2008 Del. Super. Lexis 273, at *3 (Superior Court of Del. 2008);  See also Friedman, Contract & Conveyances of Real Property, §6.3, at 813-814 (5th Ed.) ("Provisions for payment of late charges are enforceable prior to acceleration but not thereafter")

foreclosure status." (Grob. Decl. Exh. HH at 17-18). A related class action

settlement against <u>Fairbanks Capital</u> required the debt servicer to reimburse all

borrowers who were charged late fees after acceleration. (Grob. Exh. II, pp. 6, 18

and 27)

### C. <u>Typicality</u>

Plaintiff's claims are typical of the claims brought by the class. Typicality

requires only that "the claims of the class representatives arise from the same set of

events or conduct" and that "the claims are based upon the same legal theory as

those of other members of the class." <u>In re Drexel Burnham Lambert Group, Inc.</u>,

960 F.2d 285, 291 (2d Cir. 1992).[7] Plaintiff's claims, as representative of the

proposed Class, are based on the same legal theory that all Class members claim: i.e.

a breach of contract based on the Form Loan Agreement. Moreover, Plaintiff's

claims arise from the "same set of events or conduct" as those alleged by the Class

generally, claiming that Defendants: (1) collected legal fees and expenses from him

which had not been incurred; (2) collected legal fees which were illegally split with

non-attorneys; (3) collected legal fees based on the work of an unlicensed attorney;

and (4) collected late fees after acceleration.

Even if there material differences in the claims raised by Plaintiff and the

prospective Class, it is well-settled that the named plaintiff's claims "need not be

identical to the claims of the class to satisfy the typicality requirement." <u>In re Orion</u>

<u>Sec. Litigation</u>, 2008 U.S. Dist. Lexis 55368, *12 (S.D.N.Y. 2008) (citations

omitted). "The possibility of factual distinctions between the claims of the named

---

[7]    Typicality is thus not undermined or vitiated by differences in the degree of harm suffered, or even
in the ability to prove damages. <u>Trautz v. Weisman</u>, 846 F.Supp. 1160, 1167 (S.D.N.Y. 1994); 5
*Moore's Federal Practice*, § 23.24[5] (Matthew Bender 3d ed.).

plaintiffs and those of other class members also does not destroy typicality, as

similarity of legal theory may control even in the face of differences."

Pirelli v. LaBranche & Co., 229 F.R.D. 395, 412  (S.D.N.Y. 2004) quoting In re

Prudential Sec., Inc., 163 F.R.D. 200, 208 (S.D.N.Y. 1995).  See Marisol, 126 F.3d at

376-77 (finding commonality and typicality despite the fact that "no single plaintiff

is affected by every legal violation alleged in the complaint…and [] no single

specific legal claim … affects every member of the class").

    **D. <u>Adequacy of Representation</u>**

    Generally, adequacy of representation entails inquiry into whether: 1)

plaintiff's interests are antagonistic to the interest of other members of the class and

2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation. In

re Drexel Burnham Lambert Group, Inc., 960 F.2d 285, 291 (2d Cir. 1992).   In the

case at bar, there is "no fundamental conflict between the claims" of the Plaintiff and

the claims of the putative Class members.  Caleb v. DuPont De Nemours, 110 F.R.D.

316, 319 (S.D.N.Y. 1986).  "[O]nly a conflict that goes to the very subject matter of

the litigation will defeat a party's claim of representative status." Martens v. Smith

Barney Inc., 181 F.R.D. 243, 259 (S.D.N.Y. 1998) (quoting 7 Charles Alan Wright &

Arthur R. Miller, Federal Practice & Procedure § 1768, at 639 (1972)).  Any

"evidence of antagonism … should be nothing short of clear and convincing" to

support a finding of inadequacy. *Gates v. Dalton*, 67 F.R.D. 621, 632 (E.D.N.Y.

1975).  Nothing like that can be presented with respect to Mazzei's claims here.

Finally, the named plaintiff is represented by experienced and competent counsel who have vigorously pursued this litigation and have sufficient experience in complex class action litigation.[8]

## POINT II

## RULE 23(B)(3): PREDOMINANCE HAS BEEN SATISFIED IN VIEW OF THE DEFENDANTS' SYSTEMATIC PRACTICES AND FORM LOAN AGREEMENTS

As a general matter, "the Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." In re Visa Check/Master Money Antitrust Litig., 280 F.3d 124, 136 (2d Cir. 2001). "[T]he predominance requirement calls only for predominance, not exclusivity, of common questions." Visa Check, 280 F.3d at 140 (internal citations omitted)

The basis for Defendants' liability on plaintiff's breach of contract claim is identical to that of the other members of putative Class. See In Re Visa Check, 280 F.3d at 139 (The Second Circuit held that "common issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues.")

