UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

JOSEPH MAZZEI, ON BEHALF OF HIMSELF
AND ALL OTHERS SIMILARLY SITUATED,

                    **Plaintiff,**

           - against -

THE MONEY STORE, ET AL.,

                  **Defendants.**
_____

                               01 Civ. 5694 (JGK)

                               <u>OPINION AND ORDER</u>

JOHN G. KOELTL, District Judge:

    The plaintiff, Joseph Mazzei, brings this purported class action on behalf of himself and all others similarly situated against The Money Store, TMS Mortgage, Inc., and HomEq Servicing Corporation (collectively, "The Money Store defendants"). The plaintiff alleges breach of contract, violations of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1666d, TILA Regulation Z, 12 C.F.R. § 226.21, and California Business & Professional Code § 17200 <u>et seq.</u> (West 2011), in connection with the defendants' allegedly improper debt collection practices.[1] The plaintiff moves for class certification of a breach of contract class, a

_____

[1] Judge Sprizzo previously dismissed the plaintiff's claims under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 <u>et seq.</u>, and the Real Estate Settlement Procedures Act, 12 U.S.C. § 2605. <u>See</u> <u>Mazzei v. Money Store</u>, 349 F. Supp. 2d 651, 661 (S.D.N.Y. 2004) (dismissing the Fair Debt Collection Practices Act claim); <u>Mazzei v. Money Store</u>, 552 F. Supp. 2d 408, 413 (S.D.N.Y. 2008) (dismissing the Real Estate Settlement Procedures Act claim).

TILA class, and two California subclasses pursuant to Rule 23 of the Federal Rules of Civil Procedure.

## I. BACKGROUND

The following facts are undisputed unless otherwise noted.

### A.

In 1994, the named plaintiff, Joseph Mazzei, took out a home mortgage loan from The Money Store on his home in Sacramento, California.  Mazzei v. Money Store, No. 01 Civ. 5694, 2011 WL 4501311, at *2 (S.D.N.Y. Sept. 29, 2011).  The loan was issued pursuant to Fannie Mae form loan documents, including a Note and Deed of Trust (collectively, the "form loan agreement").[2]  (Grobman Decl. ¶¶ 3-5.)

In December 1999, Mazzei began to experience financial difficulties and fell behind on his loan.  Mazzei, 2011 WL 4501311, at *2.  He defaulted on several occasions.  Id.  In or about March 2000, pursuant to the Deed of Trust, The Money Store defendants accelerated Mazzei's loan obligations and declared the full amount of the debt immediately due and payable.

---

[2] On November 2, 1994, The Money Store transferred the Note and Deed of Trust to The Bank of New York.  (Dunnery Decl. Exs. A, C.)  The Money Store continued to service the loan on behalf of The Bank of New York throughout the relevant time period. (Dunnery Decl. ¶ 6.)

2

(Grobman Decl. Ex. MM at 189.)  After Mazzei's loan was
accelerated, he was charged several late fees, allegedly for his
failure to make monthly payments.  (Grobman Decl. Ex. E at 2881;
Grobman Decl. Ex. MM at 189.)  Mazzei filed for bankruptcy in
July 2000.  Mazzei, 2011 WL 4501311, at *2.  In October 2000,
Mazzei dismissed his bankruptcy petition and he alleges that he
sold his home.  (Dunnery Decl. Ex. K; Am. Compl. ¶ 33.)  At that
time, in an effort to satisfy his outstanding obligation to the
defendants, Mazzei made a payment of $61,147.32.  Mazzei, 2011
WL 4501311, at *2.  That amount included payment for all
attorneys' fees, late fees, and other expenses that the
defendants allegedly had incurred as a consequence of Mazzei's
defaults.[3]  After the payment of $61,147.32, Mazzei contends that
his loan was paid off in full, but the defendants claim that a
small balance was left unpaid and was subsequently written off.[4]

---

[3] Mazzei's account was charged $255.00 in "Bankruptcy Attorneys'
Fees," $461.47 in "Foreclosure Attorneys' Fees," and $1037.80 in
"Bankruptcy Court Costs" and "Foreclosure Court Costs."
(Grobman Decl. Ex. G at 3.)
[4] There has been some dispute between the parties over whether
the payment of $61,147.32 completely paid off Mazzei's account.
The defendants allege that an outstanding balance of $229.26 was
written off on December 26, 2001.  (Grobman Decl. Ex. G at 3-4.)
Although resolution of the issue may be relevant for Mazzei's
other claims, it is not relevant for this motion.

**B.**

The Money Store defendants are mortgage lenders and servicers of mortgage loans. (Dunnery Decl. ¶ 1.)  The defendants had outsourcing arrangements with a law firm, Moss, Codilis, Stawiarski, Morris, Schneider & Prior LLP ("Moss Codilis"), and a non-legal entity, Fidelity National Default Solutions ("Fidelity"), each of which are central to Mazzei's allegations that he was charged improper fees in connection with his default.  (Dunnery Decl. ¶ 9.)

The Money Store defendants retained Moss Codilis to help manage collection efforts for loans that were in default. (Dunnery Decl. ¶ 9(a).)  Moss Codilis, a law firm located in Colorado, sent breach letters to delinquent borrowers on loans serviced by the defendants (the "Breach Letter Program"). (Dunnery Decl. ¶ 9(a); Grobman Decl. ¶ 32.)  From 1997 through 2000, Moss Codilis sent out 88,937 breach letters on behalf of the defendants.  (Grobman Decl. Ex. Z. at 4.)  Fees for these breach letters were charged to the borrowers' accounts pursuant to the form loan agreement provisions regarding attorneys' fees. (Dunnery Decl. ¶ 9(a).)  On February 23, 2000, Moss Codilis sent a breach letter to Mazzei about his delinquent loan.[5]  (Dunnery

---

[5] Although Mazzei received four breach letters from Moss Codilis over the time he was in default, the class period Mazzei asserts only includes the final breach letter sent on February 23, 2000.

Decl. Ex. G.)  On April 6, 2000, a fee of $35.00 for the breach
letter was charged to Mazzei's account.  (Dunnery Decl. ¶ 9(a);
Grobman Decl. Ex. E at 2881; Grobman Decl. Ex. G at 3.)

The Money Store defendants also employed Fidelity to assist
with bankruptcies and foreclosures.  Fidelity, a non-legal
entity, had a national network of hundreds of law firms to which
it would refer cases from The Money Store defendants for
representation in foreclosure and bankruptcy proceedings.
(Dunnery Decl. ¶ 9(c).)  As of July 2005, the defendants had
referred over 46,000 loans to Fidelity for foreclosure and
bankruptcy matters.  (Grobman Decl. Ex. Q at 9.)  Under the
agreement between the defendants and Fidelity, the law firms
sent their bills to Fidelity as an intermediary.  (Dunnery Decl.
¶¶ 9(c), 9(c)(iii); Grobman Decl. Ex. N at 13.)  Fidelity would
then bill the defendants.  (Dunnery Decl. ¶¶ 9(c), 9(c)(iii).)
After receiving invoices from Fidelity, The Money Store
defendants paid Fidelity, which then passed on these payments to
the law firms.  (Dunnery Decl. ¶¶ 9(c), 9(c)(iii).)  The law
firms paid Fidelity a "technology and referral fee," allegedly
for a software system which helped the law firms handle the

---

Mazzei's counsel admitted at oral argument that the only breach
letter within the class period was the letter sent on February
23, 2000.  Therefore, the propriety of the other breach letters,
and the identity of the Breach Letter Program's supervisor
during the period before the final breach letter, are not in
dispute.

matters Fidelity referred to them.  (Dunnery Decl. ¶¶ 9(c),

9(c)(iii).)[6]  The "technology and referral fee" paid by the law

firms was included in the amount that Fidelity calculated for

the Fannie Mae allowable limits on legal fees for bankruptcy and

foreclosure actions.  (Grobman Decl. Ex. K at 417.)  The fee

charged by Fidelity as an "attorneys' fee" included the amount

that was paid to the attorneys as well as a technology and

referral fee.  The defendants claim that their policy was to

delay charging the borrowers' accounts for attorneys' fees until

after the defendants had already sent payment to Fidelity for

the legal services.  (Dunnery Decl. ¶¶ 9(c)(i), 18(e).)

        Under a part of the agreement between The Money Store

defendants and Fidelity (the "Bonus/Penalty Agreement"), if an

individual foreclosure or bankruptcy was completed before a set

deadline, Fidelity would receive a bonus payment from The Money

Store defendants.  (Dunnery Decl. ¶ 9(c)(ii).)  However, if

Fidelity failed to meet the deadline for the completion of an

individual bankruptcy or foreclosure, Fidelity had to pay the

defendants a penalty.  (Grobman Decl. Ex. A at 462-77; Grobman

Decl. Ex. N at 19-21.)  In instances where a penalty was

---

[6] Fidelity alternatively identified the "technology and referral
fee" as an "administrative support fee" that law firms paid for
each loan referred.  (Grobman Decl. Ex. T.)  For the purposes of
this motion, the term "technology and referral fee" will be used
to refer to any fee that was paid from law firms to Fidelity for
the referral services Fidelity provided.

assessed against Fidelity, the borrower was not paid back the portion of the funds that the defendants collected as a penalty. (Grobman Decl. Ex. A at 476-77.)

