**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____

**JOSEPH MAZZEI, ON BEHALF OF HIMSELF**
**AND ALL OTHER SIMILARLY SITUATED,**

                                                    **01 Cv. 5694 (JGK)**

                    **Plaintiff,**

         **- against -**                            **OPINION AND ORDER**

**THE MONEY STORE, ET AL.,**

                    **Defendants.**
_____

**JOHN G. KOELTL, District Judge:**

In 1994, the named plaintiff in this action, Joseph Mazzei, took out a mortgage loan from The Money Store on his home in Sacramento, California.  After Mazzei defaulted on his loan, The Money Store charged him various fees, which Mazzei paid when he paid off the loan in full in October 2000.  Thereafter, Mazzei sued The Money Store and related defendants TMS Mortgage, Inc. ("TMS") and HomEq Servicing Inc. (collectively, the "Money Store defendants"), alleging, among other claims, that the Money Store defendants were not permitted to charge certain fees under the uniform mortgage note signed by Mazzei and The Money Store (the "Note" or "Uniform Note").

This Court eventually certified two classes in this action: (1) a "Post Acceleration Late Fee Class," (or alternatively, the "Late Fee Class"), on whose behalf Mazzei asserted a breach of contract claim alleging that borrowers were assessed late fees

after their loans were accelerated in breach of the Uniform
Note; and (2) a "Fee Split Class," on whose behalf Mazzei
asserted a breach of contract claim alleging that borrowers were
assessed attorneys' fees that were improperly shared with a
nonlawyer entity, Fidelity National Solutions ("Fidelity"), in
breach of the Uniform Note.  After a two week trial, the jury
returned a verdict in favor of Mazzei and the Late Fee Class on
the first claim, and in favor of the defendants on the second
claim.  The defendants now move for decertification of the Late
Fee Class pursuant to Federal Rule of Civil Procedure 23(c)(1),
and, in the alternative, for judgment as a matter of law as to
the Late Fee claim pursuant to Federal Rule of Civil Procedure
Rule 50(b).  The plaintiff moves for a new trial as to the Fee
Split claim pursuant to Federal Rule of Civil Procedure 59.

**I.**

Mazzei brought this action on or about June 22, 2001.  He
originally asserted claims against the defendants pursuant to
the Fair Debt Collection Practices Act ("FDCPA"), the Truth in
Lending Act ("TILA"), the Real Estate Settlement Procedures Act
("RESPA"), and various related state law claims, including the
breach of contract claims.  In two separate opinions, Judge
Sprizzo, who presided over this action until he passed away in

late 2008, granted summary judgment for the defendants dismissing the plaintiff's FDCPA and RESPA claims.[1]

On or about October 19, 2010, after this case had been reassigned to this Court, the plaintiff filed his most recent complaint, the Third Amended Complaint.  The Third Amended Complaint alleged six causes of action, including the FDCPA and RESPA claims that had been dismissed by Judge Sprizzo, a TILA claim, a breach of contract claim, and an Unfair Business Practices claim under California statutory law.  On December 20, 2012, after previously denying another summary judgment motion by the defendants,[2] this Court granted in part and denied in part the plaintiff's motion for class certification.  See Mazzei v. Money Store, 288 F.R.D. 45, 69 (S.D.N.Y. 2012). Specifically, this Court certified two classes based on breach of contract claims against the defendants: the Post-Acceleration Late Fee Class and the Fee Split Class.  Id. at 66, 69.  In a subsequent Order for Certification of Class Action, the Court defined the two classes as follows:

> All similarly situated borrowers who signed form loan mortgage agreements on loans which were owned or serviced by the defendants and who from March 1, 2000 to the present ("Class Period") were charged: (A) late fees after the borrower's loan was accelerated, and where the accelerated

---

[1] See Mazzei v. Money Store, 349 F. Supp. 2d 651, 661 (S.D.N.Y. 2004) (dismissing the plaintiff's FDCPA claim); Mazzei v. The Money Store, 552 F. Supp. 2d 408, 413 (S.D.N.Y. 2008) (dismissing the plaintiff's RESPA claim).
[2] See Mazzei v. Money Store, No. 01cv5694, 2011 WL 4501311, at *5 (S.D.N.Y. Sept. 29, 2011).

3

loan was paid off ("Post Acceleration Late Fee Class"), and/or (B) amounts paid to Fidelity, a non-lawyer entity, from attorneys' fees charged to borrowers ("Fee-Split Class").

Order Dated Jan. 28, 2013 (No. 01cv5694, ECF No. 187).  As noted in the Court's decision on class certification, the Post Acceleration Late Fee Class did not include borrowers who had foreclosed loans.  See Mazzei, 288 F.R.D. at 66.

In December 2014, the case proceeded to trial on the two breach of contract claims, after the plaintiff dropped the TILA claim shortly before trial.  After a two week trial, the jury returned a verdict for the plaintiff and for the Late Fee Class on the Late Fee claim, and a verdict for the defendants on the Fee Split claim.  In January 2015, this Court agreed to delay the entry of judgment to allow the parties to make their respective post-trial motions.  Thereafter, the parties filed these motions.

## II.

There was sufficient evidence introduced at trial from which the jury reasonably could have found as follows.

## A.

In September 1989, the plaintiff, Joseph Mazzei, began working for The Money Store in its offices in Atlanta, Georgia.

4

Tr. 269.[3]  At the time, The Money Store was a second mortgage lender and a loan servicer.  Tr. 272-74.  The defendant TMS was the servicing operator for The Money Store.  Tr. 747.  In 1999, First Union Bank purchased The Money Store and closed The Money Store's loan origination business. Tr. 269, 790.  Thereafter, The Money Store became HomEq Servicing Inc.  Tr. 586.

In 1992, Mazzei accepted a promotion within The Money Store that sent him to work in Sacramento, California.  Tr. 274-75. In 1994, Mazzei purchased a house in Sacramento County with a mortgage loan he obtained from The Money Store.  Tr. 277-78.  As part of the loan transaction, Mazzei signed a Note and a Deed of Trust.  Tr. 279-80; Pl's Ex. 2 ("PX 2") (Deed of Trust); PX 119 (Note).  The bottom of the Note showed the letters "FNMA," which indicated that the Note was a Federal National Mortgage Association ("Fannie Mae") form document, PX 119, and the defendants used substantially similar Fannie Mae form documents for most borrowers.  Tr. 872-73.

The Note laid out the terms of the loan from The Money Store to Mazzei, and the Deed of Trust secured Mazzei's property.  Mazzei promised to make monthly payments on a principal loan of $63,700.00, plus interest, over a thirty-year period.  PX 119.  Section 4 of the Note, "Borrower's Failure to

---

[3] All references to "Tr." are to the transcript of the trial held in this case from December 8, 2014, to December 19, 2014.

Pay as Requested," provided remedies for the Money Store in the event Mazzei failed to pay.  Section 4(A) provided that if the Note Holder did not receive a monthly payment by the end of ten days after it was due, Mazzei agreed to pay a late charge of 5% of his overdue payment, but not less than $5 or more than $50.

Section 4(B) of the Note governed the written notice that the Note Holder must send to notify the borrower that the payments were overdue, and to specify a date by which the borrower would be in default if the borrower failed to make a payment.  Under § 4(C), the Note Holder was given the right to accelerate the loan if the borrower failed to make a payment by that date.  Specifically, that subsection provided: "If I do not pay the overdue amount by the date stated in the notice described in (B) above, I will be in default.  If am in default, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount."  Finally, § 4(D) allowed the Note Holder to recover costs and expenses from the borrower, stating: "If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back for all of its costs and expenses to the extent not prohibited by applicable law.  Those expenses include, for example, reasonable attorneys' fees, trustee foreclosure fees."

6

In late 1997 and throughout 1998, Mazzei missed loan payments to The Money Store.  Tr. 592-93.  In March, May, and November of 1998, Mazzei received letters from a law firm on behalf of the Money Store defendants notifying him that he was in default on the loan.  Def. Ex. 13 ("DX 13"); DX 14; DX 15. Mazzei testified that he missed payments principally because he was disputing nonsufficient funds ("NSF") charges that he believed were erroneous.  Tr. 508-09.  In May 1999, Mazzei was laid off from The Money Store when it was taken over by First Union Bank, and he continued to miss payments.  Tr. 269, 642. In a letter dated February 23, 2000, a law firm retained by TMS informed Mazzei that he was in default on his loan, and that if he did not pay the full amount of the default within thirty days, TMS would "accelerate the entire sum of both principal and interest," which equaled roughly $61,000.  DX 33.  The parties agree that TMS accelerated Mazzei's loan approximately thirty days later.  In a letter dated March 22, 2000, Mazzei received notice that his property was in foreclosure.  DX 39.

While his property was in foreclosure and after his loan had been accelerated, Mazzei sent cashier's checks to The Money Store in the amount of monthly payments, rather than the full amount due, in an attempt to "forestall the foreclosure." Tr. 579-80.  The Money Store returned the cashier's checks to

7

Mazzei because they were insufficient to reinstate the loan. Id.; PX 105. Mazzei also filed for bankruptcy in July 2000, days before the scheduled sale of his house in foreclosure, preventing the sale. Tr. 610; DX 59. Mazzei's bankruptcy filing was later dismissed. Tr. 615. On October 17, 2000, Mazzei paid off the full balance of the loan, including the principal, interest, and fees. Tr. 578-79; PX 124.