The class claims rely on common provisions and language in the Form Loan Agreements executed by Defendants and each member of the proposed Class. The predominance requirement generally has been found satisfied in breach of contract cases involving the interpretation of similar contractual provisions. See, e.g., Wu v. Pearson Educ., Inc., 2011 U.S. Dist. LEXIS 112308, at (S.D.N.Y. Sept. 30, 2011) ("Courts faced with similar circumstances have certified cases for class treatment as

---

8  The firm resumes of Class counsel are annexed to the Grob Decl.as Exh. NN.

long as the relevant provisions were similar."); Steinberg v. Nationwide Mut. Ins.
Co., 224 F.R.D. 67, 75-81 (E.D.N.Y. 2004) ("the pertinent provisions of
Nationwide's policies are substantially uniform and adjudication of the putative
class' breach of contract claim would not invoke predomination of individual issues
of fact.").

 Defendants cannot meaningfully dispute that both the Form Loan
Agreements and the relevant law uniformly prohibit:

(i) the collection of legal fees and expenses from borrowers which were
never paid by the Defendants, or were more than what they actually
paid; or

(ii) the collection of late fees from borrowers after acceleration, where the
accelerated loan was ultimately paid – or foreclosed on –; or

(iii) the collection of fees for legal services rendered by Moss Codilis in
Colorado, if Christina Nash was the attorney in charge of rendering
those services; or

(iv) the sharing of a portion of the"attorneys fees" collected from plaintiff
and other borrowers with a non-attorney (Fidelity).

 No individual evidentiary hearings will be required to identify the members
of the Class.  Rather, using its computer records, Defendants can determine each
person who was charged a specific, impermissible fee.  In re Visa Check, 280 F.3d
124, 142 (2d Cir. 2001) (class action is clearly manageable where the action involves
"class members who can be identified by defendant's own records"); In re Strip
Search, 461 F.3d 219, 229 (2d Cir. 2006) (same);  In re NASDAQ Market-Makers
Antitrust Litig., 172 F.R.D. 119, 129 (S.D.N.Y.1997) ("as a result of the
computerized databases of the NASD, and of defendants themselves, the data
relevant to aggregate damages here may be susceptible to being assembled and

organized in a relatively straightforward manner"); <u>Hunt v. Check Recovery Systems, Inc.</u>, 241 F.R.D. 505, 514 (N.D. Cal. 2007) ("as plaintiff correctly point out, the only individual issues are ministerial, e.g. identifying class members and calculating actual damages.  Plaintiffs explain that the calculation of actual damages will not require individualized issues of proof, because the amounts collected will be reflected in Defendant's collection records")

## POINT III

### Class Treatment Is Clearly The Superior Method Of Resolving The Issues In This Case

For the same reasons as above, the class action device is superior to other means of litigating the facts at issue here.  This case presents "precisely the type of situation for which the class action device is suited" since many nearly identical litigations can be adjudicated in unison.  <u>In re Visa Check</u>, 280 F.3d at 146; <u>see also</u>, <u>Deposit Guar. Nat. Bank v. Roper</u>, 445 U.S. 326, 339 (1980) (noting that in certain cases "aggrieved persons may be without any effective redress unless they may employ the class-action device").

Without class-wide notice, many putative class members will not even be aware that they may have been charged for improper fees and expenses. Plaintiff is unaware of any other individual actions against Defendants on the claims incorporated in the Class definition.  Individual damages to members of the proposed Class also would only amount to a few thousand dollars, an insufficient sum to warrant litigation by each proposed Class member of their own claims. Further, use of the class action device also avoids the risk of inconsistent adjudications in different forums.

23

<u>The Class Claims Are Easily Manageable</u>

Finally, on the question of manageability, the Second Circuit has held that "failure to certify an action under Rule 23(b)(3) on the sole ground that it would be unmanageable is disfavored and should be the exception rather than the rule." <u>Visa Check</u>, 280 F.3d at 140.  The Second Circuit has cautioned that "[a] class action should not be found unmanageable without [first] exploring the procedural devices available for bringing it in line;  These include subclassing and trial of subclass issues separately, bifurcating liability and damages and, if necesary appointing a special master for difficult evidentiary matters.  See <u>Robinson v. Metro-North Commuter R.R.</u>, 267 F.3d 147, 168 (2d Cir. 2001).  Here, as Dunnery admitted at his deposition, the loans serviced by Defendants were Fannie Mae and Freddie Mac Form Loan Agreements containing identical material provisions.  (Grob. Exh. A, pp. 128-31, 150-52, 354-55, 361-62; Exh. K, pp. 337-38)   In fact, because the provisions relating to fees and expenses were uniform, Defendants themselves stopped looking at individual loan documents to determine whether particular fees and expenses were recoverable from borrowers.  (Grob. Decl. Exh. A, pp. 150-52)

In addition, there is little, if any, material difference in the law of the individual jurisdictions as it relates to the breach of contract claim for which class certification is sought.  Manageability will not be an impediment for class treatment of this action.