## C.

This action arises out of The Money Store defendants' alleged breaches of the form loan agreement. Mazzei purports to represent a class of individuals who were charged improper attorneys' fees and late fees in contravention of the form loan agreement. Specifically, the plaintiff asks the Court to certify one class consisting of:

> All similarly situated borrowers who signed [form loan agreements] on loans which were owned or serviced by [the defendants] and who from March 1, 2000 to the present ("Class Period") were charged the following fees that were not permitted under the [form loan agreements]:
>
> [1] attorneys' fees and expenses which [the Money Store defendants] never paid to [Fidelity] or their attorneys, including penalties paid back by Fidelity from attorneys' fees which were not credited to borrowers; and
>
> [2] amounts paid to Fidelity, a non-lawyer entity, from attorneys' fees charged to borrowers;
>
> [3] attorneys' fees improperly collected from borrowers for issuance of breach letters by [Moss Codilis]; and
>
> [4] late fees after the borrower's loan was accelerated, and where the accelerated loan was paid off (or foreclosed on).

7

(Pl.'s Mem. Supp. Class Certif. 1.)[7]

Subgroups [1], [2], and [3] rely on provisions of the form loan agreement regarding attorneys' fees.  The form loan agreement requires that the borrower pay all reasonable attorneys' fees the defendants incur in connection with a borrower's default, bankruptcy, or foreclosure.  Specifically, the Note provides that upon default, "the Note Holder will have the right to be paid back for all of its costs and expenses to the extent not prohibited by applicable law.  These expenses include, for example, reasonable attorneys' fees . . . ." (Grobman Decl. Ex. B at ¶ 4(D) (emphasis added).)  Similarly, the Deed of Trust allows for acceleration of the debt upon default and requires the borrower pay for reasonable attorneys' fees related to the default and acceleration:

> 7.  Protection of Lender's Rights in the Property . . . If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's

---

[7] The class definition in the plaintiff's memorandum in support of class certification is clearer than the sprawling class definition in the Third Amended and Supplemental Complaint at ¶ 10.  The Court had previously stricken a prior motion for class certification in part because the plaintiff had proposed a new class in response to the defendants' opposition to class certification.  On this motion, the defendants do not contest that the plaintiff has set forth accurately in his memorandum the class he seeks to represent, and therefore the Court will accept that class definition and deem the complaint amended to incorporate that class definition.

rights in the Property (such as a proceeding in
bankruptcy . . .), then Lender may do and pay for
whatever is necessary to protect the value of the
property and Lender's rights in the
Property . . . Lender's actions may include . . .
paying <u>reasonable attorneys' fees</u> . . . any
amounts disbursed by Lender under this paragraph
[] shall become additional debt of the Borrower
secured by this Security Instrument . . .

19. Acceleration; Remedies . . . If the default
is not cured on or before the date specified in
the notice, Lender at its option may require
immediate payment in full of all sums secured by
this Security Instrument without further demand
and may invoke the power of sale and any other
remedies permitted by applicable law. Lender
shall be entitled to collect all expenses
incurred in pursuing the remedies provided in
this paragraph 19, including, but not limited to,
<u>reasonable attorneys' fees</u> and costs of title
evidence.

(Grobman Decl. Ex. C at ¶¶ 7, 19 (emphasis added).) Mazzei

alleges that the defendants charged him and others several

different types of improper "attorneys' fees."

　　Subgroup [4] focuses on a provision of the form loan

agreement that allows the defendants to charge late fees for

late monthly payments. Mazzei claims that he and other members

of the class were improperly charged late fees after the

defendants had already accelerated their loans ("Post-

Acceleration Late Fees"). The Note provides that late fees may

be charged if a monthly payment is late:

If the Note Holder has not received the full
amount of any of my monthly payments by the end
of 10 calendar days after the date it is due, I

9

will promptly pay a late charge to the Note Holder.[8]

(Grobman Decl. Ex. B at ¶ 4(A).)  The Deed of Trust also provides that a borrower could have his or her loan reinstated despite a default and after acceleration by the lender, if the borrower, among other things, "pays Lender all sums which then would be due under this Security Instrument and the Note had no acceleration occurred . . . ." (Grobman Decl. Ex. C. at ¶ 18.) The defendants allege that this provision allowed the defendants to charge late fees after acceleration of a loan if the borrower reinstated that loan.  (Dunnery Decl. ¶ 18(b) n.8.)

    If the borrower did not reinstate the loan—that is, if the borrower paid off the loan or the loan was foreclosed on—the form loan agreement is silent with regard to whether the lender may charge late fees after the borrower has defaulted and the lender has accelerated the remaining debt.  The defendants allege that it was their policy not to charge late fees after acceleration for loans in bankruptcy, (Dunnery Decl. Ex. N at 173), or for loans in which the underlying property was sold upon foreclosure (Dunnery Decl. Ex. N at 186-88).  The defendants also claim that they had a policy of reviewing state

---

[8] The plaintiffs in <u>Vincent v. Money Store</u>, No. 03 Civ. 2876, had similar provisions in their contracts.  (Grobman Decl. Ex. DD at ¶ 7(a); Grobman Decl. Ex. EE at ¶ 4(a); Grobman Decl. Ex. FF at ¶ 8(A).)

laws regularly and only charging late fees after acceleration in those states where the form loan agreement had not been interpreted to prohibit such charges. (Dunnery Decl. ¶ 9(b); Dunnery Decl. Ex. N at 186-88.)

The form Deed of Trust also has a provision that requires the refund of any improper loan charges:

> If the loan secured by this Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed the permitted limits, then . . . any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower.

(Dunnery Decl. Ex. B at ¶ 12.)  The plaintiff alleges that each of the improper fees must be returned because they are prohibited under the form loan agreement and/or exceed the permissible charges under the laws of all fifty states.

### D.

On June 22, 2001, the plaintiff filed his Complaint in this Court.  On December 1, 2004, Judge Sprizzo granted summary judgment dismissing the plaintiff's claims under the Fair Debt Collection Practices Act but denied without prejudice the defendants' motion for summary judgment on the plaintiff's claims under TILA and the Real Estate Settlement Procedures Act. On April 25, 2008, Judge Sprizzo granted summary judgment on the

plaintiff's claims under the Real Estate Settlement Procedures
Act but again denied summary judgment without prejudice on the
plaintiff's TILA claim.  See Mazzei, 552 F. Supp. 2d at 413.  On
September 29, 2011, this Court denied the defendants' motion for
summary judgment on the plaintiff's claim under TILA.  Mazzei,
2011 WL 4501311, at *3.


## II. STANDARD FOR CLASS CERTIFICATION

Before certifying a class, the Court must determine that
the party seeking certification has satisfied the four
prerequisites of Rule 23(a): (1) numerosity, (2) commonality,
(3) typicality, and (4) adequacy of representation.  See Fed. R.
Civ. P. 23(a); see, e.g., Teamsters Local 445 Freight Div.
Pension Fund v. Bombardier, Inc., 546 F.3d 196, 202-03 (2d Cir.
2008); In re Initial Pub. Offerings Sec. Litig. ("In re IPO"),
471 F.3d 24, 32 (2d Cir. 2006).  The Court must find, more
specifically, that: "(1) the class is so numerous that joinder
of all members is impracticable; (2) there are questions of law
or fact common to the class; (3) the claims or defenses of the
representative parties are typical of the claims or defenses of
the class; and (4) the representative parties will fairly and
adequately protect the interests of the class."  Fed. R. Civ. P.
23(a).  The Court must also find that the class qualifies under

one of the three sets of criteria set forth in Rule 23(b).  <u>See</u>

<u>Amchem Prods., Inc. v. Windsor</u>, 521 U.S. 591, 613-14 (1997);

<u>Teamsters</u>, 546 F.3d at 203; <u>In re IPO</u>, 471 F.3d at 32.

The plaintiff here seeks certification under Rule 23(b)(3),

which provides for a class to be maintained where "the questions

of law or fact common to the class members predominate over any

questions affecting only individual members, and . . . a class

action is superior to other available methods for fairly and

efficiently adjudicating the controversy."  Fed. R. Civ. P.

23(b)(3).  If the requirements of 23(a) have been met, and the

claims fall within the scope of Rule 23(b)(3), a court may, in

its discretion, certify the class.  <u>See In re IPO</u>, 471 F.3d at

41 ("[A] district judge may certify a class only after making

determinations that each of the Rule 23 requirements has been

met.").

"Rule 23 does not set forth a mere pleading standard.  A

party seeking class certification must affirmatively demonstrate

his compliance with the Rule—that is, he must be prepared to

prove that there are <u>in</u> <u>fact</u> sufficiently numerous parties,

common questions of law or fact, etc."  <u>Wal-Mart Stores, Inc. v.</u>

<u>Dukes</u>, 131 S. Ct. 2541, 2551 (2011).  Plaintiffs seeking class

certification bear the burden of demonstrating by a

preponderance of the evidence that the proposed class meets each

13

of the requirements for class certification set forth in Federal Rule of Civil Procedure 23.  Teamsters, 546 F.3d at 202.  When assessing whether plaintiffs have met this burden, courts must take into account "all of the relevant evidence admitted at the class certification stage."  In re IPO, 471 F.3d at 42.  A court may certify a class only after determining that "whatever underlying facts are relevant to a particular Rule 23 requirement have been established."  Id. at 41.  "[T]he obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue," although a court "should not assess any aspect of the merits unrelated to a Rule 23 requirement."  Id.

## III. DISCUSSION

### A. THRESHOLD CLASS-WIDE ISSUES

During the time between Mazzei's initial default in December 1999 and the final repayment of his mortgage loan in October 2000, the defendants charged Mazzei's account for various fees they incurred.  Mazzei's October 2000 repayment of $61,147.32 included payment for these fees, many of which Mazzei now alleges were improperly charged.  Mazzei seeks to represent a class of borrowers who were similarly subjected to improper

14

fees.  There are two threshold issues of class definition that must be addressed prior to analysis of whether the class action may be certified pursuant to Rule 23: (1) whether the proposed class definition creates a fail-safe class and (2) whether the class should be restructured.