At least as early as November 15, 1999, and extending through July 2000, The Money Store assessed Mazzei for late charges amounting to $26.76 each. PX 1; DX 97. Mazzei was assessed ten late charges in total, five of which came after his loan was accelerated. DX 97. A "Payoff Quote" sent to Mazzei in October 2000 identified several other fees, including "Attorney Outsourcing Fees." PX 13. The plaintiff also produced invoices created in 2000 and 2001, relating to Mazzei's loan file, which showed several charges submitted by Fidelity National Foreclosure Solutions to HomEq. PX 7. In February 2001, Mazzei wrote to The Money Store requesting information about several of the fees he was charged, including the attorney outsourcing fees. Tr. 529; PX 16. Mazzei initiated this case when the dispute over fees persisted. Tr. 586.

At trial, the parties disputed the propriety of charging late fees after acceleration under the Note and of charging

attorneys' fees under the Note, portions of which were allegedly shared with Fidelity, a nonlawyer entity.  The plaintiff argued that both of these practices violated the terms of the Note, and thus constituted breaches of contract.  The defendants argued that the Note permitted both types of fees.  The parties also offered dueling data experts to dispute the number of borrowers in each class and total damages.

**B.**

In presenting his case on behalf of the Late Fee class, the plaintiff relied on various expert witnesses, and on cross-designated deposition testimony of a Money Store representative. The plaintiff first called Adam Levitin, a Georgetown Law Professor, to present background information about the mortgage servicing industry, to explain mortgage loan securitization, and to opine on the relationship between borrowers and servicers. Levitin testified generally about the ability of borrowers to bring legal actions against servicers, opining that a hypothetical borrower could bring a breach of contract action against the servicer if the servicer charged unreasonable attorneys' fees.  Tr. 116.  Levitin described the agreements between loan servicers and the investors that purchase collateralized loans, or pooling and servicing agreements ("PSAs").  Levitin testified that a PSA assigns rights and

9

delegates duties under the form note to the servicer, and that the servicer and borrower have rights and duties against each other.  Tr. 118-19.  While Levitin did not offer an opinion on any of the defendants' practices in this case, he did review a PSA to which The Money Store was a party, PX 99, and explained how it delegated certain duties and powers to the Money Store defendants in order to service loans.  Tr. 128-32.

The plaintiff next called Jacqui Peace, a former head of risk management for GE Capital, the financial services arm of General Electric, to testify about industry practices in the loan servicing industry and to opine on the propriety of post-acceleration late fees.  Peace explained that once a loan is accelerated, the full amount of the loan is due and there are no longer any individual payments due.  Tr. 184.  Therefore, she stated that there are no individual payments against which late fees can be calculated.  Id.  She testified that she had never seen post-acceleration late fees charged at any institution at which she had worked, and that such fees were inconsistent with industry practices.  Tr. 186, 218.  Having reviewed Mazzei's loan file, she testified that the Money Store defendants charged Mazzei late fees after his loan was accelerated, which was inconsistent with the Note.  Tr. 217-18.

The jury also heard cross-designated deposition testimony
from John Dunnery, a Money Store employee through 2007.  Dunnery
testified that in 2000, around the time The Money Store's loan
origination program was closed down, the Money Store defendants
were servicing approximately 185,000 loans, about 130,000 of
which the Money Store defendants had originated.  Tr. 790.  By
October 2005, the defendants were servicing about 380,000 loans.
Id.  Dunnery admitted that Mazzei was charged late fees after
his loan was accelerated, and that the defendants regularly
charged post-acceleration late fees in states where the practice
had not yet been prohibited.  Tr. 820-21, 825.  Dunnery also
suggested that the Note permits the Money Store defendants to
charge fees based on "the absence of state law stating that
post-acceleration late fees should not be assessed and collected
from the borrower."  Tr. 881-82.  The defense expert witnesses
agreed.  The defendants called Carl Levinson, a former Chief
Executive Officer ("CEO") of CitiMortgage Inc., and Michael
Shaw, a Chief Risk Officer for multiple companies and for Fannie
Mae.  Both Levinson and Shaw testified that loan servicers
regularly charged late fees after acceleration, and that the
Money Store defendants did not deviate from standard industry
custom and practices in charging Mazzei late fees after his loan
was accelerated.  Tr. 1078, 1090-91, 1185, 1188, 1191-92.

11

The parties analyzed the size of the Late Fee Class and the amount of fees assessed by reference to the "Ocwen Database," a large database encompassing between 1.3 and 1.5 million loans, including all of the loans serviced by the defendants.  Tr. 322, 1331.  The plaintiff's expert in data analytics, Professor Richard Holowczak, testified about the steps he took to identify the Late Fee Class and the total number of late fees paid in accordance with the Class Certification Order.  First, in order to identify loans that were accelerated, Holowczak assumed that all loans on which no payment had been made by the borrower for ninety days were accelerated on the ninety-first day.  Tr. 312. There was some dispute at trial as to the validity of this assumption.  Shaw testified that it was not warranted because the noteholders only have the *option* under the Note to accelerate after ninety days, and that they do not always do so. Tr. 1183-84.  Both Levitin and Peace, on the other hand, testified that it was the industry standard to accelerate loans after ninety days without payment.  Tr. 96-97, 178.  And Dunnery testified that the "standard time period" in which the Money Store defendants accelerated loans was "somewhere between day 55 to day 75 of the delinquency."  Tr. 819.

After this first step, Holowczak identified, by their specific codes in the database, the number of late fees

assessed, the number of those that were actually paid by the
borrower, and then excluded all loans that were not paid off.
Tr. 312, 324.  Holowczak included loans with the database code
081—denoting loans that were "Paid off"—and the roughly 70,000
loans with the code 082—the code for "Loan Liquidated."
Tr. 347-48.  Faced with the suggestion that the 082 code
included loans that were foreclosed upon, and thus not within
the Late Fee Class definition, Holowczak testified that the 082
code was not a reliable indicator of whether or not the loans
had been foreclosed upon, and that he thus did not exclude any
loans on the basis of that code.  Tr. 384-85.  Ultimately,
Holowczak identified 144,385 loans on which late fees were
charged for a total of $59,367,756 in late charges.  Tr. 350.
The plaintiff's damages expert, Dr. Stan Smith, calculated
prejudgment interest on that total according to state statutes,
and concluded that there was roughly $41 million in prejudgment
interest for the Late Fee Class, for a total of approximately
$100 million in damages for the Late Fee Class.  Tr. 449.

    The defense database expert, Jared Crafton, disagreed
strongly with Holowczak's conclusions as to the Late Fee Class.
In determining which loans were accelerated, Crafton used the
same 90-day assumption as Holowczak.  Tr. 1400.  However,
Crafton excluded the approximately 70,000 loans with the 082

code that Holowczak had included.  Tr. 1332; DX 5006.  Crafton found that all loans in the Ocwen Database that had completed foreclosures were coded 082, and thus concluded that the "082— Loan Liquidated" code included many loans that were foreclosed upon.  Tr. 1346; DX 5005.  Therefore, he excluded those loans from the Late Fee Class.  Crafton also excluded any loans that he believed were reinstated after acceleration, and he determined that loans were reinstated if he found any payment, however minor, made after acceleration.  Tr. 1343-44.  Crafton concluded that in the event the defendants were found liable on the Late Fee Claim, the Late Fee Class consisted of 18,894 loans for a total of approximately $4 million in damages, including prejudgment interest.  Tr. 1332-33.

The jury returned a verdict on the Late Fee Claim in favor of the plaintiff and the Late Fee Class.  The jury found that the defendants breached the Note by charging Mazzei and the Late Fee Class monthly late fees after their loans were accelerated and they paid off the loans.  The jury found that Mazzei was entitled to $133.80, constituting the five post-acceleration late charges that he paid, and that the Late Fee Class was entitled to $54,786,201, which included $22,374,684 of prejudgment interest, amounting to somewhat more than half of the damages estimate by Holowczak and Smith.

14

## C.

On behalf of the Fee Split Class, the plaintiff argued that the defendants breached § 4(D) of the Note, which allowed The Money Store to recover expenses from borrowers "to the extent not prohibited by applicable law," such as "reasonable attorneys' fees." PX 119. The plaintiff argued that by sharing legal fees with a nonlawyer entity, the defendants violated the various state equivalents of Rule 5.4 of the Model Rules of Professional Conduct, which prohibits fee sharing with nonlawyers. Thus, the plaintiff argued that the defendants had charged fees that were prohibited by "applicable law" under the Note. In the alternative, the plaintiff argued that by charging borrowers for legal fees that included in part payment to Fidelity for its outsourcing operations, the defendants were not charging "reasonable attorneys' fees."

At trial, the jury heard evidence about the relationship between the Money Store defendants, Fidelity, and the attorney networks overseen by Fidelity. In the Master Service Agreement ("MSA") between The Money Store and Fidelity, The Money Store agreed to outsource to Fidelity the necessary legal services for foreclosure, bankruptcy, and other services relating to The Money Store's loan servicing business. DX 101. The Money Store worked with several outsourcers, but Fidelity was the largest.

15

Tr. 792-93.  Fidelity referred The Money Store's legal work to various law firms, and then provided oversight, monitoring, and other administrative services for those law firms.  DX 101; Tr. 196-97, 886.

Generally, the Money Store defendants did not compensate Fidelity directly, leaving it to the various law firms to compensate Fidelity for its services.  Tr. 855-56, 858, 875-76. There was some suggestion at trial that Fidelity was compensated out of the Fannie Mae allowable, Tr. 849-50, the standard fee set by Fannie Mae that loan servicers such as The Money Store paid to attorneys.  Tr. 188-89.  Jacqui Peace explained that the Fannie Mae allowable is an "upper limit" on attorneys' fees that servicers may pass through to borrowers for processes such as foreclosure and bankruptcy.  Tr. 190.  However, the plaintiff presented no direct evidence of payments from attorneys to Fidelity.  When calculating the amount of attorneys' fees that were allegedly shared with Fidelity, the plaintiff relied on percentages specified in various "network agreements" between Fidelity and law firms.  PX 107; PX 108.