**POINT IV**

**THE COURT SHOULD ALSO CERTIFY A SUBCLASS
OF CALIFORNIA BORROWERS**

Finally, plaintiffs also seek certification of a subclass of California borrowers

whose loans were serviced by Defendants and who, after March 2000, were charged

(i) any of the fees or expenses set forth in the general Class Definition; or (ii) fees

which are not included among those allowed to be charged under Cal. Civil Code

2924c after a Notice of Default was recorded.

California's Business & Profession's Code §17200 – the state's Unfair

Competition Law – provides that violations of other state and federal laws such as

TILA are independent violations of the California statute, and treats those violations,

"when committed pursuant to business activity, as unlawful practices independently

actionable under section 17200." Farmers Ins. Exchange v. Superior Ct., 2 Cal.4th

377, 383 (Cal. 1992).   Thus, to the extent that HomEq violated §1788.18 of the

California Civil Code or TILA by collecting fees and expenses from California

borrowers which are not "expressly authorized by the agreement creating the debt or

permitted by law", then a violation of  §17200 is similarly established.  See In re

First Alliance, 280 B.R. 246, 250 (C.D. Cal. 2002) (defendant liable under §17200

based on violation of TILA).   Thus, the class action analysis described above applies

equally to the class of California property owners who were charged the fees and

expenses described in the general Class Definition.

Moreover, Plaintiff also seeks to certify a subclass of California borrowers

who were charged fees which are not included in Cal. Civil Code 2924c.  Sections

2924c and 2924d of the California Civil Code "regulate costs that may be charged to

a California borrower after notices of default and sale have been recorded." <u>Walker</u>

<u>v. Countrywide Home Loans, Inc.</u>, 98 Cal.App.4th 1158, 1174 (2002)  Thus, under

§2924c,  the costs and expenses which may be charged to a borrow after recording of

default

> ***shall be limited to the costs*** incurred for recording,
> mailing… publishing, and posting notices required by
> Section 2924 to 2924i, inclusive, postponement
> pursuant to 2924g . . . and a fee for a trustee's sales
> guarantee.

Cal. Civ. Code 2924c, Grob. Decl. Exh. OO.

In this case, after the Notice of Default on Mazzei's property was recorded,

Defendants charged Mazzei for $133.80 in late fees, $15.00 for two Property

Inspections, $100.00 for a Broker Price Opinion, and $13.00 for the cost of

recording a Substitution of Trustee. (Grob. Decl. Exh. E; Exh. F: Exh. G, at pp. 7-12)

Moreover, Defendants admit that they charged California borrowers for all fees and

expenses they incurred after a Notice of Default was recorded, irrespective of the

express limitations imposed by §2924c. (Grob. Decl. Exh. MM hereto, pp. 266-67;

Exh. K, pp. 360-362.)

The overarching legal issue common to the class is whether HomEq has the

right to charge borrowers for late fees, inspection fees, broker price opinion fees,

substitution fees and other fees which are not specifically enumerated in §2924f.  In

<u>Walker</u>, the California appellate court held what is obvious from the statute -- that

"after the notice of default is recorded, borrowers are responsible only for the

amounts stated in the notice of default plus specific costs and expenses

delineated by statute." 98 Cal. App.4[th] at 1174.   Indeed, <u>Walker</u> directly rejects

Defendants' position that it has the right to charge fees like the property inspections

charged to plaintiff after a notice of default has been recorded:

> Here, Countrywide [the debt servicer] agrees that it is not
> permitted to, and does not, charge to delinquent borrowers
> property inspection fees incurred *after* a loan is referred
> for foreclosure.

Walker, 98 Cal. App. 4th at 1174 (emphasis in original).


## CONCLUSION

For foregoing reasons, plaintiff respectfully submits that his instant motion

for class certification be granted in all respects.

Dated: New York, New York
       February 10, 2012

<div style="margin-left:40%">

Respectfully submitted,


_____SS_____
Paul S. Grobman (PG 1876)
THE LAW OFFICES OF PAUL
GROBMAN
555 Fifth Avenue, 17th Floor
New York, NY 10017
212 983-5880

Neal A. DeYoung (ND 3098)
SHARMA & DEYOUNG LLP
286 Madison Avenue, Suite 2002
New York, New York 10017
(212) 561-1907


Attorneys for Plaintiff and the Class

</div>