### 1. FAIL-SAFE CLASS DEFINITION

The defendants argue that the proposed class definition creates an impermissible "fail-safe" class.  A fail-safe class is one whose definition "shields the putative class members from receiving an adverse judgment . . . ."  Randleman v. Fidelity Nat'l Title Ins. Co., 646 F.3d 347, 352 (6th Cir. 2011); see also Kamar v. Radio Shack Corp., 375 F. App'x 734, 736 (9th Cir. 2010) ("The fail-safe appellation is simply a way of labeling the obvious problems that exist when the class itself is defined in a way that precludes membership unless the liability of the defendant is established.").  In a fail-safe class, either the class members win or, by virtue of losing, they are not in the class, and therefore not bound by the judgment.  See Genenbacher v. CenturyTel Fiber Co. II, 244 F.R.D. 485, 488 (C.D. Ill. 2007).  A proposed "fail-safe" class should not be certified because it is unfair to defendants, it prevents an adverse judgment being entered against plaintiffs, and it is

unmanageable because the members of the class could only be
known after a determination of liability.  See Randleman, 646
F.3d at 352; Kamar, 375 F. App'x at 736.

The proposed class definition creates a fail-safe class.
Mazzei has offered the following broad class definition:

> All similarly situated borrowers who signed form
> loan mortgage agreements . . . on loans which
> were owned or serviced by [the defendants] and
> who from March 1, 2000 to the present ("Class
> Period") were charged the following fees that
> were not permitted under the [form loan
> agreements]:

(Pl.'s Mem. Supp. Class Certif. 1 (emphasis added).)
Defining the class to include only those who were charged
fees "that were not permitted" results in a fail-safe
class.  The merits of Mazzei's claim depend on whether the
fees "were not permitted."  With the current class
definition, if the trier of fact decided that any or all of
the fees were permitted under the form loan agreements,
there would immediately be no members of the class for
those fees.  The language "were not permitted" defines the
class impermissibly by the very liability the plaintiff
seeks to establish.

Despite a fail-safe class definition, courts have the
discretion "to construe the complaint or redefine the class to
bring it within the scope of Rule 23 . . . ."  Cokely v. N.Y.

16

<u>Convention Ctr. Operating Corp.</u>, No. 00 Civ. 4637, 2004 WL
1152531, at *2 n.3 (S.D.N.Y. May 21, 2004) (quoting 7A Wright &
Miller, Fed. Prac. & Proc. Civ. 2d § 1759 (2003) (citations
omitted)); Fed. R. Civ. P. 23(c)(1); <u>see also</u> <u>Campbell v. First
Am. Title Ins. Co.</u>, 269 F.R.D. 68, 73-74 (D. Me. 2010) (revising
the class definition to avoid "the 'fail safe' issue").  By
removing the troublesome language "that were not permitted under
the [form loan agreements]," the fail-safe problem is partially
resolved.[9]


## 2. DIVIDING THE CLASS INTO FIVE POSSIBLE CLASSES

The next threshold issue is whether the single class
offered by the plaintiff should be split into separate classes.
"[C]ourts ha[ve] discretion to create additional classes or
split a class into subclasses, as long as each individual class
satisfies the prerequisites of Federal Rules of Civil Procedure
23(a) and 23(b)."  <u>In re Nanophase Techs. Corp. Litig.</u>, Nos. 98 C
3450, 98 C 7447, 1999 WL 965468, at *2 (N.D. Ill. Sept. 30,
1999) (citations omitted); <u>see also</u> <u>Kamar v. Radio Shack Corp.</u>,
254 F.R.D. 387, 391 n.2 (C.D. Cal. 2008) (citing Wright, Miller

---

[9] Subgroup [3], which includes charges for attorneys' fees that
were "improperly collected," also has a fail-safe definition
issue.  However, that fail-safe issue will be discussed in
detail when that claim is analyzed in its entirety in Part
III.B.1.

& Kane, 7A Fed. Prac. & Proc. Civ. § 1759 ("[I]f plaintiff's definition of the class is found to be unacceptable, the court may construe the complaint or redefine the class to bring it within the scope of Rule 23.")).  Mazzei initially proposed the class action as one breach of contract claim class, with each subgroup constituting a subclass of the same breach of contract claim class.  The class was defined as including those individuals during the Class Period who were charged the fees specified in categories 1 through 4, and 5.  By its definition, to be a member of the class, an individual had to be charged each of the fees that were alleged to be in violation of the form loan agreement.  However, at oral argument, Mazzei conceded that the class could be divided into separate classes rather than be treated as one breach of contract class action.  The breaches described in each of the subgroups depend on distinct factual allegations.  If the subgroups were analyzed as parts of one class under Rule 23, there would be glaring problems of commonality, typicality, and adequacy under Rule 23(a), as well as issues of predominance and superiority under Rule 23(b).  See, e.g., Weiss v. La Suisse, Societe D'Assurances Sur La Vie, 226 F.R.D. 446, 451 (S.D.N.Y. 2005) (holding that class failed predominance requirement because members alleged same contract was breached in a number of different ways).  Therefore, the

subgroups will be treated as separate classes, and each such class will be required to meet all of the elements of Rule 23.

Furthermore, although Mazzei divided the class action into four subgroups, it is apparent that the class definition calls for the creation of five separate classes.  The first subgroup Mazzei proposed included two distinct factual allegations: (1) fees were allegedly charged by the defendants that were never paid to attorneys at all, and (2) fees were allegedly charged by the defendants, paid to attorneys, refunded to the defendants, yet never returned to the class members.  Because these groups do not necessarily overlap, the subgroup will be divided into separate classes.  Keeping as much of Mazzei's originally proposed language as possible, the following five classes result:

> All similarly situated borrowers who signed form loan mortgage agreements on loans which were owned or serviced by the defendants and who from March 1, 2000 to the present ("Class Period") were charged:
>
> (1) attorneys' fees improperly collected from borrowers for issuance of breach letters by Moss Codilis ("Breach Letter Fee Class");
>
> (2) attorneys' fees and expenses which the defendants paid to Fidelity but which were paid back to the defendants by Fidelity as penalties from attorneys' fees and which were not credited to borrowers ("Penalty Fee Class");

(3) attorneys' fees and expenses which the defendants never paid to Fidelity or their attorneys ("Phantom Fee Class");

(4) late fees after the borrower's loan was accelerated, and where the accelerated loan was paid off (or foreclosed on) ("Post-Acceleration Late Fee Class"); and

(5) amounts paid to Fidelity, a non-lawyer entity, from attorneys' fees charged to borrowers ("Fee-Split Class").[10]

## B. RULE 23 ANALYSIS OF FIVE CLASSES

Each of the five classes must meet all of the requirements of Rule 23 to be certified. The defendants argue that, for various reasons, none of the proposed classes meets the requirements of Rule 23. Each of the class action claims shall be described in detail and analyzed in turn.

### 1. BREACH LETTER FEE CLASS

Mazzei's first purported class, the Breach Letter Fee Class, is defined to include all borrowers who were charged for attorneys' fees improperly collected from borrowers for issuance of breach letters by Moss Codilis during the Class Period.

---

[10] The classes have been reordered to facilitate a more orderly discussion of each potential class. As discussed below, the plaintiff has failed to present sufficient evidence justifying certification of the first three classes, but has presented sufficient evidence supporting certification of the final two classes.

Mazzei alleges that the Breach Letter Program was overseen by Christina Nash, an attorney not licensed to practice law in the state of Colorado. (Grobman Decl. Ex. BB at 15.) According to Mazzei, Nash's deposition testimony demonstrates that Nash was responsible for the "daily oversight of the breach letter program." (Grobman Decl. Ex. BB at 20). Therefore, because Nash was not licensed to practice law in Colorado, any "attorneys' fees" charged to Mazzei or members of the class for breach letters from Moss Codilis during Nash's tenure were allegedly improper. The defendants counter that at the time Mazzei's breach letter was written, the Breach Letter Program was under the supervision of Valerie Bromley, a Colorado licensed attorney, and not Christina Nash. (Dunnery Decl. Ex. L at 225-26.) The defendants claim that Valerie Bromley began supervising the Breach Letter Program in 1999, before Mazzei's letter was sent. (Dunnery Decl. ¶ 9(a).) The defendants further allege that specific language in Mazzei's breach letter was based on Bromley's work, demonstrating that his letter was prepared under the supervision of Bromley. (Dunnery Decl. Ex. L at 225-26.) Therefore, because Mazzei was charged a breach letter fee for a letter from a Colorado licensed attorney, his fee was proper.[11]

---

[11] At argument, the plaintiffs conceded that Nash's involvement

The defendants argue that the Breach Letter Fee Class should fail because Mazzei's breach letter was not written while Christina Nash was supervising the Breach Letter Program. Mazzei counters that his letter was written while Nash was still in charge.  Whether it is labeled the failure to demonstrate typicality, adequacy, or an implied requirement of Rule 23(a), Mazzei has not successfully shown by a preponderance of the evidence that his letter was authored by Nash, and therefore this class fails.  Furthermore, the individualized inquiry necessary for each class member's breach letter results in a failure of the commonality requirement as well as the predominance prong of Rule 23(b)(3).[12]

---

in the Breach Letter Program ended in November 2000, and therefore the class period for the Breach Letter Fee Class only extends from March 1, 2000 through November 1, 2000.  However, the class period has no effect on the ability of the class to satisfy Rule 23.