The parties' experts disagreed as to whether the defendants were violating "applicable law" in compensating Fidelity through fees paid to attorneys.  The plaintiff called Professor Bruce Green, who explained Model Rule 5.4 to the jury (the rule

16

prohibiting the sharing of legal fees with nonlawyers) and noted
that every state had adopted the rule in some form.  Tr. 678-83.
Green testified that assuming Fidelity and the law firms were
paid out of the Fannie Mae allowable, this would constitute
impermissible fee sharing under the laws of every state.  Tr.
689.  Green also opined that it was deceptive for the Money
Store defendants to characterize the fees encompassing
Fidelity's work charged to borrowers as "legal fees."  Tr. 701-
02.  The plaintiff called a borrower, Lori Jo Vincent, who
testified that she was never aware that the attorneys' fees she
paid were paid to a non-attorney entity.  Tr. 483.

The defendants called Professor Roy Simon as their expert
on legal ethics, and Simon testified that paying Fidelity out of
the Fannie Mae allowable would not be fee splitting, because the
law firms were simply paying Fidelity a set rate for its
administrative services.  Tr. 1038-39, 1043.  Accordingly, Simon
concluded that the outsourcing agreement contemplated by the MSA
and network agreements did not constitute a violation of the
ethical rules as long as fees charged to borrowers were within
"a reasonable range."  Tr. 998.  Simon explained that lawyers
are permitted to hire people outside the law firm to perform
services and assist the lawyers in providing legal services.
Id.  Simon also informed the jury that the Rules of Professional

17

Conduct do not apply to nonlawyers, such as the defendants and Fidelity, Tr. 997, and that he did not see any payments by law firms to Fidelity.  Tr. 998.  Based on the evidence presented at trial, the jury reasonably could have found that the plaintiff failed to prove that the Money Store defendants violated "applicable law" by charging borrowers for fees that were paid in part to Fidelity.

The plaintiff also attempted to show that fees paid to Fidelity were not "reasonable" by reference to Fannie Mae guidelines.  During Jacqui Peace's testimony, and on cross-examination of Michael Shaw, the plaintiff referenced a series of Fannie Mae guidelines that stated that outsourcing fees should not be charged to the borrower.  Tr. 203-04, 1261-62; PX 163; PX 164.  However, those guidelines appeared to apply only if Fannie Mae was using its own attorney network, unlike the situation in this case, where the defendants were using Fidelity to oversee their own attorney networks.  Tr. 1269; PX 163; PX 164.  Moreover, multiple witnesses, including Ms. Peace, testified that the Fannie Mae allowable simply set an "upper limit" on the size of the attorney fees that could be charged to the borrower, rather than restricting the defendants' ability to charge for outsourcing services.  Tr. 190, 1165-68.  The plaintiff did not argue that the fees charged to borrowers

18

exceeded the Fannie Mae allowable.  Based on the evidence
presented at trial, the jury reasonably could have found that
the plaintiff failed to prove that the Money Store defendants
charged attorneys' fees that were not reasonable under § 4(D) of
the Note.

      For the plaintiff's damages calculation, Professor
Holowczak testified that the Fee Split Class included 243,805
loans that were charged roughly $283 million in attorneys' fees.
Tr. 354.  Of these, Holowczak estimated that roughly $229
million of those fees were charged in connection with loans that
Fidelity was overseeing.  Tr. 373.  Dr. Smith further refined
the number by using the network agreements to estimate the
average percentage of those fees that were paid from law firms
to Fidelity, and arrived at a damages estimate of $42 million.
Tr. 444-47.  For the defendants, Jared Crafton testified that
these numbers were inflated because they included payments to
several outsourcers other than Fidelity.  Tr. 1366-71.  Crafton
did not provide an estimate of damages for the Fee Split Class
because he did not see payments made to Fidelity by lawyers.
Tr. 1370, 1374-76.

      Ultimately, the jury found that the plaintiff failed to
prove that the Money Store defendants breached the Note with

Mazzei or with borrowers in the Fee Split Class by charging

attorneys' fees that attorneys paid to Fidelity.

This is only a summary of some of the evidence from the two

week trial which is recounted here to place the parties' motions

in perspective.

### III.

The plaintiff moves for a new trial as to the Fee Split

Claim pursuant to Federal Rule of Civil Procedure 59.

Under Rule 59, a "court may, on motion, grant a new trial

on all or some of the issues—and to any party . . . after a jury

trial, for any reason for which a new trial has heretofore been

granted in an action at law in federal court."  Fed. R. Civ. P.

59(a)(1)(A).  The Court of Appeals for the Second Circuit has

explained that "[a] district court may grant a new trial

pursuant to Rule 59 even when there is evidence to support the

jury's verdict, so long as the court 'determines that, in its

independent judgment, the jury has reached a seriously erroneous

result or its verdict is a miscarriage of justice.'"  AMW

Materials Testing, Inc. v. Town of Babylon, 584 F.3d 436, 456

(2d Cir. 2009) (quoting Nimely v. City of New York, 414 F.3d

381, 392 (2d Cir. 2005)).

The plaintiff contends that the Fee Split verdict was a

miscarriage of justice.  As set forth in more detail below, the

Court has rejected most of the plaintiff's arguments previously, either at trial or in prior motions, and the remaining arguments are without merit.

### A.

Some of the plaintiff's bases for a new trial—those pertaining to the New Invoice System database—are intertwined. The plaintiff argues that he was deprived of crucial evidence at trial because of the defendants' failure to preserve the New Invoice System, a database containing some information about invoices Fidelity sent to the Money Store defendants. Initially, the plaintiff's claim fails because it is clear from the jury's verdict that any additional evidence from the New Invoice System would not have made any difference in this trial. The plaintiff obtained the records from the New Invoice System relating to Mazzei and introduced them at trial.  PX 7.  They showed invoices for various services relating to Mazzei that Fidelity sent to HomEq.  Despite access to the New Invoice documents relating to Mazzei, the jury returned a verdict in favor of the defendants on Mazzei's individual Fee Split claim. The plaintiff has not shown how his inability to offer evidence from the New Invoice System as to other members of the Fee Split Class could conceivably have resulted in a different verdict. See Pouncy v. Danka Office Imaging Co., No. 06cv4777, 2009 WL

21

3415142, at *2 (S.D.N.Y. Oct. 22, 2009) (denying a motion for a new trial where the plaintiff failed to show that new evidence "would have had a material effect on the jury's verdict"), aff'd, 393 F. App'x 770 (2d Cir. 2010).  Even with the evidence from the New Invoice System, Mazzei could not prove his individual claim.  There is thus no basis to believe that evidence from the New Invoice System would have proved any claim with respect to the class.  On this basis alone, the plaintiff's motion based on the New Invoice System should be denied.

For the sake of completeness, the Court will address the plaintiff's other contentions relating to the New Invoice System.  The plaintiff faults the defendants for their conduct throughout trial in referring to the absence of evidence of payments from lawyers to Fidelity, evidence that the plaintiff contends could have been presented if the defendants had preserved the New Invoice system in the same accessible form in which it had once existed, and faults the Court for declining to grant trial sanctions for the defendants' failure to preserve the New Invoice System in that form.  The plaintiff's contentions are without merit, but do require recounting some history of this litigation.

The New Invoice System is the subject of a longstanding dispute.  On or about May 5, 2009, the plaintiff moved for

sanctions against the defendants for having failed to preserve
and maintain records pertaining to the litigation from at least
July 2002.  The motion was based on Dunnery's deposition
testimony, in which he testified that HomEq purged its
accounting system annually of all loans that had been paid off.
May 4, 2009, Grobman Decl. Ex. E, at 84-87 (No. 03cv2876, ECF
No. 86).  The defendants responded with a declaration of Hans
Kobelt, then an attorney for the Money Store defendants, in
which he swore that all of the defendants' records were being
retained "in either the IT Turbo system, the New Invoice system,
or Oracle, as well as hard copies and imaged loan documents from
the loan files themselves."  June 10, 2009, Decl. of W. Hans
Kobelt ¶ 9 (No. 03cv2876, ECF No. 82).  Based on this and other
representations, the plaintiff withdrew his motion at the time.

In October 2013, the plaintiff filed a letter in this Court
claiming that the defendants had failed to preserve information
in the New Invoice System.  See Letter Dated October 17, 2013
(No. 01cv5694, ECF No. 219).  The Court referred the matter to
Magistrate Judge Ellis, and in July 2014, Judge Ellis granted
the plaintiff's motion for sanctions, holding that the
defendants failed to maintain the New Invoice System in an
accessible format.  Judge Ellis ordered the defendants to bear
the cost of determining whether the New Invoice System was

searchable and to pay the plaintiff attorneys' fees for the
sanctions motion.  See Opinion and Order Dated July 18, 2014
(No. 01cv5694, ECF No. 273).  The parties filed objections to
Judge Ellis's opinion, and the plaintiff moved for trial
sanctions against the defendants, such as an adverse inference
or a default judgment on liability.  Prior to trial, the
plaintiff moved to preclude the defendants from questioning
Professor Holowczak on the fact that the Ocwen Database did not
contain any evidence of fee splitting because, according to the
plaintiff, the New Invoice System would have contained that
evidence but the defendants failed to preserve it.