[12] The Breach Letter Fee Class also has a fail-safe class definition problem.  Mazzei defines the Breach Letter Fee Class as all those charged for "[3] attorneys' fees improperly collected from borrowers for issuance of breach letters by [Moss Codilis]."  (Pl.'s Mem. Supp. Class Certif. 1 (emphasis added).) At the merits phase of the litigation, Mazzei will have to establish that the fees were "improperly collected."  Mazzei again seeks to identify membership by a successful outcome on the merits.  Although courts have the discretion to alter the class definition, see Campbell, 269 F.R.D. at 73-74, redefinition would be difficult for this class because it would depend on an ability to determine the degree to which a licensed attorney was in fact involved in each of the breach letters.  In any event, because the Breach Letter Fee Class fails for several reasons beyond the fail-safe definition, an exercise of

Mazzei must establish typicality, that "the claims or defenses of the representative parties are typical of the claims or defenses of the class," and adequacy, that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(3)-(4). Under both the typicality and adequacy prongs of Rule 23(a), a purported class representative must have suffered the same injury as those people he or she seeks to represent. See, e.g., Amchem, 521 U.S. at 625-26 ("[A] class representative must be part of the class and possess the same interest and suffer the same injury as the class members.") (internal quotation marks and citation omitted); Caridad v. Metro-North Commuter R.R., 191 F.3d 283, 293 (2d Cir. 1999) (finding typicality if "the disputed issue of law or fact occup[ies] essentially the same degree of centrality to the named plaintiff['s] claim as to that of other members of the proposed class"); Spagnola v. Chubb Corp., 264 F.R.D. 76, 96 (S.D.N.Y. 2010) ("Plaintiffs seek to certify a class of individuals or entities who purchased their policies from 2000 to the present, but [the named plaintiff] purchased his policies in 1988 and 1999, and thus appears to fall outside of the very class definition he seeks to

---

discretion to redefine the class to avoid the fail-safe problem would be futile.

certify.").  In addition to the explicit Rule 23(a)
requirements, courts have implied the additional requirement
that the class representative must be a member of that class.
See Feinstein v. Firestone Tire & Rubber Co., 535 F. Supp. 595,
600 (S.D.N.Y. 1982).  Mazzei has not satisfied these
requirements by a preponderance of the evidence.  See Teamsters,
546 F.3d at 202.

     Mazzei has not shown that he is a member of the class
because he has not demonstrated by a preponderance of the
evidence that his breach letter was written under the
supervision of Christina Nash.  The evidence is, at best,
ambiguous as to whether Christina Nash or Valerie Bromley
supervised Mazzei's breach letter.  Nash stated that she was
probably the only attorney running the Breach Letter Program in
1997 and 1998, however, in 1999, Valerie Bromley began to work
with her.  (Grobman Decl. Ex. BB at 43-44.)  Although Nash was
referred to as "in-house counsel" in 1999 (Grobman Decl. Ex. BB
at 19-20), Mazzei's letter was not sent until February 2000,
when Bromley had been at Moss Codilis for several months.
Furthermore, Nash testified at her deposition that a paragraph
in the Mazzei letter was added to all form letters by Bromley
(Dunnery Decl. Ex. L at 226), which indicates that at the point
in time when Mazzei's letter was written, Bromley may have been

in charge of the Breach Letter Program.  Mazzei has not adduced sufficient evidence to demonstrate by a preponderance of the evidence that his breach letter was written by, or created under the supervision of, Christina Nash.  Therefore, Mazzei has not satisfied typicality, adequacy, or the implied requirement that he is a member of the class he seeks to represent.

Furthermore, even if Mazzei could ultimately demonstrate that Nash wrote or supervised the creation of his breach letter, Mazzei fails the typicality requirement because he is subject to the unique defense that Nash may not have written or supervised the creation of his breach letter.  When the purported representatives may be "subject to unique defenses which threaten to become the focus of the litigation," posing a risk that "absent class members will suffer if their representative is preoccupied with defenses unique to it," class certification is inappropriate.  Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 903 F.2d 176, 180 (2d Cir. 1990) (citations omitted).  The unique defense does not have to be established in order to render the representative atypical; it is sufficient that the defendants show "that it is meritorious enough to require the plaintiff to devote considerable time to rebut [it]."  Lapin v. Goldman Sachs & Co., 254 F.R.D. 168, 179 (S.D.N.Y. 2008) (quoting Hallet v. Li & Fung

Ltd., No. 95 Civ. 8917, 1997 WL 621111, at *3 (S.D.N.Y. Oct. 6,
1997)).  The defendants have demonstrated that even if Nash did
actually write or supervise the writing of Mazzei's breach
letter, there will be substantial litigation that focuses on
whether Mazzei's letter was written by Nash or Bromley.  This
unnecessary litigation would distract from the claims of those
class members whose letters were plainly written by Nash.

Mazzei countered at oral argument that there is no "unique
defense" because if Nash did not write his letter, which was
sent near the beginning of the Class Period, then Nash did not
write any of the letters, and the entire class fails.
Therefore, Mazzei argued, the defense that the letter was
written by Bromley is not unique, because it applies to every
member of the class.  However, Mazzei has not demonstrated that
as of one specific date, all letters were switched from Bromley
to Nash.  In fact, it appears that there was overlap, because
Bromley began working at Moss Codilis in 1999 but Nash continued
to review breach letters through November 2000.  (Grobman Decl.
Ex. BB at 16; Dunnery Decl. ¶ 18(a).)  The fact that each member
of the class is potentially subject to his or her own "unique
defense"—far from resolving all issues in favor of
certification—only highlights the thousands of individualized
inquiries the class requires.  See, e.g., Wu v. MAMSI Life &

Health Ins. Co., 269 F.R.D. 554, 563-64 (D. Md. 2010) (denying certification because "many of the proposed class claimants are subject to unique defenses . . . the sole class representative[] is subject to several unique defenses that preclude a finding of typicality . . . ."). Indeed, Mazzei's counter-argument to save typicality demonstrates why the class must fail the commonality prong of Rule 23(a) and the predominance requirement of Rule 23(b)(3).

Mazzei cannot establish that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). To establish commonality, Mazzei must demonstrate that the class claims "depend upon a common contention" and that "common contention, moreover, must be of a nature that it is capable of class wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." See Dukes, 131 S. Ct. at 2551. Here, the determination of the authorship of Mazzei's breach letter will not generate a common class-wide answer. Rather, each class member will have to demonstrate that his or her own letter was authored by Nash.

Mazzei also cannot establish predominance, that "the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R.

27

Civ. P. 23(b)(3).  To satisfy the predominance requirement, the issues subject to generalized proof and applicable to the class as a whole must predominate over, and be more substantial than, the issues that are subject to individualized proof.  See In re Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124, 136 (2d Cir. 2001), abrogated on other grounds by In re IPO, 471 F.3d at 24.  The common question Mazzei highlights—whether Nash was engaged in the unauthorized practice of law—is straightforward and unlikely to take significant time to resolve.  However, that inquiry pales in comparison to the individualized determinations that must be undertaken with respect to each class member's breach letter.  Mazzei has not presented any evidence or explanation as to how breach letter identification could be resolved by generalized proof common to all class members. Instead, it appears that the factfinder will have to analyze each breach letter to determine whether it was written under the supervision of Nash or Bromley.  The difficulty of even determining the authorship of Mazzei's breach letter, when he is the named plaintiff and the litigation is over ten years old, presages the complex and unmanageable individualized inquiries that would be required if the class were certified.[13]  Therefore,

---

[13] Although a full analysis is unnecessary because the class fails several Rule 23 elements, the complexity of the individualized inquiries demonstrates that the class action also

Mazzei has failed to demonstrate by a preponderance of the evidence that the Breach Letter Fee class satisfies Rule 23.

## 2. PENALTY FEE CLASS

Mazzei's next proposed class, the Penalty Fee Class, is defined to include all borrowers who, during the Class Period, were charged attorneys' fees and expenses which the defendants paid to Fidelity but which were paid back to the defendants by Fidelity as penalties from attorneys' fees which were not credited to borrowers.  (Pl.'s Mem. Supp. Class Certif. 1.) Mazzei alleges that every borrower who paid attorneys' fees but whose completed bankruptcy or foreclosure went past the specified deadlines was improperly charged.  The borrowers paid attorneys' fees that were subsequently refunded to the defendants under the Bonus/Penalty Agreement, not paid to attorneys.  The defendants allege that because Mazzei admits that a bankruptcy or foreclosure was never completed for his mortgage, there was no bonus or penalty paid in his case. (Dunnery Decl. ¶ 9(c)(ii).)

---

likely fails the superiority prong of Rule 23(b)(3).  See Cohn v. Mass. Mut. Life Ins. Co., 189 F.R.D. 209, 219 (D. Conn. 1999) ("[T]he greater the number of individual issues, the less likely that superiority can be established") (internal quotation marks and citation omitted).

Just as with the Breach Letter Fee Class, Mazzei fails typicality, adequacy, and the implied requirement that the class representative be a member of the class.  See Amchem, 521 U.S. at 625; Caridad, 191 F.3d at 293; Spagnola, 264 F.R.D. at 96; Feinstein, 535 F. Supp. at 600.  The key fact to reach this conclusion is not in dispute: Mazzei did not have a completed foreclosure or bankruptcy.  Mazzei paid off his loans in full and dismissed his own bankruptcy petition.  Therefore, the Bonus/Penalty Agreement did not apply to Mazzei's loan and no attorneys' fees could have been refunded to the defendants for the legal work performed in connection with Mazzei's loan.  The plaintiff has presented no evidence, much less a preponderance of the evidence, to show that Mazzei satisfies the Rule 23 requirements for this class.  Because Mazzei would not benefit from a decision in favor of the class on this claim, he has no interest in litigating it successfully, and therefore he is an atypical and inadequate representative.  Accordingly, the Penalty Fee Class does not satisfy the requirements of Rule 23.