On November 24, 2014, this Court held a final pretrial
conference where it resolved all of the above motions and
objections.  The Court affirmed Judge Ellis's opinion in all
relevant parts, and denied the plaintiff's motion for additional
sanctions.  See Nov. 24, 2014, Hr'g Tr. 61, 67.  The Court
described the New Invoice System, noting that it was a "web-
based system that was used to submit invoices to The Money Store
by Fidelity and vendors such as law firms and trustee firms."
Id. at 63.  The New Invoice System did "not contain records of
bills submitted to law firms or payments made by the law firms
for technology or administrative services fees."  Id.

24

The Court held that although the defendants willfully failed to preserve the New Invoice System in the same accessible form that had previously existed, as Judge Ellis found, "there was no evidence of the defendants' bad faith in the sense that the defendants were intentionally depriving the plaintiff of information for use in this litigation." Id. at 65; see Linde v. Arab Bank, No. 04cv2799, 2009 WL 8691096, at *2, (E.D.N.Y. June 1, 2009) (considering, as a factor in determining sanctions, "whether the party is motivated by a bad faith desire to deprive the court of evidence that would be damaging to it"). The Court noted that additional sanctions were inappropriate because the New Invoice System would not have shown actual payments to Fidelity or the lawyers or charges to the members of the plaintiff class. Nov. 24 Hr'g Tr. 67.

The Court also denied the plaintiff's Daubert motion to preclude the defendants from informing the jury that there was no evidence of fee splitting in the Ocwen database. Id. at 94. To the extent that the Ocwen database was discussed at trial, it would be useful for the jury to understand how it was constructed and why it was not constructed in certain ways to show the existence or non-existence of fee splitting. Id. at 96. But, in light of the fact that the Ocwen database was not constructed to show fee splitting, the Court noted that "[i]f

the defendants harp on the fact that the Ocwen database does not include evidence of fee splitting when the foundation testimony shows why it would not include such evidence, then the Court would sustain appropriate objections to the testimony at that point." Id.  The Court reiterated this ruling at the beginning of the trial, stating that "there could be a few questions to show that's not what this invoice system is constructed to show." Tr. 11.

The plaintiff now objects to the Court's failure to grant the plaintiff's motion for further sanctions, and argues that defense counsel crossed the line set by the Court in referring to the absence of evidence of fee-splitting throughout trial. But, as the Court explained several times during this litigation, the plaintiff's failures in proof are due principally to his lack of diligence in pursuing evidence.  In the time since this Court was assigned to this case in the beginning of 2009, the plaintiff cannot point to any requests for discovery that were denied by this Court.  Despite that fact, the plaintiff never deposed any corporate representatives of Fidelity or of Lender Processing Services, the successor entity that controlled the New Invoice System, nor did he ever seek any court orders for other databases mentioned by the defendants in the course of the 2009 sanctions motion.

26

Moreover, the plaintiff never deposed a single lawyer who allegedly split fees with Fidelity, not even the lawyers who worked on Mazzei's account.  In sum, there were no discernible efforts to seek evidence of fee splitting from any source other than the New Invoice System, a database that, as the Court has explained, only contained tangential information.

In his current motion, the plaintiff argues that he could not have sought fee-split data from Fidelity prior to the Class Certification Order because courts "ordinarily refuse[] to allow discovery of class members' identities at the pre-certification stage." Dziennik v. Sealift, Inc., No. 05cv4659, 2006 WL 1455464, at *1 (E.D.N.Y. May 23, 2006).  But the evidence the plaintiff failed to seek pertained to the alleged merits of the plaintiff's attorney fee splitting claim, not to the identities of class members.  Judge Sprizzo allowed class discovery to begin in 2008.  See Order Dated May 29, 2008 (No. 01cv5694, ECF No. 78).  The plaintiff contends that the defendants had the obligation to preserve the other databases mentioned in connection with the 2009 sanctions motion, but the plaintiff never made any discovery motion as to the other databases. Despite rehashing the same spoliation arguments in this motion, the plaintiff has yet to offer a satisfactory explanation for his failures to pursue evidence diligently.  The Magistrate

27

Judge imposed an appropriate narrowly-tailored sanction for the defendants' failure to assure that the New Invoice System was retained in the same accessible form in which it had previously existed and this Court affirmed that sanction.  The plaintiff failed to seek a greater sanction in his initial motion and this Court appropriately refused to grant a more severe sanction at trial in view of the tangential nature of the New Invoice System and the plaintiff's failure to pursue evidence diligently from alternative and more relevant sources.

Moreover, the defendants' conduct at trial did not violate the Court's pretrial rulings.  During witness testimony and summation, the defendants noted the absence of evidence of payments from lawyers to Fidelity, which they also referred to as an absence of evidence of fee splitting.  While the plaintiff argues that this conduct was improper, the Court did not preclude the defendants from referring to the absence of evidence of fee splitting in general.  Rather, the Court held that the defendants could not suggest to the jury that the absence of fee splitting in the Ocwen database meant that there was no evidence of fee splitting, because the Ocwen database was not constructed to show fee splitting.  During the trial, the defendants followed the Court's instructions and did not harp on

28

the absence of evidence of fee splitting in the Ocwen database.[4]
But in disputing the plaintiff's claim that attorneys' fees were
improperly shared with Fidelity, the defendants properly could
argue that the plaintiff had not presented evidence of actual
payments from attorneys to Fidelity.  This was evidence that the
plaintiff had failed to pursue and did not present, and which
would not have been contained in the New Invoice System.
Nothing in the Court's rulings prevented the defendants from
arguing that the plaintiff had not satisfied his burden of proof
on the Fee Split claim.

**B.**

The plaintiff also argues that a new trial is warranted
because the jury's verdict as to the Fee Split Class was against
the weight of the evidence.  In arguing that it was unreasonable
for the jury not to find that attorneys' fees were improperly
shared with Fidelity, the plaintiff points to the MSA, the
network agreements, and some portions of Dunnery's deposition

---

[4] The plaintiff argues that during trial, the Court sustained several
objections to the defendants' conduct as it related to the Court's pretrial
ruling on this matter.  This is inaccurate.  There was one instance where
defense counsel began to cross the line with a question asking about the
absence of Fidelity *invoices*, and the Court interrupted *sua sponte* before
defense counsel finished the question.  Tr. 727-28.  Because the New Invoice
System did include evidence of Fidelity invoices to HomEq, a question about
their absence may have opened the door for the plaintiff to introduce
testimony about the defendants' failure to maintain the database in the same
accessible form in which it had previously existed.  By contrast, all of the
defendants' questions about the absence of evidence of fee splitting, or
payments from attorneys to Fidelity, were proper and the Court did not
sustain objections to them.

testimony, particularly Dunnery's testimony that Fidelity was "compensated out of the Fannie Mae fee."  Tr. 849.

A jury verdict should only be found to be against the weight of the evidence if it is "seriously erroneous."  Piesco v. Koch, 12 F.3d 332, 345 (2d Cir. 1993).  "Where the resolution of the issues depended on assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial."  Id. (internal quotation marks omitted) (quoting Metromedia Co. v. Fugazy, 983 F.2d 350, 361 (2d Cir. 1992)).

The plaintiff principally argues that the defendants did not present any evidence to counter Dunnery's testimony that Fidelity was paid "out of" the Fannie Mae allowable.  But the ultimate issue for the jury was not whether Fidelity was paid out of the Fannie Mae allowable, but whether payments to Fidelity were in breach of the Note, either because they were "prohibited by applicable law" or because the fees were not "reasonable."  PX 119.  Professor Simon testified as an expert in legal ethics that he did not find any ethical violation in the MSA or the network agreements, and that, in any event, the Professional Rules of Conduct did not apply to nonlawyers. Simon testified credibly that lawyers can hire persons outside a law firm to perform services to assist the lawyers in providing

30

legal services.  Tr. 998.  Simon also testified that there was
no requirement that Fidelity's charges be billed separately from
the attorneys' fees, because Fidelity's administrative services
were "all in league with and coordination with the lawyers or
assisting the lawyers to perform legal services."  Tr. 1039.
The jury was entitled to creditd Simon's testimony.  See DLC
Management Corp. v. Town of Hyde Park, 163 F.3d 124, 134 (2d
Cir. 1998) (explaining that, on a Rule 59 motion, "a court
should rarely disturb a jury's evaluation of a witness's
credibility"); S.E.C. v. Zwick, No. 03cv2742, 2007 WL 831812, at
*16 (S.D.N.Y. Mar. 16, 2007) (rejecting an argument in a Rule 59
motion that the jury should not have credited witness
testimony), aff'd, 317 F. App'x 34 (2d Cir. 2008).

The jury also could have credited the multiple witnesses,
including Ms. Peace, who testified that the Fannie Mae allowable
was only an "upper limit" on the amount of attorneys' fees that
could be charged to borrowers.  Tr. 190, 998, 1165.  The
plaintiff did not argue that the Fee Split Class was charged
attorneys' fees that were too high, and accordingly the jury
could have found that the fees were "reasonable" under the Note.
Finally, the jury could have found that, based on the lack of
evidence of payments to Fidelity by attorneys, the plaintiff did
not satisfy his burden to show fee splitting.  Based on the

evidence in this case, it was not seriously erroneous for the jury to conclude, as a matter of contract interpretation, that the plaintiffs failed to prove that the defendants breached § 4(D) of the Note by charging attorneys' fees that attorneys paid to Fidelity.  The jury reasonably rejected Mazzei's individual claim and the class claim by the Fee Split Class.