### 3. PHANTOM FEE CLASS

Mazzei's next purported class, the Phantom Fee Class, includes all those charged attorneys' fees and expenses which the defendants never paid to Fidelity or their attorneys during

30

the Class Period.  (Pl.'s Mem. Supp. Class Certif. 1.)  The
"Phantom Fees" are attorneys' fees that Mazzei alleges the
defendants' charged to borrowers, that the borrowers paid to the
defendants, but that the defendants never subsequently paid to
Fidelity.  (Grobman Decl. ¶ 11; Dunnery Decl. ¶ 9(c).)

Mazzei's evidence for the Phantom Fees are Fidelity
invoices produced during discovery in this litigation and in a
related suit, Vincent v. Money Store, No. 03 Civ. 2876.  The
invoices have a section titled "Invoice Processing Summary,"
with various fields for the entry of dates, including "Date
Submitted," "Accepted," "Approved," "Check Requested," and
"Check Confirmed."  (Grobman Decl. Ex. G at 7-12.)  A date
entered under "Check Confirmed" is confirmation that a check has
been sent to Fidelity.  (Grobman Decl. Ex. A at 516.)  None of
Mazzei's Fidelity invoices have a date under "Check Confirmed."
(Grobman Decl. Ex. G. at 7-12.)  Instead, each invoice has the
word "Unavailable" under "Check Confirmed."  (See Grobman Decl.
Ex. G. at 7-12.)  Mazzei alleges that the lack of a date under
"Check Confirmed" is proof that he was charged for attorneys'
fees that were never actually paid to Fidelity.  Mazzei made
discovery requests for evidence from the defendants that the

31

"attorneys' fees" in the invoices had actually been paid to attorneys.[14]  No documents were produced.

Although Mazzei does not allege that the defendants had a "policy" of charging Phantom Fees, he does claim that other members of the class were charged Phantom Fees.  Specifically, Mazzei points to the Fidelity invoices of the four plaintiffs in Vincent v. Money Store, No. 03 Civ. 2876.  (Pl.'s Mem. Supp. Class Certif. 11-13.)  Although none of the Vincent plaintiffs' invoices were marked "Unavailable" under "Check Confirmed," their invoices did have other anomalies.  Nine of the invoices were blank under "Check Confirmed," while six had dates listed that were one to three years after the plaintiffs were charged for and paid the fees.  (Grobman Decl. ¶ 14; Grobman Decl. Ex. M.)  According to Mazzei, the evidence indicates that not only were the Vincent plaintiffs charged for Phantom Fees, but also that because nearly all of the invoices in such a small sample size had some anomalies, it can be inferred that the defendants regularly charged Phantom Fees to a large number of borrowers.

The defendants allege that they had a policy not to bill borrowers for attorneys' fees until a check had been sent to

---

[14] Specifically, Mazzei requested "[a]ll documents concerning the 'Foreclosure Attorney/Court Costs' of $1,299.27 . . . including, but not limited to, any correspondence, breakdown of fees, time sheets, bills and/or invoices from counsel, or proof of payment by defendants."  (Grobman Decl. Ex. O at ¶ 18.)

Fidelity.  (Dunnery Decl. ¶ 9(c)(i).)  Therefore, the defendants argue, even if Mazzei was accidentally charged fees that were never paid to attorneys, it is unlikely that anyone else was. (Dunnery Decl. ¶ 9(c)(i).)  The defendants also claim that the word "Unavailable" or a blank space does not mean that the fee was not actually paid to Fidelity (Dunnery Decl. ¶ 18(c)),[15] and that the incorrect designation on the computer system could be the result of input errors by clerical personnel (Dunnery Decl. ¶ 17).[16]

Mazzei has not demonstrated by a preponderance of the evidence that the Phantom Fee Class satisfies the requirements of Rule 23.  Mazzei has failed to demonstrate that the class satisfies the commonality requirement.  There is no "common contention . . . capable of class wide resolution." Dukes, 131 S. Ct. at 2551.  Mazzei does not offer any proof, or even

---

[15] "[T]he investigation would require a separate review . . . for each relevant individual loan to determine whether or not a check was actually sent to pay for the legal services for that loan, regardless of the gap in the information on the face of the 'Fidelity invoice' concerning the 'check confirmed' date." (Dunnery Decl. ¶ 18(c).)

[16] The defendants also claim that Mazzei has shown no other borrower who had "Unavailable" under "Check Confirmed."  This argument is essentially one of numerosity, that Mazzei has failed to demonstrate that there are other members of the class. However, the defendants stipulated to numerosity.  (See Grobman Decl. Exs. KK, LL.)  Therefore, the defendants, having so stipulated, cannot raise the failure to demonstrate numerosity as a hurdle to class certification, even under the guise of typicality or adequacy.

allege, that the defendants had a policy of charging borrowers for fees that were not paid to Fidelity.  Therefore, Mazzei cannot resolve the Phantom Fee question with common proof that would apply to the entire class.  The failure of commonality is best illustrated by Mazzei and the <u>Vincent</u> plaintiffs.  Even if Mazzei could prove that he had been charged for attorneys' fees that were never paid to Fidelity, that proof would have no bearing on whether the <u>Vincent</u> plaintiffs had been similarly charged for Phantom Fees.  Mazzei could not rely on the "Unavailable" designation because the <u>Vincent</u> plaintiffs' invoices did not even say "Unavailable."[17]  Mazzei would have to demonstrate that each <u>Vincent</u> plaintiff, and each member of the class, had paid fees that were not subsequently paid to attorneys.

Mazzei's unique facts, including his invoice listing of "Unavailable" under "Check Confirmed," render him an atypical and inadequate class representative of the Phantom Fee Class.  Typicality is satisfied when "each class member's claim arises

---

[17] Mazzei does not purport to represent a class of only those whose invoices stated "Unavailable."  However, even if Mazzei's proposed class were redefined to include only those class members whose invoices stated "Unavailable" under "Check Confirmed," absent proof of a common policy by the defendants, such a class would still fail for lack of predominant common questions. Without a common policy, there would remain the possibility for each purported class member, the fees were paid but the "Unavailable" designation was the result of a clerical error.

from the same course of events." <u>Marisol A. v. Giuliani</u>, 126
F.3d 372, 376 (2d Cir. 1997) (per curiam) (citation omitted).
To establish adequacy of representation, "[t]he representatives
and the class members must share common objectives and legal or
factual positions . . . ." <u>M.O.C.H.A. Society, Inc. v. City of
Buffalo</u>, No. 98 Civ. 99C, 2008 WL 343011, at *5 (W.D.N.Y. Feb.
6, 2008) (quoting 7A Wright, Miller & Kane Fed. Prac. and Proc.
Civ. § 1769 (3d ed. 2007)).  Mazzei's invoices indicate a date
of "Unavailable," while invoices for other potential class
members are either correct, blank, or dated years after the
legal services supposedly were rendered.  Each of these factual
scenarios requires different proof.  For Mazzei's claim to
succeed, he must show that "Unavailable" means the fee was never
paid to attorneys.  By contrast, for the <u>Vincent</u> plaintiffs'
claims to succeed, Mazzei must show that a blank under "Check
Confirmed" or a long delay between the date of a charge and the
date of payment is proof that the fees were never paid by the
defendants.  Because Mazzei's claim will be successful without
offering any of the proof required for the <u>Vincent</u> plaintiffs'
success, Mazzei has no incentive to litigate their factual
positions, let alone those of other class members with a myriad
of scenarios that are as yet unknown.  Mazzei's interests are
not coextensive with the class, and his injuries are dissimilar

from those of other class members; therefore, Mazzei fails typicality and adequacy as well.

The plethora of individual inquiries that undercut commonality, typicality, and adequacy also doom predominance. See In re Currency Conversion Fee Antitrust Litig., 230 F.R.D. 303, 309 (S.D.N.Y. 2004) ("[A] court must deny certification where individual issues of fact abound.") (citations omitted). There is one question common to all potential members of the Phantom Fee Class: whether the charging of fees that were never actually paid to attorneys violated the form loan agreement.  In contrast, the non-common questions—whether each individual member was charged fees that were never paid, and whether each specific designation on the Fidelity invoices indicates attorneys' fees that were not paid—will undoubtedly be the focus of the litigation.  Cf. Spagnola, 264 F.R.D. at 98 (predominance "requires that common questions be the focus of the litigation") (emphasis added).  Even for those class members that may share Mazzei's "Unavailable" invoice designation, it would still have to be demonstrated that, for each individual, the attorneys' fees were actually charged to the plaintiff and were not actually paid to Fidelity or to the corresponding law firm. These questions are not susceptible of common proof.  See, e.g., Wilborn v. Wells Fargo Bank, N.A. ("In re Wilborn"), 609 F.3d

36

748, 755-56 (5th Cir. 2010) (denying class certification
because, among other reasons, the highly individualized
inquiries regarding the types of attorneys' fees charged and
"whether [the] fees were actually imposed or merely recorded on
internal records"); Klay v. Humana, Inc., 382 F.3d 1241, 1264
(11th Cir. 2004); Weiss,  226 F.R.D. at 452 ("Because members of
the proposed class allege that their insurance policies were
breached in a 'variety of ways,' each type of breach would
require a different factual showing.").