### C.

The plaintiff next argues that the Court erred in declining to admit an affidavit submitted earlier in this case by Mark Buechner, an attorney for Wells Fargo (the "Buechner Affidavit").  The defendants originally submitted the Buechner Affidavit in September 2014, in opposition to the plaintiff's motion for further sanctions for the defendants' failure to maintain the New Invoice System in the same accessible format in which it had previously existed.  The Buechner Affidavit contains some background information on the defendants' litigation holds, the New Invoice System, and other databases. See Buechner Affidavit (No. 01cv5694, ECF No. 305).  On December 2, 2014, shortly prior to trial, the plaintiff submitted a letter to this Court outlining the plaintiff's "proffer of evidence to be elicited through the testimony of Mark Buechner," requesting the Court to permit Buechner's testimony, which the plaintiff claimed would be confined to the topics discussed in

32

his affidavit.  On December 3, 2014, the plaintiff submitted a brief reply requesting that in the event Buechner is outside the Court's subpoena power, the plaintiff be permitted to offer the Buechner Affidavit as evidence.

Shortly thereafter, this Court denied the plaintiff's requests.  See Order Dated Dec. 3, 2014 (No. 01cv5694, ECF No. 442).  The Court noted that Buechner was outside the Court's subpoena power because the defendants represented, without contradiction, that Buechner resides and works in North Carolina, and there was no indication that his testimony could be compelled.  And the plaintiff could point to no rule under the Federal Rules of Evidence that would allow the Buechner Affidavit, which is hearsay, to be admitted at trial.  The Court also noted that the plaintiff had not proffered what admissible testimony he would offer from Buechner.  The plaintiff appeared to intend to elicit testimony from Buechner about the defendants' failure to preserve the New Invoice System in the same accessible format, but that testimony would not have been proper in light of the Court's denial of the plaintiff's motion for additional sanctions.

In his current motion, the plaintiff does not present any reason for disturbing the Court's initial ruling.  The plaintiff argues, as he did in his original motion, that the defendants

33

did not object to the admissibility of the Buechner Affidavit, but this is incorrect; the defendants objected when the plaintiff made the motion.  None of the Federal Rules of Evidence the plaintiff now points to support the admissibility of the affidavit.[5]  The plaintiff argues that the Court failed to reconsider admitting the affidavit when the plaintiff renewed his motion during trial.  However, the Court did reconsider the motion and rejected it, stating during the trial that the affidavit was "plainly hearsay" and "no more admissible today than it was [before trial]."  Tr. 903.

The plaintiff argues that the Buechner affidavit should have been allowed after the defendants designated some portions of the Dunnery deposition that referenced the New Invoice System.  But the jury only heard a few scattered references to the New Invoice System during Dunnery's deposition testimony, and those references were read without objections by the plaintiff.  Tr. 902.  Thus the information in the Buechner Affidavit about the New Invoice System would only have been confusing to the jury.  The Court offered to strike the references to the New Invoice System, but the plaintiff declined

---

[5] The plaintiff argues that the Buechner Affidavit is a statement of a party opponent under Rule 801(d)(2) of the Federal Rules of Evidence, but Buechner is employed by Wells Fargo, who is not a party opponent.  The plaintiff argues that it is a statement against interest from an unavailable declarant, but has not identified any statement in the affidavit that Buechner only would have made if he believed it to be true because "it was so contrary to [his] proprietary or pecuniary interest . . . ."  Fed. R. Evid. 804(b)(3).

34

the invitation.  Tr. 902-03.  The plaintiff also presents arguments about the need to correct for the defendants' alleged spoliation and the defendants' references to the absence of evidence of fee splitting, but the Court has rejected that argument several times, including prior to and during trial, and in the context of this motion.  The Court declined prior to trial to grant any additional sanctions for the defendants' failure to preserve the New Invoice System in a more accessible form, and the defendants obeyed the Court's instructions during the trial.

Accordingly, the Court did not err in declining to admit the Buechner Affidavit.

### D.

Finally, the plaintiff argues that the Court erred in denying the plaintiff's request for a jury instruction on restitution damages for the Fee Split Class, or what the plaintiff terms the Court's "*sua sponte* dismissal" of the restitution request.  However, because the jury returned a verdict in favor of the defendants on the plaintiff's Fee Split claim and thus did not reach damages, the plaintiff's argument is moot.

In any event, the Court did not err in denying the plaintiff's request.  The plaintiff's argument that the Court

dismissed the request *sua sponte* is frivolous.  Relying on a
restitution theory, the plaintiff sought to recover the entire
amount of fees paid by the class to attorneys, not simply the
amount that had been allegedly wrongfully paid to Fidelity.  The
plaintiff proposed a request to charge the jury on that theory.
Not surprisingly, this request was vigorously contested by the
defendants.  Not only did the defendants oppose the request in
their requests to charge, but during the trial the Court alerted
the plaintiff to the precise questions and doubts that the Court
had about the restitution jury charge proffered by the plaintiff
and allowed the parties to brief the issue further, whereupon
the plaintiff submitted a letter outlining his arguments.  See
Tr. 956-58; Pl's Letter Dated Dec. 14, 2014 (No. 01cv5694, ECF
No. 452).  At the charge conference, when the Court presented a
draft jury charge that did not include a restitution theory of
damages, the plaintiff did not object.  The plaintiff then
raised the issue immediately prior to summations, where the
Court noted that it had been waived but was without merit, in
any event.  Tr. 1649.

    The plaintiff devotes his entire argument regarding the
Court's denial of the restitution charge to the frivolous *sua
sponte* issue and to arguing that the plaintiff's failure to
object at the charge conference did not constitute waiver,

because only a "[f]ailure to object to a jury instruction . . .
prior to the jury retiring results in a waiver of that
objection." Jarvis v. Ford Motor Co., 283 F.3d 33, 57 (2d Cir.
2002) (internal quotation marks omitted).  However, immediately
after the Court deemed the request waived, the Court also held
that, "in the alternative, it's plain that a damages theory of
restitution is not an available damages theory in this case."
Tr. 1649.  The plaintiff does not explain why restitution
damages were appropriate for the breach of contract claim on
behalf of the Fee Split Class.

"The decision whether to award restitution damages lies
within the discretion of the trial court." Waxman v. Envipco
Pick Up & Processing Servs., Inc., No. 02cv10132, 2006 WL
236818, at *5 (S.D.N.Y. Jan. 17, 2006).  Restitution damages are
sometimes awarded in cases of total breach or repudiation,
allowing the non-breaching party to claim restitution damages in
order to be restored to its original position. See Summit
Props. Int'l, LLC v. Ladies Prof'l Golf Ass'n, No. 07cv10407,
2010 WL 4983179, at *3 (S.D.N.Y. Dec. 6, 2010).  But in this
case, there was no total breach or repudiation of the contract.
Indeed, in Mazzei's case, the loan under the Note was made and
then paid off together with interest and charges.  Mazzei's
claim is only that part of the amounts for attorneys' fees that

37

were paid to Fidelity were charged in breach of the contract. Thus this theory of restitution damages would not apply.  See Restatement (Second) of Contracts § 373 Cmt. a (1981) ("[R]estitution [under § 373] is available only if the breach gives rise to a claim for damages for total breach and not merely to a claim for damages for partial breach."); Direction Assocs., Inc. v. Programming & Sys., Inc., 412 F. Supp. 714, 719 (S.D.N.Y. 1976) (denying restitution damages where there was no material or total breach of contract).

Alternatively, restitution damages may be awarded where a party "renders performance under an agreement that is illegal or otherwise unenforceable for reasons of public policy." Restatement (Third) of Restitution and Unjust Enrichment § 32 (2011); see also Norman v. Salomon Smith Barney, Inc., 350 F. Supp. 2d 382, 389-90 (S.D.N.Y. 2004) (allowing recovery of restitution "where contract is void for illegality of performance").  However, the plaintiff does not contend that the entire agreement is unenforceable; rather, the plaintiff is challenging only the defendants' ability to charge certain types of fees under one portion of the contract, namely the portion of the attorneys' fees that the plaintiff claims were wrongfully paid to Fidelity.  As the Court noted when denying the request, the "particular breach in this case was the payment of the

38

attorneys' fees that went to Fidelity.  So, the correct amount
of restitution in this case would be the same as compensatory
damages."  Tr. 1650.  Accordingly, the Court appropriately
denied the request to charge the jury on the theory of
restitution damages.

Because the plaintiff has not shown that "the jury has
reached a seriously erroneous result or its verdict is a
miscarriage of justice," AMW Materials Testing, 584 F.3d at 456
(internal quotation marks omitted), the plaintiff's motion under
Rule 59 is **denied.**

### IV.

The defendants move for decertification of the Late Fee
Class pursuant to Rule 23 of the Federal Rules of Civil
Procedure.  In the alternative, the defendants move for judgment
as a matter of law on the Late Fee claim pursuant to Rule 50(b)
of the Federal Rules of Civil Procedure.  The defendants advance
the same two bases for each motion—that the plaintiff failed to
prove on a classwide basis that the members of the class
actually had their loans accelerated, and that the plaintiff
failed to prove on a classwide basis that the members of the
class were in privity of contract with the defendants.