        Moreover, the class also fails predominance because of the
likelihood of individualized defenses for each class member.
See Wilborn, 609 F.3d at 756.  In Wilborn, the Fifth Circuit
Court of Appeals noted that even if all members of a purported
class were incorrectly charged the same improper attorneys' fees
under their mortgage loan agreements, common questions would
still not predominate because the defendant may have viable
defenses to some of the class members' claims, such as waiver or
estoppel.  Id.  In this case, the defendants could also have
similar individual affirmative defenses for each class member.
All of these individualized inquiries demonstrate that Mazzei
has failed to prove by a preponderance of the evidence that
common questions predominate.  Therefore, the Phantom Fee Class
does not satisfy the requirements for class certification.

## 4. FEE-SPLIT CLASS

The next class Mazzei seeks to certify, the Fee-Split Class, includes all borrowers charged for amounts paid to Fidelity, a non-lawyer entity, from attorneys' fees charged to borrowers during the Class Period.  (Pl.'s Mem. Supp. Class Certif. 1.)  The defendants outsourced their bankruptcy and foreclosure legal work to Fidelity, which passed the work on to law firms throughout the nation.  Mazzei alleges that the "technology and referral fee" law firms paid to Fidelity was illegal fee-splitting between a law firm and a non-legal entity.[18]  Mazzei argues that because such fee-splitting is prohibited by the laws of all fifty states, the defendants' charges for such fees violated the form loan agreement provision prohibiting fees in violation of "applicable law."  (Grobman Decl. Ex. B at ¶ 4(D).)  The defendants allege that the arrangement between the Fidelity and the law firms was not illegal fee-splitting.

---

[18] Mazzei was also charged a $50 "outsource management fee." (Grobman Decl. Ex. H at 15; Grobman Decl. Ex. Q at 6.)  The defendants paid the outsource management fee to Fidelity when Fidelity took over a matter from a previous outsourcer. (Grobman Decl. Ex. A at 453.)  The defendants have alleged that the borrower was never meant to incur the fee and the charge to Mazzei was a clerical error.  (Grobman Decl. Ex. Q at 6.) Regardless of the charge for the outsource management fee, because Mazzei's loan was referred to Fidelity, which then received a "technology and referral fee" for Mazzei's loan, Mazzei is typical of the class.

The defendants only contest the Fee-Split Class on grounds of a lack of typicality, adequacy, and predominance.  The defendants argue that Mazzei is atypical and inadequate because he has not shown that he was charged fees that were split.  The defendants also argue that common questions do not predominate because variances in state laws on unlawful fee-splitting, as well as the agreements between Fidelity and its network of hundreds of law firms, call for individualized inquiries.  However, the Fee-Split Class satisfies all of the elements of Rule 23 and may be certified as a class action.

The class satisfies commonality.[19]  Unlike the classes Mazzei proposed that have been discussed above, the central issue for this class—whether the arrangement among the defendants, Fidelity, and Fidelity's network of firms was improper—is capable of class-wide resolution.  See Dukes, 131 S. Ct. at 2551.  It will have to be determined, whether, as a matter of fact or law, the arrangement amounted to unlawful fee-

---

[19] Although the defendants stipulated to numerosity, (Grobman Decl. Exs. KK, LL), the Fee-Split Class clearly satisfies the requirement that "the class is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  Courts generally find numerosity satisfied when a class has forty or more members.  Ansari v. New York Univ., 179 F.R.D. 112, 114 (S.D.N.Y. 1998) (collecting cases).  As of July 2005, the defendants had referred over 46,000 loans to Fidelity for foreclosure and bankruptcy matters.  (Grobman Decl. Ex. Q at 9.)  Therefore, the numerosity requirement is met easily for the Fee-Split Class.

splitting and, if it did, whether such fee-splitting violated the form loan agreement.  A determination that the arrangement was unlawful and in violation of the form loan agreement will render the defendants liable to all members of the class who were charged such fees without further inquiry.

The defendants argue that Mazzei is an atypical and inadequate class representative because he has shown no evidence that his fees were split between Fidelity and a law firm.  The defendants' argument misses the crux of Mazzei's fee-splitting claim—namely, that everyone whose loan was referred to Fidelity, including Mazzei, was subject to unlawful fee-splitting. Fidelity charged attorneys representing the defendants a "technology and referral" fee on each case Fidelity referred. (Green Decl. ¶ 15 (citing Grobman Decl. Ex. K at 417); Dunnery Decl ¶¶ 9(c)(iii), 18(e).)  That payment would be made "by the law firm upon the referral of the case."  (Dunnery Decl. ¶ 9(c)(iii).)  The "technology and referral fee" paid by the law firms was included in the amount that Fidelity calculated for the Fannie Mae allowable limits on legal fees for bankruptcy and foreclosure actions, (Grobman Decl. Ex. K at 417), and was passed on to borrowers as attorneys' fees, without any indication that it actually was paid to Fidelity, a non-legal entity, (Green Decl. ¶¶ 15, 18 (citing Grobman Decl. Ex. G at 3,

40

11)).  Because Mazzei's loan, like the loans of all borrowers in
default, was referred to a law firm by Fidelity, his loan was
subject to the "technology and referral fee," which he now
claims was improper.  Mazzei satisfies both typicality and
adequacy.

To qualify as a typical and adequate class representative,
Mazzei must "be part of the class and 'possess the same interest
and suffer the same injury' as the class members."  Amchem, 521
U.S. at 625-26 (citation omitted); see also Caridad, 191 F.3d at
293.  Mazzei's fee-splitting claim will succeed or fail in
tandem with the claims of other members of the class.  Fidelity
referred loans from the defendants to law firms in its network
in exchange for a "technology and referral fee."  (Green Decl.
¶ 15 (citing Grobman Decl. Ex. K at 417); Dunnery Decl.
¶¶ 9(c)(iii), 18(e).)  The defendants have not disputed that
Mazzei's loan was referred to a law firm by Fidelity, and was
one for which Fidelity received a "technology and referral fee."
(Green Decl. ¶¶ 15, 18.)  Under Mazzei's theory of the
defendants' liability, he was charged for fees that were split
between Fidelity and a law firm via the "technology and referral
fee."  Whether the defendants are actually liable is an issue to
be determined on a class wide basis and need not be resolved on
this motion for class certification.  However, if the defendants

41

are liable then all members of the class, including Mazzei, are entitled to relief.

The defendants also argue that Mazzei is atypical because he does not have a breach of contract claim against The Money Store.  The defendants claim that The Money Store assigned Mazzei's loan to The Bank of New York in 1994, and this assignment relieved them of liability on the contract.[20]  The plaintiff counters, correctly, that this argument is waived. Absent a novation, the defendants, as assignors, remain jointly liable on the contract with The Bank of New York, the assignee. See Baer v. Associated Life Ins. Co., 248 Cal. Rptr. 236, 239 (Ct. App. 1988).[21]  Therefore, the defendants necessarily argue

---

[20] The defendants argue that the assignment to The Bank of New York defeated all of Mazzei's claims on grounds of a lack of typicality.  Because Mazzei's other class claims considered above failed to satisfy the Rule 23 requirements, it was unnecessary to consider this argument for those claims. However, because the argument is waived, the fact that Mazzei's loan was assigned to The Bank of New York would not, in itself, have defeated certification for any of the class claims discussed above.

[21] The defendants cite California law for their argument that the defendants ceased to have a contractual relationship with the plaintiff after the assignment.  The loan documents relate to a loan made to a California resident secured by a mortgage on California property.  There is no reason to question that California law applies to the issue of assignment or novation. The parties have cited California law on this issue and the Court can accept the parties' assumption that California law applies.  See Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000) ("The parties' briefs assume that New York law controls, and such implied consent . . . is sufficient to

that there has been a novation, however, "[n]ovation is an affirmative defense that is waived if not specifically [pleaded]."  Heavenly Ham Co. v. HBH Franchise Co., No. 04 C 2577, 2005 WL 331558, at *5 (N.D. Ill. Feb. 7, 2005) (citations omitted).  Because the defendants failed to raise the novation argument in their pleadings or at any time prior to their brief in opposition to class certification, the affirmative defense is waived.  See Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank, 392 F.3d 520, 526 (2d Cir. 2004) ("Generally a failure to plead an affirmative defense results in a waiver.") (internal quotation marks and citation omitted).  Therefore, the defendants have waived their novation argument against Mazzei's status as a typical and adequate class representative.[22]

The Fee-Splitting Class also satisfies the Rule 23(b)(3) requirements of predominance and superiority.  Mazzei has demonstrated that common questions predominate over and are more substantial than the issues that are subject to individualized proof.  In re Visa Check/MasterMoney Antitrust Litig., 280 F.3d

_____

establish choice of law.") (internal quotation marks and citation omitted).
[22] There would also be reason to question the merits of the defendants' argument.  The defendants point to language in the Deed of Trust that provides: "The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower . . . ."  (Grobman Decl. Ex. C at § 11.)  While this language purports to bind assignees, it does not release assignors of any liabilities.

43

at 136.  The common questions, whether the arrangement violated
ethics laws on fee-splitting and the form loan agreement, are
the only inquiries required for a finding that the defendants
are liable.  Unlike the Phantom Fee Class or the Breach Letter
Fee Class, there are no individualized issues for each class
member as to whether they were charged the fee and what the
nature of the fee was.  Fidelity was allegedly paid the
"technology and referral fee" for every loan that was outsourced
to a law firm.  The law firms then allegedly passed on the
"technology and referral feel" to borrowers as part of
"attorneys' fees."  The defendants have not introduced any
evidence that would require individual hearings or substantial
time devoted to the unique facts relating to individual class
members.