Pursuant to Rule 23(c)(1)(C), "[a]n order that grants or
denies class certification may be altered or amended before

39

final judgment." Fed. R. Civ. P. 23(c)(1)(C); see also Boucher
v. Syracuse Univ., 164 F.3d 113, 118 (2d Cir. 1999) ("[U]nder
Rule 23(c)(1), courts are required to reassess their class
rulings as the case develops." (internal quotation marks
omitted)).  A court may "decertify a class if it appears that
the requirements of Rule 23 are not in fact met." Sirota v.
Solitron Devices, Inc., 673 F.2d 566, 572 (2d Cir. 1982).
However, a court "may not disturb its prior findings absent some
significant intervening event or a showing of compelling reasons
to reexamine the question." Gulino v. Bd. of Educ., 907 F. Supp.
2d 492, 504 (S.D.N.Y. 2012) (internal quotation marks omitted).
aff'd, 555 F. App'x 37 (2d Cir. 2014).  Compelling reasons
"include an intervening change of controlling law, the
availability of new evidence, or the need to correct a clear
error or prevent manifest injustice." Id. (internal quotation
marks omitted).  The moving party in a decertification motion
bears "a heavy burden to prove the necessity of either the
drastic step of decertification or the less draconian but still
serious step of limiting the scope of the class." Gordon v.
Hunt, 117 F.R.D. 58, 61 (S.D.N.Y. 1987).

It is well-established that a district court should deny a
Rule 50 motion unless "viewed in the light most favorable to the
nonmoving party, 'the evidence is such that, without weighing

the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached.'" Cruz v. Local Union No. 3 of the Int'l Bhd. of Elec. Workers, 34 F.3d 1148, 1154-55 (2d Cir. 1994) (alteration in original) (quoting Simblest v. Maynard, 427 F.2d 1, 4 (2d Cir. 1970)).  A trial court considering a motion under Rule 50(b) "must view the evidence in a light most favorable to the nonmovant and grant that party every reasonable inference that the jury might have drawn in its favor." Samuels v. Air Transp. Local 504, 992 F.2d 12, 16 (2d Cir. 1993).  A jury verdict should be set aside only when "there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or [where there is] such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [jurors] could not arrive at a verdict against [the movant]." Logan v. Bennington Coll. Corp., 72 F.3d 1017, 1022 (2d Cir. 1996) (alterations in original) (internal quotation marks omitted); see also AIG Global Sec. Lending Corp. v. Banc of Am. Sec. LLC, 646 F. Supp. 2d 385, 388-89 (S.D.N.Y. 2009), aff'd, 386 F. App'x 5 (2d Cir. 2010).

**A.**

Initially, the defendants argue that the Late Fee Class
should be decertified and that, in the alternative, judgment
should be granted as a matter of law in their favor on the Late
Fee claim because the plaintiff failed to prove, on a classwide
basis or as a matter of law, that the Money Store defendants
actually accelerated the class members' loans.

In its decision on class certification, this Court held
that the plaintiff had satisfied his burden under Rule 23(b)(3)
to show that common questions predominated over individual
questions for the Late Fee Class.  Mazzei v. Money Store, 288
F.R.D. 45, 67 (S.D.N.Y. 2012).  The plaintiff showed that the
defendants had a policy of charging post-acceleration late fees,
and that state contract law was sufficiently uniform to allow
for classwide adjudication of whether that policy violated the
Uniform Notes signed by borrowers.  Id.  The defendants now
contend, in an argument not raised when the Late Fee Class was
certified, that Rule 23(b)(3) is no longer met in this case
because the plaintiff did not prove on a classwide basis that
the defendants actually accelerated each class member's loan.
For substantially the same reasons, the defendants argue that
they are entitled to judgment as a matter of law on the Late Fee
claim.

At the close of trial, the Court instructed the jury that a "loan is accelerated when the lender or servicer provides notice or demand to the borrower that the entire balance of the loan is due immediately." Tr. 1750.  The Court stated that "the plaintiff must prove by a preponderance of evidence that his loan and the class members' loans were accelerated," that they were charged late fees after the acceleration, that those fees were not permitted under the contract, that they paid off their loans, and that they were injured as a result.  Tr. 1750-52.  See also Beal Bank v. Crystal Props. Ltd., L.P. (In re Crystal Props., Ltd., L.P.), 268 F.3d 743, 749 (9th Cir. 2001) ("Both state *and* federal courts have made clear the unquestionable principle that, even when the terms of a note do not require notice or demand as a prerequisite to accelerating a note, the holder must take affirmative action to notify the debtor that it intends to accelerate." (emphasis in original)).  The jury returned a verdict in favor of the plaintiff and the Late Fee Class on the Late Fee claim, and thus concluded that the defendants had accelerated the class members' loans and charged them post-acceleration late fees.

The defendants argue that the plaintiff did not present evidence that the absent class members' loans were in fact accelerated, but instead relied on the expert witnesses'

43

assumption that the loans were accelerated after 90 days without payment from the borrower.  See, e.g., Tr. 312, 1400.  The defendants argue that such an assumption cannot constitute sufficient classwide evidence that the loans were in fact accelerated.  See, e.g., Alphamed Pharm. Corp. v. Arriva Pharm., Inc., 432 F. Supp. 2d 1319, 1347 (S.D. Fla. 2006) (granting a defendant's Rule 50 motion for judgment as a matter of law where the evidence at trial demonstrated that the plaintiff's "assumptions" were "at the very least, speculative"), aff'd, 294 F. App'x 501 (11th Cir. 2008).  However, contrary to the defendants' argument, the plaintiff presented evidence to support the 90-day assumption.  Jacqui Peace and Adam Levitin testified that it was "standard practice in the mortgage industry" to accelerate loans after 90 days of nonpayment on the loan from the borrower.  Tr. 96-97, 178.  Dunnery also testified that the Money Store defendants tended to accelerate loans "somewhere between day 55 to day 75 of the delinquency," although The Money Store "may have gone to day 95."  Tr. 819-20.  Based on this testimony, the jury could reasonably infer that the defendants followed the mortgage industry standards and generally accelerated loans after 90 days without payment from the borrower.  The experts' testimony about industry practices and the Dunnery testimony about the Money Store defendants' loan

44

acceleration practices applied to the borrowers on a classwide basis such that the common question of the defendants' liability still predominated at trial.  See Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co., 301 F.R.D. 116, 136 (S.D.N.Y. 2014) (finding predominance requirement met as to liability because the proof of liability centered on the defendants' loan underwriting practices).[6]

The defendants argue that the circumstances surrounding Mazzei's loan illustrate the impropriety of relying on the 90-day assumption.  The parties agree that Mazzei's loan was accelerated on or about March 22, 2000, but Professor Holowczak testified that according to the 90-day assumption, Mazzei's date of acceleration occurred on November 3, 1999.  Tr. 338.  The defendants were free to argue at trial that Mazzei's circumstances undermined the experts' and Dunnery's testimony that the defendants accelerated loans on or prior to the 91st day without payment.  But in light of the jury's verdict in favor of the plaintiff, the Court "must resolve this conflict in the evidence in favor of [the nonmoving party]." Stratton v.

---

[6] Relying on Marlo v. United Parcel Service, Inc., 639 F.3d 942 (9th Cir. 2011), the defendants argue that industry practice cannot serve as proof that the defendants accelerated the class members' loans.  But that case is inapposite and does not support the defendants' stated proposition.  See id. at 948 (finding, in a fair-wages action, that the plaintiff did not establish predominance by reference to generalized policies of the defendant because individual questions predominated).  Nothing prevented the jury from inferring that it was standard mortgage industry practice to accelerate loans at a certain period, and that the defendants followed that practice.

45

Dep't for the Aging for N.Y., 132 F.3d 869, 874 n.2 (2d Cir.
1997).  At the very least, the history of Mazzei's loan
indicated that it was in fact accelerated and that he paid post-
acceleration late fees.  Indeed, the defendants pointed to no
case out of the thousands of loans included in the class where
no payments were made on a loan for more than 90 days, and where
the loan was never accelerated.  In the absence of any contrary
evidence, the jury could rely on the expert testimony of
industry practice and Dunnery's testimony as to the defendants'
practice.

Ultimately, the issue the defendants raise as to
acceleration affects the proper amount of damages, and not the
defendants' liability.  If the jury calculated damages using the
90-day assumption, but some borrowers' loans were actually
accelerated later, the jury's estimation of the damages may be
somewhat inflated.  But the jury's estimation of damages does
not require mathematical precision, because "a plaintiff need
only demonstrate a stable foundation for a reasonable estimate
as to damages."  Boyce v. Soundview Tech. Grp., Inc., 464 F.3d
376, 392 (2d Cir. 2006) (internal quotation marks omitted)
(holding that the breaching party must "shoulder the burden" in
proving uncertainty of damages).  In this case, the jury awarded
Mazzei a total of five late fees, apparently accepting Mazzei's

46

date of acceleration as March 22, 2000, and awarding Mazzei the
late fees that he paid after that date.  The jury awarded the
Late Fee Class approximately $54 million, including
approximately $22 million of prejudgment interest, or roughly
half of Dr. Smith's calculations based on Holowczak's estimate
of the Late Fee Class.  Tr. 449.  Roughly half of the loans in
Holowczak's estimate were coded "082," and the jury reasonably
could have excluded those loans based on Crafton's testimony
that the 082 code included loans that had been foreclosed upon
and that there was no basis to conclude that loans in that
category were paid off as required to be included in the class
definition.  Tr. 1346.  Accordingly, the jury made a reasonable
estimate as to the damages for the Late Fee Class.

        In sum, the defendants have not presented any new
evidence or pointed to a significant intervening event after
this Court's certification order, and the defendants' argument
based on the acceleration of the loans does not present a
compelling reason for decertifying the Late Fee Class.  See
Stinson v. City of New York, No. 10cv4228, 2014 WL 4742231, at
*5 (S.D.N.Y. Sep. 23, 2014).  The defendants also have not
shown, on this basis, that "reasonable and fair minded" persons
could not have "arrive[d] at a verdict against [the
defendants]." Logan, 72 F.3d at 1022.