The defendants argue that because Fidelity had different
agreements with hundreds of law firms, individualized analysis
of the agreements will be required.  The defendants' contention
is misguided because the analysis of the agreements between
Fidelity and its network of law firms is not necessary to
establish the defendants' liability.  Fidelity did not provide
the technology and referral service to law firms for free;
regardless of the specifics, because Fidelity received a fee
from every firm for each loan referred, inquiry into each

44

agreement is not necessary to determine liability.  Although
investigation into the individual fee-split agreements may be
necessary for calculations of damages, because Fidelity may have
had different fee-splits with each law firm, "it is settled in
this Circuit that factual differences in the amount of damages
. . . will not defeat class action certification when plaintiffs
allege that the same unlawful course of conduct affected all
members of the proposed class." In re Sumitomo Copper Litig.,
182 F.R.D. 85, 92 (S.D.N.Y. 1998) (citing Green v. Wolf, 406
F.2d 291, 299-301 (2d Cir. 1968)); see also In re Amaranth
Natural Gas Commodities Litig., 269 F.R.D. 366, 385 n.133
(S.D.N.Y. 2010) (collecting cases).

     The defendants also argue that the variety in state ethics
laws defeats predominance.  "[I]f a claim is based on a
principle of law that is uniform among the states, class
certification is a realistic possibility." Klay, 382 F.3d at
1262; Steinberg v. Nationwide Mut. Ins. Co., 224 F.R.D. 67, 77
(E.D.N.Y. 2004) ("A claim or defense can implicate common issues
and be litigated collectively, despite the existence of state
law variations, so long as the elements of the claim or defense
are substantially similar . . . .") (internal quotation marks
and citation omitted).  The plaintiff bears the burden of
showing, through an "analysis of state law variations," that

such variations do not "swamp any common issues."  In re
Currency Conversion Fee Antitrust Litig., 230 F.R.D. at 312.
Here, Mazzei has demonstrated that the Fee-Split Class claim is
based on substantially uniform principles of state law.

Mazzei's claim relies on principles of state ethics laws
prohibiting the splitting of fees between lawyers and non-
lawyers.  The plaintiff's argument is that under the ethics
rules that prevail throughout the nation, the attorneys hired by
Fidelity could not ethically pay part of their attorneys' fees
to Fidelity and that it was a breach of the form loan agreement
to include such payments as part of the attorneys' fees charged
to the borrowers.  The plaintiff's expert on state ethics laws,
Bruce Green, is a law professor at Fordham University School of
Law and the director of the school's Center for Law and Ethics.
Professor Green has produced persuasive evidence that the
relevant law on fee splitting is identical in all material
respects throughout the fifty states.  (Green Decl. ¶ 21 ("The
sharing of legal fees between lawyers and non-lawyers is
expressly forbidden by the rules of professional conduct in all
50 states and the District of Columbia. . . . [V]ariations are
immaterial to this lawsuit.").)  While the defendants question
Professor Green's opinion, they have presented no countervailing
evidence to suggest that the Fidelity arrangement was consistent

46

with the ethics rules of any state.  Professor Green's credible
and thorough report demonstrates that state ethics rules do not
defeat predominance for the Fee-Split Class.  Therefore, common
questions predominate.

The class action is also "superior to other available
methods for fairly and efficiently adjudicating the controversy"
for the Fee-Split Class.  Fed. R. Civ. P. 23(b)(3).  The factors
considered in determining superiority are: "(A) the class
members' interests in individually controlling the prosecution
or defense of separate actions; (B) the extent and nature of any
litigation concerning the controversy already begun by or
against class members; (C) the desirability or undesirability of
concentrating the litigation of the claims in the particular
forum; and (D) the likely difficulties in managing a class
action."  Id.  These factors all militate toward certification
of the Fee-Split Class.

The class members have little interest in controlling the
litigation individually.  Each of the class member's claims is
for such a minimal recovery that proceeding individually would
be prohibitively expensive.  See Seijas v. Republic of Arg., 606
F.3d 53, 58 (2d Cir. 2010) (noting that "In such circumstances
[of small recoveries], the class action device is frequently
superior to individual actions.").  Furthermore, the parties

47

have not introduced evidence that other class members have
brought litigation elsewhere.  The absence of such suits
indicates a lack of individual interest in controlling the
litigation.  See Dungan v. Acad. at Ivy Ridge, 249 F.R.D. 413,
427 (N.D.N.Y 2008).

        Moreover, "[t]rying this action collectively allows for a
more cost-efficient and fair litigation of common disputes than
requiring each plaintiff to prosecute his or her own individual
action." Garcia v. Pancho Villa's of Huntington Vill., Inc.,
281 F.R.D. 100, 107 (E.D.N.Y. 2011) (internal quotation marks
and citation omitted).  The common liability questions for the
Fee-Split Class make class-wide adjudication more efficient and
desirable.  Furthermore, class certification will preclude
inconsistent rulings that would, in the absence of class-wide
adjudication, expose the defendants to potentially inconsistent
decisions.  See Carpenter v. Hall, 311 F. Supp. 1099, 1112 (S.D.
Tex. 1970).  And finally, the relative absence of individual
inquiries for liability also demonstrates that there will be
little difficulty in managing the class action.  Augustin v.
Jablonsky, 461 F.3d 219, 230 (2d Cir. 2006).  Accordingly, the
Fee-Split Class may be certified under Rule 23.

## 5. POST-ACCELERATION LATE FEE CLASS

The Post-Acceleration Late Fee Class, as defined by Mazzei, includes every borrower who was charged late fees after the borrower's loan was accelerated, and where the accelerated loan was paid off (or foreclosed on) during the Class Period. (Pl.'s Mem. Supp. Class Certif. 1.) Mazzei alleges that it was the regular practice of the defendants to charge late fees after acceleration. He argues that such late fees violated the form loan agreement because there was no provision allowing them, and therefore the contract implicitly prohibited them. The defendants claim that although Mazzei may have been charged post-acceleration late fees improperly, few others were.[23] The defendants further allege that it was their regular practice not to collect late fees after acceleration when the borrower's loan was in foreclosure, and that they conducted regular compliance reviews to assure late fees after acceleration were only charged in those states where the form loan agreement had not been interpreted to prohibit such charges. (Dunnery Decl. ¶ 9(b); Dunnery Decl. Ex. N at 186-88; Dunnery Decl. Ex. O at 355-56.)

---

[23] As explained with regard to the Phantom Fee Class, to the extent the defendants argue against typicality on the grounds that Mazzei has not shown other affected class members, this argument is waived because the defendants stipulated to numerosity.

At the outset, the class definition must be altered to
eliminate typicality, adequacy, and predominance problems caused
by the inclusion of loans that were "foreclosed on" in the class
definition.  Mazzei's loan was not foreclosed on, and this
dissimilarity in facts between Mazzei and the class makes Mazzei
an atypical and inadequate class representative for the
"foreclosed on" class members.  See Amchem, 521 U.S. at 625;
Caridad, 191 F.3d at 293; Spagnola, 264 F.R.D. at 96; Feinstein,
535 F. Supp. at 600.  The "foreclosed on" portion of the class
also fails the predominance requirement because Mazzei has not
demonstrated that it was the regular practice of the defendants
to charge late fees after acceleration when a loan was
foreclosed on.  The defendants have provided evidence that they
had a policy not to charge late fees after acceleration for
loans that were foreclosed on.  (Dunnery Decl. Ex. N at 186-88.)
Mazzei has not produced any evidence to contradict the
defendants' proof that there was no common policy to charge such
fees.  Therefore, without a common policy, the plaintiff has not
shown by a preponderance of the evidence that the foreclosure
portion of the class would require anything less than a loan-by-
loan analysis.  Removing the "(or foreclosed on)" language from
the class definition can remedy these failings.  See  Cokely,
2004 WL 1152531, at *2 n.3.

Mazzei has demonstrated that the Post-Acceleration Late Fee
Class satisfies all of the Rule 23(a) requirements.  The common
question capable of class-wide resolution is whether, when the
loan was subsequently paid off, the defendants were prohibited
under the form loan agreement from charging late fees after
acceleration.  If such fees were prohibited, then any class
member charged these fees was charged in breach of the form loan
agreement.  Mazzei paid off his loan, and the pay-off amount
included charges for late fees after acceleration.  Therefore,
Mazzei is a typical and adequate class representative.

The class also satisfies the requirements of Rule 23(b)(3).
The defendants only contest the class on three grounds, each
attacking the predominance of common questions.  Because the
plaintiff has shown that the defendants had a common policy of
charging late fees after acceleration, and because contract law
is sufficiently uniform to interpret the form loan agreement,
none of the defendants' arguments defeat class certification.

The defendants argue that because Mazzei has not
demonstrated that the defendants had a policy of charging late
fees after acceleration, inquiries into each loan will be
necessary to determine if such fees were charged.  To succeed,
Mazzei must demonstrate that there was a "policy" of charging
Post-Acceleration Late Fees.  See, e.g., Smilow v. Southwestern

Bell Mobile Sys., 323 F.3d 32, 36, 39-42 (1st Cir. 2003)
(holding that class could proceed despite differences within the
class because the plaintiffs alleged systematic overcharging by
a cell phone company); Haroco, Inc. v. Am. Nat'l Bank & Trust
Co. of Chi., 121 F.R.D. 664, 669 (N.D. Ill. 1988) ("Since
plaintiffs' claims arise from allegations of common practice and
rights derived from form contracts, the case appears to present
the classic case for treatment as a class action.") (internal
quotation marks and citation omitted).  Without a policy,
adjudication would require individual investigation for each
loan, and certification would likely be denied because of a lack
of predominance.  See Weiss, 226 F.R.D. at 451 (holding
different types of breaches required individual investigation
defeating predominance).