47

**B.**

The defendants' second basis for decertifying the Late Fee
Class and granting them judgment as a matter of law on the Late
Fee claim is much more substantial.  The defendants argue that
the plaintiff did not prove that the borrowers in the class were
in a contractual relationship with the Money Store defendants.
The defendants concede that they have contractual relationships
with the borrowers who signed Uniform Notes for mortgage loans
originated by the Money Store defendants.  However, in 2001, the
Money Store defendants ceased originating loans, Tr. 873-74, and
only serviced loans originated after that point.  Thus, the
Money Store defendants were not signatories to any borrowers'
Uniform Notes originated after the defendants ceased originating
loans.  The defendants contend that the plaintiff has not shown,
on a classwide basis or as a matter of law, that the defendants
had a contractual relationship with those borrowers.  Because
the only claim in this case is for breach of contract, the
existence of a contractual relationship between the class
members and the defendants is critical.

Although the defendants did not make arguments about the
issue of privity to the jury during the trial, the Court
instructed the jury on the necessity of finding that the class
members entered into a contractual relationship with the Money

Store defendants, even where the defendants "only serviced the loans of many class members." Tr. 1749-50. The jury returned a verdict in favor of the plaintiff and the Late Fee Class with respect to the Late Fee claim, thus concluding that a contractual relationship existed between the members of the Late Fee Class and the defendants. The defendants argue that the plaintiff did not prove such a contractual relationship on a classwide basis, and that there is a complete absence of evidence supporting the jury's finding that a contractual relationship existed between the defendants and the class members whose loans were only serviced, and not originated, by the defendants.

It is "hornbook law that a nonsignatory to a contract cannot be named as a defendant in a breach of contract action unless it has thereafter assumed or been assigned the contract." Harte v. Ocwen Fin. Corp., No. 13cv5410, 2014 WL 4677120, at *5 (E.D.N.Y. Sept. 19, 2014) (internal quotation marks omitted) (quoting In re Cavalry Constr., Inc., 428 B.R. 25, 30 (S.D.N.Y. 2010)). The Late Fee Class included borrowers whose loans were only serviced and not originated by the defendants, and the plaintiff was required to prove at trial that those borrowers were in "privity of contract" with the defendants in order to assert a breach of contract claim on behalf of the class. See,

e.g., Impulse Mktg. Grp., Inc. v. Nat'l Small Bus. Alliance, Inc., No. 05cv7776, 2007 WL 1701813, at *6 (S.D.N.Y. June 12, 2007) ("Privity of contract has long been held as a requirement for a breach of contract action.").

A number of courts have addressed whether servicers that are nonsignatories to mortgage loan agreements may be held liable by the mortgagor in a breach of contract action.  A significant majority of courts have concluded that loan servicers are not in privity of contract with mortgagors where the servicers did not sign a contract with the mortgagors or expressly assume liability.  See, e.g., Perron v. JP Morgan Chase Bank, N.A., No. 12cv01853, 2014 WL 931897, at *4 (S.D. Ind. Mar. 10, 2014) ("The [h]omeowners have failed to cite to any case law . . . in which contractual privity between the borrower and the holder of a note was imputed to the loan servicer."); Edwards v. Ocwen Loan Servicing, LLC, 24 F. Supp. 3d 21, 28 (D.D.C. 2014) ("Judges around the country . . . have held that a loan servicer, as a lender's agent, has no contractual relationship or privity with the borrower and therefore cannot be sued for breach of contract.") (collecting cases).[7]  The plaintiff points to two cases within the Seventh

---

[7] See also Petty v. Countrywide Home Loans, Inc., No. CIV.A. 3:12-6677, 2013 WL 1837932, at *10 (S.D.W. Va. May 1, 2013) (holding that the defendant who bought the loan under a pooling and servicing agreement could not be held liable in a breach of contract claim) (collecting cases); Johnson v.

Circuit, including an opinion by the Court of Appeals for the
Seventh Circuit, which hold that "[i]f an original mortgagee can
be sued under state law for breach of contract, so may the
partial assignee," the servicer, if the servicer "violates the
terms of the part of the mortgage contract that has been
assigned to [it]."  In Re Ocwen Loan Servicing, LLC Mortg.
Servicing Lit., 491 F.3d 638, 645 (7th Cir. 2007); see also
Kesten v. Ocwen Loan Servicing, LLC, No. 11cv6981, 2012 WL
426933, at *7 (N.D. Ill. Feb. 9, 2012).  Finally, two district
courts within this Circuit have held that mortgagors
theoretically could state a claim against servicers that are not
parties to the contract if the mortgagors demonstrate an agency
relationship or the "functional equivalent of privity," but
neither court found such a claim to have been pleaded in those
cases.  See Harte, 2014 WL 4677120, at *6-7; Kapsis v. Am. Home
Mortg. Servicing Inc., 923 F. Supp. 2d 430, 451-52 (E.D.N.Y.
2013) ("The determination of whether the 'functional equivalent

---

Affiliated Computer Servs., Inc., Civ. Act. No. 3:10-CV-2333-B, 2011 WL
4011429, *7 (N.D. Tex. Sept. 9, 2011) (dismissing a breach of contract claim
against a loan servicer where the plaintiff was not a party to the servicing
agreement and did not allege the contract was entered into to benefit him
directly); James v. Litton Loan Servicing, L.P., No. 09cv147, 2011 WL 59737,
at *11 (M.D. Ga. Jan. 4, 2011) ("The fact that a loan servicer, which has
undertaken a contractual obligation to provide legal services for a lender,
may appear in bankruptcy court to protect a claim relating to the debt it
services does not mean that the servicer is considered in privity with a
borrower for purposes of a breach of contract claim."); Kehoe v. Aurora Loan
Servs. LLC, No. 10cv00256, 2010 WL 4286331, at *8 (D. Nev. Oct. 20, 2010)
("[C]ourts have held that a loan servicer . . . is not a party to the deed of
trust . . . .  Moreover, the fact that Aurora serviced Plaintiff's loan does
not create contractual privity between Aurora and the Plaintiffs.").

of privity' exists . . . is a highly fact-dependent endeavor
which must consider the de facto dealings between the relevant
parties as well as the language of all relevant contracts."
(quoting Cavalry Constr., 428 B.R. at 31) (internal quotation
marks omitted)).

All of these cases make it clear that a servicer is not
automatically in privity with a borrower where the servicer was
not also the original lender.  Privity will depend on the nature
of the relationship between the servicer and the borrower and
whether there has been a valid assignment of contractual duties
to the servicer.  Indeed, the jury in this case was specifically
charged:

> The plaintiff argues that the Money Store defendants were
> assigned the rights and obligations for those loans that
> they serviced such that the Money Store defendants entered
> into a contractual relationship with the class members.  It
> is for the jury to decide whether the plaintiff has proved
> by a preponderance of evidence that a contractual
> relationship exists between the class members and the Money
> Store defendants because the Money Store defendants either
> originated the loans for the class members or were assigned
> the rights and obligations to service the loans for the
> class members.

Tr. 1750.

While it was theoretically possible for the plaintiff to
have presented classwide proof on whether there were valid
assignments relating to the borrowers whose loans the defendants
only serviced, it is clear that the plaintiff never presented

52

that evidence at trial.  Moreover, in this motion the plaintiff
does not explain the nature of that evidence and how individual
factual issues with respect to each loan would not predominate
over the classwide issues.  See Fed. R. Civ. P. 23(b)(3).  The
plaintiff argues that the evidence he presented at trial
demonstrated that all of the borrowers were in a contractual
relationship with the Money Store defendants, even if the
defendants only serviced the absent class members' loans.  But
the only evidence the plaintiff offered in support of such a
relationship was background testimony by Adam Levitin, a law
professor, and the PSA that Levitin described.  Levitin
explained to the jury that his role was to educate the jury on
aspects of the home mortgage industry such as "the components of
the loan, the note, and the mortgage," and the "role of the
servicer."  Tr. 140.  Levitin made clear that he was providing
"no opinion whatsoever on the defendants in this case."  Id.
Levitin opined that a borrower *could* bring a breach of contract
action against a servicer.  Tr. 116.  Putting aside that Levitin
had no competence to testify on a conclusion of law, that
testimony was strictly hypothetical and was directed to a
situation where a servicer failed to credit a borrower for a
payment the borrower made.  Indeed, much of Levitin's testimony,
designed to educate the jury, was not about any class members,

but rather was about a hypothetical "Betty the Borrower."  The

plaintiff points to the following passage in which Levitin

describes a PSA as the "contract" between investors and

servicers:

> The servicer has been assigned rights in the contract and
> delegated duties in the contract. . . . [O]nce you have
> been delegated duties under the contract, you have stepped
> into the shoes of the original party to the contract. . . .
> So like Betty could sue the servicer if the servicer just
> takes her money and never credits her account, similarly
> the servicer can sue Betty when Betty doesn't pay.

Tr. 119.

Other than Levitin's general background testimony, Levitin

briefly described Plaintiff's Exhibit 99.  Levitin described

Plaintiff's Exhibit 99 as a "filing made with the Securities

Exchange Commission by The Money Store," which included a PSA.

Tr. 129; PX 99.  The PSA, dated November 30, 1994, transferred

the servicing rights for Mazzei's loan from the Money Store

lender to the Money Store servicer.  Tr. 130.  Levitin also

testified about § 5.01B of the PSA, which he explained gives the

servicer the "power to service the loan."  Tr. 131.  The

plaintiff did not offer any other PSA in this trial, nor did he

offer evidence or testimony about the Uniform Notes of any other

absent class members, aside from Ms. Vincent.