     The plaintiff's evidence is sufficient to meet his burden
of demonstrating that the defendants had a policy of charging
post-acceleration late fees.  The defendants' witness testified
that in states where state law did not prohibit late fees after
acceleration of the loans, the defendants would charge such
fees.  (See, e.g., Grobman Decl. Ex. A at 355-64; Grobman Decl.
Ex. MM at 168-69; Dunnery Decl. Ex. N at 172, 186.)  The
defendants argue that this policy of compliance with state laws
demonstrates it did not have a policy of violating state laws.

However, Mazzei argues that these fees were prohibited under the form loan agreement, not state law, and notwithstanding state laws that had not barred such fees.  Therefore, the defendants' policy to charge fees except where prohibited by state law potentially conflicts with the plaintiff's proffered interpretation of the form loan agreement.  The defendants' policy of compliance, as construed by Mazzei, was a policy of systematically violating the form loan agreement in the states where the defendants had determined that there was no specific state law or court decision that prohibited such fees.

The defendants also claim that variations in state laws prevent a finding of predominance, while Mazzei argues that state contract law uniformly forbids post-acceleration late fees.  Mazzei has met his burden of demonstrating that state contract law is sufficiently uniform to allow for class-wide adjudication.  See Currency Conversion Fee Antitrust Litig., 230 F.R.D. at 303.  The interpretation of uniform contracts, such as the form loan agreement, is well suited for treatment as a class action.  See, e.g., Wu v. Pearson Educ., Inc., 277 F.R.D. 255, 265 (S.D.N.Y. 2011); Farinella v. PayPal, Inc., 611 F. Supp. 2d 250, 263 (E.D.N.Y. 2009) ("differences in state contract law do not defeat the predominance prong"); Steinberg, 224 F.R.D. at 74 ("[C]laims arising from interpretations of a form contract

appear to present the classic case for treatment as a class
action . . . .").  Furthermore, Mazzei cites to cases in twelve
states that have all held that absent a specific contract
provision to the contrary, late fees may not be charged post-
acceleration.  The defendants have not pointed to any provision
of the form loan agreement that specifically authorized late
fees following acceleration of the loan.  Although the
defendants argue that twelve states are insufficient to prove
national uniformity, the defendants do not produce a single case
or statute in which a state has upheld or allowed a late fee
after acceleration where a contract does not expressly provide
for such a fee.

The defendants also argue that Florida contract law is
unusual because it has a "materiality" requirement.  Although
the defendants identify one case in which Florida's
"materiality" requirement was sufficient to defeat predominance,
see Marino v. Home Depot U.S.A., Inc., 245 F.R.D. 729, 734 (S.D.
Fla. 2007), the settled law in the Second Circuit is that
contract law is sufficiently uniform for class treatment,
notwithstanding Florida's materiality requirement.  See, e.g.,
Wu, 277 F.R.D. at 265; Spagnola, 264 F.R.D. at 98; Steinberg,
224 F.R.D. at 74.  Moreover, Marino, on which the defendants
rely, is distinguishable from this case.  In Marino, each class

54

member was subject to completely unique individual treatment
that would have required the Court to analyze each claim for
whether the breach was "material."  245 F.R.D. at 734.  By
contrast, in this case, the provisions for late fees were
standardized in form loan agreements.  In any event, if
determining materiality becomes a significant individualized
issue during the course of the litigation, the class could then
be redefined to exclude Florida class members.

The defendants also argue that even if contract law is
uniform, the possibility that the defense of the "voluntary
payment doctrine" could apply to class member should defeat
predominance.  The plaintiff responds that the possibility of an
individualized affirmative defense is insufficient to defeat
certification, and furthermore that the voluntary payment
doctrine is inapplicable to the class.  The voluntary payment
doctrine will not bar certification of the class.

While the existence of individualized defenses can overcome
predominance and defeat a motion for class certification, "the
fact that a defense may arise and may affect different class
members differently does not compel a finding that individual
issues predominate over common ones."  Dupler v. Costco
Wholesale Corp., 249 F.R.D. 29, 45 (E.D.N.Y. 2008) (quoting In
re Visa Check/MasterMoney Antitrust Litig., 280 F.3d at 139,

149) (internal quotations omitted).  "[A]s long as a sufficient constellation of common issues binds class members together, variations in the sources and application of [a defense] will not automatically foreclose class certification under Rule 23(b)(3)."  Id.  The voluntary payment doctrine "bars recovery of payments voluntarily made with full knowledge of the facts. Id. (internal quotation marks and citations omitted).  However, "[i]t is not the law that any time a voluntary payment doctrine issue is raised that certification must be denied.  Such an absolute rule would bar almost all class actions involving alleged nondisclosures (even in standard form contracts) because there is always the possibility that a particular plaintiff, despite a nondisclosure by the defendant, somehow stumbled upon the nondisclosed fact at issue on his or her own and continued to make payments.  Instead, the [C]ourt must examine in each particular case how the voluntary payment doctrine issue may impact the common issues of law and fact."  Id. at 45.

Upon examination, it is apparent that the defendants have done nothing beyond raise the specter of the voluntary payment doctrine in a footnote; their argument is pure speculation.  The defendants have not shown a single class member that may potentially be subject to the voluntary payment doctrine.  Cf. Dillon v. U-A Columbia Cablevision of Westchester, Inc., 790

N.E.2d 1155, 1156 (N.Y. 2003) (dismissing class action complaint because the named plaintiff was subject to the voluntary payment doctrine because she knew she would be charged the late fee at issue).  Furthermore, whether the voluntary payment doctrine applies to any members of the class is a common issue, not an individualized issue, because the plaintiff argues that the affirmative defense cannot apply to any of the class members. See Miller v. Optimum Choice, Inc., No. DKC 2003 3653, 2006 WL 2130640, at *7 (D. Md. July 28, 2006) ("Because the affirmative defenses are common across the putative class members, the defenses would not operate to destroy the predominance of common questions across the class, but would instead provide an additional link of commonality between the class members."). Mazzei argues that the voluntary payment doctrine is inapplicable to the entire class for two reasons.  First, the doctrine is inapplicable when the payments were made under the threat of loss of property, as they were to each class member who defaulted on that borrower's home loan.  See Best Buy Stores, L.P. v. Developers Diversified Realty Corp., No. 05 2310, 2010 WL 4628548, at *3 (D. Minn. Nov. 4, 2010) (collecting cases).  Second, the form loan agreement provides that the defendants must refund any unpermitted fees (Grobman Decl. Ex. C at ¶ 12), which thereby expressly contracts around

the voluntary payment doctrine.  See Best Buy Stores, L.P., 2010
WL 4628548, at *2 (voluntary payment doctrine does not apply
when "the parties have expressly contracted for repayment of
excess funds").  Each counterargument by Mazzei applies equally
to every member of the class.

Although the validity of Mazzei's arguments need not be
resolved at this time, if Mazzei is correct on either ground,
the resolution of the voluntary payment defense will affect
every member of the class.  Resolving the application of the
voluntary payment doctrine as a common issue will be more
efficient, not less.  Therefore, the voluntary payment defense
will not defeat predominance.

The plaintiff has demonstrated that common questions
predominate.  Furthermore, for the same reasons discussed with
respect to the Fee-Split Class, a class action is superior to
other methods of adjudication.  The plaintiff has met his burden
of demonstrating by a preponderance of the evidence that the
Post-Acceleration Late Fee Class satisfies all of the
requirements of Rule 23(a) and Rule 23(b)(3).  Accordingly, the
class should be certified as a class action.

## IV. THREE ADDITIONAL SUBCLASSES

Mazzei also moves for the certification of three additional subclasses:

(1) All those borrowers who, "but for the overcharges described in the Class as certified, would have had a 'credit balance' under § 1666d of TILA." (Pl.'s Mot. Supp. Class Certif. 2.)

(2) "California borrowers whose loans were serviced by [the defendants] and who, after March 2000, were charged . . . any of the fees or expenses set forth in the general Class Definition." (Pl.'s Mot. Supp. Class Certif. 25.)

(3) "California borrowers whose loans were serviced by [the defendants] and who, after March 2000, were charged . . . fees which are not included among those allowed to be charged under Cal. Civil Code 2924c after a Notice of Default was recorded." (Pl.'s Mot. Supp. Class Certif. 25.)

Mazzei has hardly argued in support of these subclasses and has not demonstrated his compliance with Rule 23 by a preponderance of the evidence for any of them. See Dukes, 131 S. Ct. at 2551; Teamsters, 546 F.3d at 202. Mazzei has not provided evidence that he is a member of these classes, typical of the classes, or an adequate class representative under Rule 23(a). He has adduced no common questions, nor even attempted to demonstrate the Rule 23(b)(3) requirements of predominance or superiority. He has referred to these subclasses in his brief without any effort to demonstrate that the requirements of Rule

59

23 are satisfied.   Moreover, Mazzei did not reply to the
defendants' argument against these classes, instead focusing on
the classes discussed above and abandoning these class claims.
As to each of these subclasses the motion for class
certification is therefore denied.


                              CONCLUSION

        The Court has considered all of the arguments of the
parties.   To the extent not specifically addressed above, the
remaining arguments are either moot or without merit.   For the
foregoing reasons, the plaintiff's motion for class
certification pursuant to Rule 23(a) and (b)(3) is **denied in
part and granted in part**.   The plaintiff is directed to submit a
proposed order certifying the Fee-Split Class and the Post-
Acceleration Late Fee Class by **January 7, 2013**.   The defendants
may submit any objections and counter-order by **January 14, 2013.**
**The Clerk of Court is directed to close docket nos. 158 and 164.**
SO ORDERED.

Dated:  New York, New York
        December 20, 2012

                                    John G. Koeltl
                             United States District Judge