The plaintiff points to Dunnery's testimony that as of

2000, 130,000 loans that the defendants originated were still

active, and the plaintiff argues that the Late Fee Class
included those loans.  But this would be sheer surmise.  To be
included in the Late Fee Class, a borrower was required to have
paid late fees after the borrower's loan was accelerated and
then paid off the loan.  The jury likely concluded that the
loans constituting the Late Fee Class were those identified by
Professor Holowczak with "081" codes, representing a class of
approximately 70,000 loans taken out of a database of over one
million loans.  There was no evidence that even hinted at which
of those 70,000 loans were originated by the defendants and
which were merely serviced.  And as to loans that were only
serviced, there was no evidence of specific assignments to the
defendants.

Thus, the plaintiff's entire evidentiary basis for
contending that privity was established between the defendants
and the class members whose loans were not originated by the
defendants is Levitin's background, theoretical testimony, a
1994 PSA, and Levitin's testimony that the circumstances behind
Mazzei's loan and its securitization were "typical of the
industry."[8]  Tr. 138.  None of these proffered bases suffice,
individual or collectively, to establish privity of contract
between all of the absent class members and the Money Store

---

[8] The plaintiff also points to Levitin and Peace's testimony about the bundles
of "mortgage servicing rights" that were bought and sold by banks, under
which servicers were transferred payment rights.  Tr. 110, 163.

defendants as servicers of their loans.  The PSA included in
Plaintiff's Exhibit 99, dated November 30, 1994, plainly does
not encompass borrowers' loans originated after 2001, when the
Money Store defendants ceased originating loans.  Indeed, it is
not evidence of any servicing relationship between the
defendants and borrowers whose mortgages were originated after
November 1994.  The plaintiff attempts to rely on Levitin's
statement that the 1994 PSA is "typical" of the industry, which
would have required the jury to speculate that other absent
class members would have had a similar PSA that assigned
contractual obligations to the defendants.  But a verdict based
on such speculation cannot stand.  See Crespo v. Chrysler Corp.,
75 F. Supp. 2d 225, 232 (S.D.N.Y. 1999) (citing Williams v.
County of Westchester, 171 F.3d 98, 101 (2d Cir. 1999).

Moreover, Levitin's testimony about mortgage industry
standards and practices alone cannot establish a contractual
relationship between the class members and the Money Store
defendants.  Other than Dunnery's testimony, which did not
support the existence of a contractual relationship with the
class members, there was no evidence from any witness with
personal knowledge of the defendants' practices.  Moreover, the
plaintiff presented no evidence about the contractual

relationships of any class member other than Mazzei,[9] and Mazzei's loan was originated by the defendants and thus has no bearing on this issue.  The plaintiff cannot substitute Levitin's general background testimony about industry practices as proof of contractual relationships.

The plaintiff argues that the defendants presented no evidence to show that the class members were *not* in privity with the defendants, but of course, the party claiming a breach of contract "carries the burden of persuasion."  Bourne v. Walt Disney Co., 68 F.3d 621, 631 (2d Cir. 1995) (citing Gordon v. Leonetti, 324 F.2d 491, 492 (2d Cir. 1963)).  Without any evidence establishing that the Money Store defendants assumed or were assigned specific contractual obligations, or were otherwise in privity of contract with the absent class members whose loans they serviced, the plaintiff cannot assert a breach of contract claim on behalf of the class.  See, e.g., Phillips v. Ocwen Loan Servicing, LLC, No. 12cv3861, 2015 WL 1138248, at *11 (N.D. Ga. Mar. 12, 2015) (granting summary judgment for defendant servicer where undisputed evidence showed that the defendant was not a party or assignee to the plaintiff's Note);

---

[9] The plaintiff also introduced the testimony of Lori Ann Vincent, but Vincent was not a member of the Late Fee Class and the contractual documents that led to the servicing of her loan by one of the defendants were never discussed or introduced in evidence.  Tr. 477-78, 487.

Schmidt v. Nat'l City Corp., No. 06cv209, 2008 WL 5248706, at *7
(E.D. Tenn. Dec. 17, 2008) (same).

It is apparent, after trial, that the Rule 23 requirements

The Court's certification of the Late Fee Class, which
included borrowers "who signed form loan mortgage agreements on
loans which were owend or serviced by the defendants," was based
on the then unchallenged premise that the borrowers were
similarly situated with respect to their contractual privity
with the Money Store defendants, regardless of whether their
loans were owned or merely serviced by the Money Store
defendants. Mazzei, 288 F.R.D. at 56, 66.  At trial, the
plaintiff failed to adduce any evidence to support that premise.

It is apparent, after trial, that the Rule 23 requirements
are "not in fact met." Sirota, 673 F.2d at 572.  As the
defendants admit, Mazzei has a contractual relationship with the
defendants because the Money Store defendants originated his
loan and signed the Note.  This is also true for other class
members whose loans were originated by the defendants.  See
Defs' Mem. in Supp. of Mot. to Decertify Post-Acceleration Late
Fee Class (No. 01cv5694, ECF No. 467), at 12 ("Defendants had
such a relationship with some class members, *i.e.* those whose
loans were originated by Defendants or those whose loans the
Defendants acquired by assignment.").  However, this fact
renders Mazzei an atypical class representative for those

members of the class whose loans were merely serviced by the
defendants.  See Campusano v. BAC Home Loans Servicing LP, No.
11cv4609, 2013 WL 2302676, at *8 (C.D. Cal. Apr. 29, 2013)
(finding Rule 23(a)(3) typicality requirement unmet because the
loan agreements that the plaintiff signed were not typical of
the class).  The plaintiff also did not prove that the common
question of whether the defendants breached the form loan
documents by charging post-acceleration late fees predominated
over the individual issues of whether each class member is in
privity of contract with the defendants.  See Wu v. Pearson
Educ. Inc., No. 09cv6557, 2012 WL 6681701, at *8 (S.D.N.Y. Dec.
21, 2012) (decertifying a class after discovery due to issues
with commonality, typicality, and predominance where there was a
"multiplicity of contracts"); Martinez v. Welk Grp., Inc., No.
09cv2883, 2012 WL 2888536, at *4 (S.D. Cal. July 13, 2012)
(finding the Rule 23(b)(3) predominance requirement unmet for a
breach of contract claim where class members did not all have
the same contract).

    Although decertification of a class is a "drastic step" and
courts are less inclined to decertify a class after a trial on
the merits, Jermyn v. Best Buy Stores, L.P., 276 F.R.D. 167,
168-69 & n.1 (S.D.N.Y. 2011), a judgment on the merits in this
case cannot be upheld given the plaintiff's failure of proof on

behalf of the class.  See Rossini v. Ogilvy & Mather, Inc., 798
F.2d 590, 596 (2d Cir. 1986) (affirming decertification of one
class after trial where evidence did not support the existence
of such a class but reversing decertification of other classes);
Reed v. Town of Babylon, 914 F. Supp. 843, 849 (E.D.N.Y. 1996)
(partially decertifying class due to "complete lack of evidence"
to support aspect of claim).  The plaintiff has failed to prove
that members of the Late Fee Class whose loans were serviced but
not originated by the defendants were in privity with the
defendants, and the plaintiff never provided any basis to
allocate the damages among members of the class whose loans were
originated by the defendants and those whose loans were only
serviced.  Therefore, upholding the jury's $54 million verdict
against the defendants would be a manifest injustice.  Moreover,
the plaintiff has offered no evidence that he is a typical
representative of a class that includes borrowers whose loans
were only serviced by the defendants, nor has he offered
evidence as to how individual questions as to the contractual
status of the borrowers would not predominate if they were
properly considered at trial.  Accordingly, the late fee class
should be decertified.  Indeed, decertifying the class furthers
the interests of absent class members because it protects them
from being saddled with the fact that the plaintiff failed to

produce enough evidence to protect their interests at trial.
See Rector v. City & Cnty. of Denver, 348 F.3d 935, 949 (10th
Cir. 2003) (decertifying class "in order to protect the
interests of the absent class members").

    The defendants state in their motion papers that the Court
need reach their Rule 50(b) motion "only if" the Court denied
the decertification motion.  See Mem. in Supp. of Defs' Mot. for
J. as a Matter of Law, at 1 (No. 01cv5694, ECF No. 496).  At the
argument of the current motions, however, the defendants asked
the Court to rule on the alternative Rule 50(b) motion.  For
purposes of completeness, the Court will do so.  A Rule 50(b)
motion should only be granted when "there is such a complete
absence of evidence supporting the verdict that the jury's
verdict could only have been the result of sheer surmise and
conjecture."  Logan, 72 F.3d at 1022.  In this case, the
defendants would be entitled to judgment as a matter of law on
the claim on behalf of the Late Fee Class because of the
"complete absence of evidence" supporting a contractual
relationship between the members of the Late Fee Class and the
defendants.  Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.,
136 F.3d 276, 289-90 (2d Cir. 1998).  Accordingly, if the Court
were to reach the defendants' Rule 50(b) motion, that motion
would be granted.

**CONCLUSION**

The Court has considered all of the arguments of the parties. To the extent not specifically addressed above, the remaining arguments are either moot or without merit. For the reasons explained above, the plaintiffs' motion for a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure is **denied.** The defendants' motion to decertify the Late Fee Class pursuant to Rule 23(c)(1) of the Federal Rules of Civil Procedure is **granted.** The Clerk is directed to **close Docket Nos. 450, 466, 492, and 495.**


SO ORDERED.

Dated:  **May 29, 2015**
        **New York, New York**                  _____/s/_____
                                                     **John G. Koeltl**
                                             **United States District Judge**

62